# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                                    )
ESTATE OF MICHAEL HEISER, et al.,   )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )      Civil Action No. 00-2329 (RCL)
                                    )
ISLAMIC REPUBLIC OF IRAN, et al.,   )
                                    )
        Defendants.                 )
_____)
ESTATE OF MILLARD D. CAMPBELL, et al., )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )      Civil Action No. 01-2104 (RCL)
                                    )
ISLAMIC REPUBLIC OF IRAN, et al.,   )
                                    )
        Defendants.                 )
_____)
```

## MEMORANDUM OPINION

## BACKGROUND

These actions arise from the June 25, 1996 bombing at Khobar Towers, a residence on a United States military base in Dhahran, Saudi Arabia. The plaintiffs in this consolidated action are the family members and estates of 17 of the 19 servicemen killed in the attack. Plaintiffs allege that the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), the Iranian Islamic Revolutionary Guard Corp ("IRGC" or "the Pasdaran"), and "John Does 1-99" are liable for damages from the attack because they provided material support and

assistance to Hezbollah,[1] the terrorist organization that orchestrated and carried out the bombing.[2] Plaintiffs have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

## PROCEDURAL HISTORY

In their second amended complaints, plaintiffs named as defendants (1) the Islamic Republic of Iran; (2) the Iranian Ministry of Information and Security ("MOIS"); (3) the Iranian Islamic Revolutionary Guard Corps ("IRGC" or "the Pasdaran"); (4) and "John Does 1-99[.]" Second Amended Complaints, ¶1; see also *id.*, ¶¶ 24, 25, 27, 29.  Plaintiffs sought damages for wrongful death (Count I); survival action (Count II); "economic damages" (Count III); intentional infliction of emotional distress (Count IV); for plaintiffs Ibis S. Haun, Marie R. Campbell, Shyrl L. Johnson, Katie L. Marthaler and Dawn Woody, loss of consortium (Count V); solatium (Count VI); and "punitive damages" (Count VII).

Plaintiffs requested judgment in their favor against all of the defendants. In addition, the plaintiffs in Civil Action No. 00-2329 sought compensatory damages against all defendants in the amount of $890,000,000, "plus economic damages in an amount to be determined at trial for each of Decedents' Estates"; punitive damages against defendants MOIS, the IRGC and John Does 1-99 in the amount of $500,000,000; and reasonable costs, expenses and attorneys' fees.

---

[1] According to the Oxford English Dictionary, the term "Hezbollah" is synonymous with the terms "Hizbollah" and "Hizbullah," all of which are English transliterations of the Arabic term referring to the extremist Shiite Muslim group also known as the "Party of God."  *See* Oxford English Dictionary (2d ed. 1989).  Accordingly, to the extent that any of these terms are used within this opinion, they shall be used interchangeably.

[2] At other points during the case, plaintiffs sought redress for their losses from various other defendants who have since been dismissed from the case, namely Hezbollah and Osama Bin Laden.

The plaintiffs in Civil Action No. 01-2104 sought compensatory damages against all defendants in the amount of $3,660,000,000 "plus economic damages in an amount to be determined at trial for each of Decedents' Estates"; punitive damages against defendants MOIS, the IRGC and John Does 1-99 in the amount of $500,000,000; and reasonable costs, expenses and attorneys' fees.

On February 1, 2002, the court (Jackson, J.) consolidated the two civil actions, and in Civil Action No. 00-2329, granted the plaintiffs' motion for entry of default as to defendants Islamic Republic of Iran, MOIS and the IRGC. February 1, 2002 Order (Docket No. 9, Civil Action No. 00-2329) at 1.  On February 6, 2002, the Clerk entered a default in Civil Action No. 00-2329 against defendants Islamic Republic of Iran, MOIS and the IRGC. Default (Docket No. 10, Civil Action No. 00-2329).  On July 30, 2002, both actions were referred to Magistrate Judge Robinson for all purposes. (July 30, 2002 Order (Docket No. 11) at 1.)  On October 4, 2002, Magistrate Judge Robinson granted plaintiffs' motion in Civil Action No. 01-2104 for entry of default as to defendants Islamic Republic of Iran, MOIS and the IRGC.  (October 4, 2002 Order (Docket No. 11, Civil Action No. 01-2104) at 1.)  On October 8, 2002, the Clerk entered a default in Civil Action No. 01-2104 against defendants Islamic Republic of Iran, MOIS and the IRGC. Default (Docket No. 12, Civil Action No. 01-2104) at 1.  On March 14, 2003, plaintiffs moved for a continuance of the hearing on liability and damages. Plaintiffs' counsel represented that counsel "has learned that certain immediate family members of the soldiers killed in the Khobar Towers terrorist attack -- family members who have cognizable claims under the Foreign Sovereign Immunities Act ("FSIA") -- are not currently named as parties in these consolidated actions." (Motion for Continuance of Trial Date and Request for Scheduling Conference (Docket

No. 16) at 2.)  Counsel further represented that the firm "is in the process of identifying all such family members and anticipates filing amended complaints within the next several weeks." *Id.* Magistrate Judge Robinson granted plaintiffs' motion, and, in accordance with the request of plaintiffs' counsel, "tentatively" scheduled the hearing for "the period of December 1, 2003 to December 18, 2003[.]" (March 17, 2003 Order (Docket No. 17) at 1.)  Plaintiffs filed their second amended complaints on May 6, 2003.

Upon consideration of plaintiffs' motions to vacate their consent to proceed before a magistrate judge for all purposes and to clarify the purpose of the referral to a magistrate judge, the court re-referred the consolidated civil actions to Magistrate Judge Robinson "to hear and determine pretrial matters as permitted thereby, and pursuant to 28 U.S.C. § 636(b)(1)(B), to conduct hearings, and to submit proposed findings and recommendations for the disposition by the Court of any motion for judgment by default upon the evidence submitted in accordance with 28 U.S.C. § 1608(e)."  (Docket No. [20] at 1-2.)  The Court denied plaintiffs' motion for clarification of the referral.  (August 22, 2003 Order (Docket No. 25) at 1.)  On September 3, 2003, Magistrate Judge Robinson scheduled the hearing on liability and damages for December 1 through December 18, 2003.  (September 3, 2003 Order (Docket No. 26) at 1.)

Plaintiffs filed their pretrial statement on October 31, 2003  ((Docket No. 30).)  In accordance with Magistrate Judge Robinson's Final Pretrial Order (Docket No. 32), plaintiffs filed a memorandum regarding issues relevant to liability. See Supplemental Bench Memorandum on Liability Issues ("Memorandum on Liability") (Docket No. 33). In the memorandum, plaintiffs stated that they "do not expect to identify [Defendants] John Does 1-99 before the commencement of the trial[,]" and that "[a]ccordingly, Plaintiffs will not seek a

finding of liability against the co-conspirators John Does 1-99, who were named as defendants

when the complaints in this consolidated action were filed." (Memorandum on Liability at 9.)

On November 19, 2003, plaintiffs moved for entry of default against the Islamic Republic

of Iran, MOIS and the IRGC. (Plaintiffs' Motion for Entry of Default (Docket No. 38) at 1.) The

Court granted the motion. November 26, 2003 Order. (Docket No. 39, Civil Action No.

00-2329; Docket No. 32, Civil Action No. 01-2104.)

Plaintiffs examined witnesses and offered other evidence with respect to liability and

damages on December 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 16, 18 and 19, 2003. On December 19, 2003,

plaintiffs moved to voluntarily dismiss Defendants "John Does 1-99," and Magistrate Judge

Robinson granted the motion. (December 19, 2003 Tr. (Docket No. 128) at 69-70.) The

magistrate judge recessed the hearing until February 5, 2004, the earliest date that plaintiffs'

counsel, plaintiffs' witnesses and the court were be available to continue. Magistrate Judge

Robinson received further evidence on February 5, 6, 9 and 10, 2004.

During the recess in the evidentiary hearing a panel of the District of Columbia Circuit

decided *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004). Plaintiffs

asked that the hearing resume on February 5, 2004 as scheduled. On February 6, 2004, when the

schedule for the conclusion of the evidentiary hearing and for closing argument was addressed by

Magistrate Judge Robinson, counsel for plaintiffs asked that counsel's closing argument be

deferred until counsel filed Plaintiffs' proposed findings of fact and conclusions of law.

Magistrate Judge Robinson ordered that plaintiffs file their proposed findings and conclusions on

April 1, 2004, the date proposed by plaintiffs' counsel. Magistrate Judge Robinson scheduled

plaintiffs' closing argument for April 15, 2004, the date proposed by Plaintiffs' counsel. On

April 9, 2004, Magistrate Judge Robinson postponed the April 15 closing argument, intending to

order supplemental briefing of issues relevant to the liability of the remaining defendants.

In light of the D.C. Circuit's opinions in *Cicippio-Puleo* and *Acree v. Republic of Iraq*,[3]

plaintiffs moved to modify the magistrate judge's Final Pretrial Order, or in the alternative to file

third amended complaints so as to incorporate claims based in state law.  On August 4, 2004,

Magistrate Judge Robinson denied plaintiffs' Motion for Reconsideration; granted plaintiffs'

motion for leave to file third amended complaints; and ordered that plaintiffs file the third

amended complaints by August 9, 2004.  (Aug. 4, 2004 Order (Docket No. 103) at 2-3.)

Plaintiffs filed the third amended complaints on August 4, 2004.  Plaintiffs named as

defendants in the third amended complaints the Islamic Republic of Iran, the "Iranian Ministry of

Information and Security[,]" and the "Iranian Islamic Revolutionary Guard Corps[.]" Plaintiffs

again alleged that "[t]he Hizbollah terrorist organization is a creation and agent of the Islamic

Republic of Iran"; that "[i]n 1995, Hizbollah began plotting a terrorist attack against United

States interests in Saudi Arabia"; and that "[Hizbollah] ultimately detonated a bomb outside

Khobar Towers."  (Third Amended Complaints at 2.)  Plaintiffs allege that "[u]nder United

States law, the Islamic Republic of Iran --which funds, trains, and directs Hizbollah through the

Iranian Ministry of Information and Security and the Iranian Revolutionary Guard Corps-- is

responsible for this terrorist attack and for the murder of [Plaintiffs' decedents]."  *Id.*

### FINDINGS OF FACT[4]

---

[3] 370 F.3d 41 (D.C. Cir. 2004).

[4] A detailed discussion of the facts and circumstances associated with each individual
plaintiff will not be addressed in this section, but rather in the respective portions of this opinion
relating to the merits of each individual plaintiff's cause of action against the defendants.  *See*

1.      In June 1996, Master Sergeant Michael Heiser, Captain Leland Timothy Haun, Airman First-Class Justin R. Wood, Senior Airman Earl F. Cartrette, Jr., Airman First-Class Brian McVeigh, Sergeant Millard D. Campbell, Staff-Seageant Kevin J. Johnson, Airman First-Class Joseph E. Rimkus, Airman First-Class Brent E. Marthaler, Technical Sergeant Tranh ("Gus") Nguyen, Airman First-Class Joshua E. Woody, Airman First-Class Peter J. Morgera, Master Sergeant Kendall Kitson, Jr., Captain Christopher Adams, Airman First-Class Christopher Lester, Senior Airman Jeremy A. Taylor, and Technical Sergeant Patrick P. Fennig were citizens of the United States and members of the United States Air Force.  They were stationed in Dhahran, Saudi Arabia, and resided in the Khobar Towers.

2.      The United States military presence in Saudi Arabia was with the consent of that host country.  *Blais*, 2006 WL 2827372, *2 (D.D.C. Sept. 29, 2006) (Lamberth, J.).  It was part of a coalition of forces, primarily from the United States, Great Britain, and France, that was charged with monitoring Iraq's compliance with United Nations Security Council resolutions enforcing the cease-fire that had brought an end to the 1991 "Desert Storm" ejection of Iraqi occupying forces from Kuwait.  *Id.*

3.      The deployment of U.S. troops to the region was considered a peacetime deployment within a friendly host country.  *Id.*

4.      The seventeen decedents represented in this action were engaged in routine peace time operations while stationed in Saudi Arabia, and were charged with enforcing the "no fly zone" in southern Iraq.

5.      Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism

---

*infra* Conclusions of Law, Part VI.

pursuant to section 69(j) of the Export Administration Act of 1979 (50 U.S.C.A. §

2405(j)) continuously since January 19, 1984." *Flatow v. Islamic Republic of Iran*, 999

F. Supp.1, 11, (D.D.C. 1998) (Lamberth, J.).

6.    Defendant the IRGC is a non-traditional instrumentality of Iran.  It is the military arm of a

kind of shadow government answering directly to the Ayatollah and the mullahs who

hold power in Iran. It is similar to the Nazi party's SA organization prior to World War II.

The IRGC actively supports terrorism as a means of protecting the Islamic revolution that

brought the Ayatollah to power in 1979.  It has its own separate funding sources,

derived from confiscation of the assets of the former Shah of Iran in 1979, when the Shah

was deposed.  *Blais*, 2006 WL 2827372, at *2.

7.    The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed

the coalition forces charged with monitoring compliance with U.N. security council

resolutions.  *Id.* at *3.

*The Attack on the Khobar Towers*

8.    At approximately 10 minutes before 10 pm on June 25, 1996, a large gasoline tanker

truck pulled up alongside the perimeter wall of the Khobar Towers complex.  The driver

jumped out, ran into a waiting car that had pulled up near the truck, and sped off.  *Id.*

9.    Although security guards near the top of Building 131 started to give warnings about the

unusual vehicle location, the truck exploded with great force within about 15 minutes.

The investigation determined that the force of the explosion was the equivalent of 20,000

pounds of TNT.  The Defense Department said that it was the largest non-nuclear

explosion ever up to that time.  *Id.*

10.     The explosion sheared off the face of Building 131, where Paul Blais and his crewmates were housed, and reduced most of it to rubble.  Nineteen United States Air Force personnel were killed in the explosion, and hundreds of others were injured.  *Id.*

*Iranian Support and Sponsorship of the Attack*

11.     The attack was carried out by individuals recruited principally by a senior official of the IRGC, Brigadier General Ahmed Sharifi. Sharifi, who was the operational commander, planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria.  He provided the passports, the paperwork, and the funds for the individuals who carried out the attack.  *Id.*

12.     The truck bomb was assembled at a terrorist base in the Bekaa Valley which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah.  The individuals recruited to carry out the bombing referred to themselves as "Saudi Hezbollah," and they drove the truck bomb from its assembly point in the Bekaa Valley to Dhahran, Saudi Arabia.  *Id.*

13.     The terrorist attack on the Khobar Towers was approved by Ayatollah Khameini, the Supreme leader of Iran at the time.  It was also approved and supported by the Iranian Minister of Intelligence and Security ("MOIS") at the time, Ali Fallahian, who was involved in providing intelligence security support for the operation.  Fallahian's representative in Damascus, a man named Nurani, also provided support for the operation.  *Id.*

14.     Under Louis Freeh, the FBI conducted a massive and thorough investigation of the attack, using over 250 agents.  *Id.*

15.     Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment on

June 21, 2001, against 13 identified members of the pro-Iran Saudi Hezballah

organization.  The indictment's description of the plot to bomb the Khobar Towers

complex frequently refers to direction and assistance from Iranian government officials.

*Id.*

16.     In addition, as a result of this investigation, the FBI also obtained a great deal of

information linking the defendants to the bombing from interviews with six admitted

members of the Saudi Hezbollah organization, who were arrested by the Saudis shortly

after the bombing.  *Id.* at 11-30.  These six individuals admitted to the FBI their

complicity in the attack on the Khobar Towers, and admitted that senior officials in the

Iranian government provided them with funding, planning, training, sponsorship, and

travel necessary to carry out the attack on the Khobar Towers.   (Exh. 7 at 11, 13-14, 27;

*see also* Dec. 18, 2003 Tr. at 24-30.)  The six individuals also indicated that the selection

of the target and the authorization to proceed was done collectively by Iran, MOIS, and

IRGC, though the actual preparation and carrying out of the attack was done by the

IRGC.  (Dec. 18, 2003 Tr. at 25.)

17.     According to Director Freeh. the FBI obtained specific information from the six about

how each was recruited and trained by the Iranian government *in Iran* and Lebanon, and

how weapons were smuggled into Saudi Arabia from Iran through Syria and Jordan.  One

individual described in detail a meeting about the attack at which senior Iranian officials,

including members of the MOIS and IRGC, were present.  (Dec. 18, 2003 Tr. at 23.)

Several stated that IRGC directed, assisted, and oversaw the surveillance of the Khobar

Towers site, and that these surveillance reports were sent to IRGC officials for their review.  Another told the FBI that IRGC gave the six individuals a large amount of money for the specific purpose of planning and executing the Khobar Towers bombing.

18.     Louis Freeh has publicly and unequivocally stated his firm conclusion, based on evidence gathered by the FBI during their five-year investigation, that Iran was responsible for planning and supporting the Khobar Towers attack. *Blais* at *4.

19.     Dale Watson was formerly the deputy counterterrorism chief of the FBI in 1996, and subsequently became the section chief for all international terrorism in 1997.  Mr. Watson was responsible for day to day oversight of the FBI investigation of the Khobar Towers attack.  Mr. Watson has given sworn testimony that information uncovered in the investigation, "clearly pointed to the fact that there was Iran MOIS and IRGC involvement in the bombing." *Id.*

20.     Dr. Patrick Clawson testified as an expert in three areas: (1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy.  Dr. Clawson's expert opinion regarding the perpetrators of the Khobar Towers bombing is based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject. Exh. 9 at 62-63.

21.     Dr. Clawson testified that the government of Iran formed the Saudi Hezbollah organization.  *Id.* at 56.  He testified that the IRGC was responsible for providing military training to Hezbollah terrorists as to how to carry out a terrorist attack.  *Id.* at 28.  He also testified as to the defendants' state-sponsorship of terrorism, noting that at the time of the

Khobar Towers bombing, Iran spent an estimated amount of between $50 million and $150 million on terrorist activities.  Exh. 10 at 46.

22.     In light of all these facts, Dr. Clawson stated conclusively his opinion that the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction.  Exh. 9 at 67-68.

23.     Dr. Clawson's expert opinion is supported by Dr. Bruce Tefft, whose expert opinion this Court adopted in *Blais*.  Dr. Tefft was one of the founding members of the CIA's counterterrorism bureau in 1985.  He served in the CIA until 1995, and has continued to work as a consultant on terrorism since that time, including work as an unofficial adviser to the New York Police Department's counterterrorism and intelligence divisions.  He retains a top-secret security clearance in connection with his work.  He has been qualified as an expert witness in numerous other cases involving Iranian sponsorship of terrorism. He was qualified as an expert witness on terrorism in this case.  *Id.*

24.     Dr. Tefft expressed the opinion that defendants the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support.  He stated that there was "no question about it. It wouldn't have happened without Iranian support." *Id.*

25.     Dr. Tefft based his conclusion on publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time.  He relied on the public sources described above, as well as several others, which he described as authoritative and reliable, including congressional

testimony by Matthew Levitt, senior fellow and director of the Washington Institute's

Terrorism Studies Program, and articles published by the Federation of American

Scientists as well as the Free Muslims Coalition.  *Id.*

## CONCLUSIONS OF LAW

I.      *Jurisdiction*

In the United States, the Foreign Sovereign Immunities Act provides the sole basis for

asserting jurisdiction over foreign sovereigns.  *Argentine Republic v. Amerada Hess Shipping

Corp.*, 488 U.S. 428, 434-34 (1989).  Normally, a party may not bring an action for money

damages in U.S. courts against a foreign state.  28 U.S.C. § 1604.  The "state-sponsored

terrorism" exception, however, removes a foreign state's immunity to suits for money damages

brought in U.S. courts where plaintiffs are seeking damages against the foreign state for personal

injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage

taking, or the provision of material support or resources (as defined in section 2339A of title 18)

for such an act if such act or provision of material support is engaged by an official, employee, or

agent of such foreign state while acting within the scope of his or her office, employment or

agency."  28 U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under section 1605(a)(7), plaintiffs must

show that: (1) the foreign sovereign was designated by the State Department as a "state sponsor

of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and

(3) the foreign sovereign engaged in conduct that falls within the ambit of the statute.  *Prevatt v.

Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28, 2006).

Each of the requirements is met in this case.  First, defendant Iran has been designated a

state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time

of the attack. *See* 31 C.F.R. § 596.201 (2001); *Flatow*, 999 F. Supp. at 11, ¶ 19. Second, the

plaintiffs have described themselves as "the Estates and family members" of 17 of the 19

servicemen who were killed on June 25, 1996, after "Hizbollah terrorists detonated a 5,000

pound truck bomb outside of Khobar Towers, a United States military complex in Dhahran,

Saudi Arabia." Second Amended Complaint, at 3. Both the plaintiffs and the victims to which

they are related were United States nationals at the time the bombing occurred. Finally,

defendant Iran's support of an entity that committed an extrajudicial killing squarely falls within

the ambit of the statute. Defendants MOIS and the IRGC are considered to be a division of state

of Iran, and thus the same determinations apply to their conduct. *Roeder*, 333 F.3d at 234; *see

also Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (Bates, J.)

(analogizing the IRGC to the MOIS for purposes of liability, and concluding that both must be

treated as the state of Iran itself).

     Personal jurisdiction exists over a non-immune sovereign so long as service of process

has been made under section 1608 of the FSIA. *See Stern v. Islamic Republic of Iran*, 271 F.

Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). In this case, service of process has been made.

Accordingly, this Court has *in personam* jurisdiction over defendants Iran, MOIS, and IRGC.

## II.   *Legal Standard for FSIA Default Judgment*

     Under the Foreign Sovereign Immunities Act, "[n]o judgement by default shall be entered

by a court of the United States or of a state against a foreign state . . . unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e);

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542

U.S. 915 (2004).  In default judgment cases, plaintiffs may present evidence in the form of

affidavits.  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. Mar. 29, 2006)

(quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003)).

Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true.  *Campuzano*,

281 F. Supp. 2d at 268.  This Court accepts the uncontested evidence and testimony submitted by

plaintiffs as true in light of the fact that the defendants in this action have not objected to it or

even appeared in this action to contest it.

III.     *Magistrate Judge's Report and Recommendation of Proposed Findings of Fact and*
         *Conclusions of Law*

         A.       *Standard of Review of a Magistrate Judge's Proposed Findings and*
                  *Recommendation*

Under the Federal Magistrate's Act, "a judge may . . . designate a magistrate judge to

conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed

findings of fact and recommendations for the disposition."  28 U.S.C. § 636(b)(1)(B).  Once the

magistrate judge's proposed findings and recommendation are submitted to the court and copies

have been served on the parties, the parties may serve and file within ten days from receipt of

service written objections to any proposed finding or recommendations made within the

magistrate judge's report and recommendation. 28 U.S.C. § 636(b).  In reviewing the objections

made to the magistrate judge's report and recommendation, the district court judge shall make a

*de novo* review of the portions of the report and recommendation objected to by the parties.  *Id.*

Upon review, "[a] judge of the court may accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge."  *Id.*; *see also Roell v. Withrow*, 538

U.S. 583, 585 (2003) (noting that a district court is "free to do as it sees fit with [a] magistrate judge's recommendations" made under authority of 28 U.S.C. § 636(b)(1)).[5]  The district court "must not be a rubber stamp" of the magistrate judge's recommendations.  *Reese v. Meritor Automotive, Inc.*, 113 F. Supp. 2d 822, 824 (W.D.N.C. 2000) (quoting 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3070.2 (2006)).

     B.    *Magistrate Judge Robinson's Proposed Findings of Fact and Recommendation*

In her Report and Recommendation, Magistrate Judge Robinson recommended that plaintiffs' motion for default judgment be denied on the basis that plaintiffs had not presented evidence satisfactory to the Court of defendants' liability.  (Rep. and Reco. [129] 30.)  The magistrate judge proposed that "Plaintiffs failed to establish a nexus between the June 25, 1996 bombing and any action or decision of any of the Defendants in these consolidated actions."  *Id.* As a result, Magistrate Judge Robinson recommended that this Court find that plaintiffs failed to "[establish] [their] claim or right to relief by evidence that is satisfactory to the Court[.]" *Id.* (quoting *Haim v. Islamic Republic of Iran*, 2006 U.S. Dist. LEXIS 12816, at *3) (internal citation omitted).  The magistrate judge also discussed generally, but made no specific findings or

---

[5] Plaintiffs have requested pursuant to LCvR 72.3(c) and LCvR 78.1 that the Court hold a hearing on plaintiffs' objections to the magistrate judge's Report and Recommendation.  Pl. Obj. to Report and Recommendation, at 1.  Though the district court must consider any objections that have been made regarding the magistrate judge's proposed findings, the language of 28 U.S.C. § 636(b)(1) does not obligate the court to hold a hearing on those objections.  *See United States v. Raddatz*, 447 U.S. 667, 674-76 (1980).  Rather, by "providing for a '*de novo* determination' rather than *de novo* hearing [in the statutory language], Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *Id.* at 676.  Accordingly, to the extent that plaintiffs have objected to Magistrate Judge Robinson's Report and Recommendation to this Court, those objections have been considered and will be addressed within the purview of this written opinion, and not at a hearing before this Court.

recommendations concerning, two additional issues, namely: (1) whether plaintiffs, as members of the United States Air Force operating under peacetime rules of engagement, may qualify for recovery under the FSIA; and (2) whether an apparent conflict of interest existed with respect to plaintiffs' representation by DLA Piper Rudnick Gray Cary US LLP.[6]  (Rep. and Reco. [129] 15-17, 25-26.)

    Plaintiffs objected to the magistrate judge's finding as to the insufficiency of the evidence,[7] as well as to other portions of the report and recommendation.  (*See* Pl.'s Obj. to Report and Recommendation [130] 4-5.)   In addition to the objection as to the sufficiency of their evidence, plaintiffs objected to: (1) whether Magistrate Judge Robinson had jurisdiction to preside over an evidentiary hearing or to make a report and recommendation regarding default judgment; (2) the magistrate judge's discussion of whether plaintiffs, as members of the United States Air Force, could recover as noncombatants under peacetime rules of engagement at the time of their deaths; and (3) her discussion of an apparent conflict of interest with respect to plaintiffs' counsel.  (Pl.'s Obj. to Report and Recommendation [130] 5.)

    Having reviewed *de novo* the objected-to portions of Magistrate Judge Robinson's report and recommendation to this Court, and for the reasons set forth in this opinion, this Court makes the following determinations.  First, the Court finds that Magistrate Judge Robinson had proper

---

[6] Previously, Piper Rudnick LLP.

[7] As to the magistrate judge's finding and recommendation regarding the sufficiency of the evidence plaintiffs submitted, plaintiffs object on the grounds that the evidence presented is sufficient to find the defendants liable, that such evidence is "consistent with and virtually identical to–and even more direct than–liability evidence found to be sufficient as a matter of law in 23 other [FSIA] cases," and that this Court may take judicial notice of evidence, findings and conclusions entered by this Court in *Blais v. Islamic Republic of Iran*, 2006 WL 2827372, at *3-4 (D.D.C. Sept. 29, 2006) (Lamberth, J.).  (Pl.'s Obj. to Report and Recommendation [130] 4-5.)

jurisdiction to hear evidence and render a report and recommendation in this matter.  Second, the

Court finds that plaintiffs may properly recover under the FSIA as noncombatants under

peacetime rules of engagement.  Third, this Court finds that no conflict of interest presently

exists arising out of plaintiffs' representation by DLA Piper Rudnick Gray Cary US LLP.

Finally, the Court finds that plaintiffs have provided evidence satisfactory to this Court to

establish their claim or right to relief.  In light of the foregoing findings, judgment shall be

entered in favor of the plaintiffs and against the defendants.

IV.     *Analysis and Review of Objections to Magistrate Judge Robinson's Report and*
        *Recommendation*

        A.      *Plaintiff's Objection that Magistrate Judge Robinson Lacked Jurisdiction to Hear*
                *Evidence and Render an Opinion in this Matter*

        Plaintiffs objected to the magistrate judge's report and recommendation in its entirety on

the grounds that she lacked jurisdiction to conduct an evidentiary hearing or issue a

recommendation on plaintiffs' motion for default judgment against the defendants.  At the heart

of their objections is the notion that appointment of a magistrate judge in lieu of an Article III

Judge is unauthorized by the Magistrates Act and might run afoul of the parties' due process and

Article III rights under the U.S. Constitution.[8]

        Plaintiffs' objection is unfounded.  As noted above,[9] such an appointment is clearly

authorized by the Magistrates Act.  The plain language of 28 U.S.C. § 636(b)(1)(B) clearly states

_____

        [8] Plaintiffs chief concern is that any final judgment might be collaterally attacked by
defendants on these grounds.

        [9] *See supra* Part III.A.

-18-

that a district court "may . . . designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition." 28 U.S.C. § 636(b)(1)(B).  Additionally, the Supreme Court held that this statute "strikes the proper balance between the demands of due process and the constraints of Article III." *Raddatz*, 447 U.S. at 683-84.  Delegation under this provision does not run afoul of Article III "so long as the ultimate decision is made by the district court." *Raddatz*, 447 U.S. at 683.  Moreover, the parties' due process rights are protected by the fact that "the district court judge alone acts as the ultimate decisionmaker, [and] the statute grants the judge the broad discretion to accept, reject, or modify the magistrate's proposed findings." *Id.* at 680.  Here, Magistrate Judge Robinson heard evidence from the parties, and rendered a report and recommendation to this Court, pursuant to 28 U.S.C. § 636(b), and this Court alone is responsible for rendering the ultimate decision as to the merits of this case.  Accordingly, this Court finds that neither of the parties' due process or Article III rights were violated by appointing Magistrate Judge Robinson to conduct an evidentiary hearing.  This Court finds that Magistrate Judge Robinson had proper jurisdiction under 28 U.S.C. § 636(b) to conduct an evidentiary hearing and submit a report and recommendation thereon.

      B.     *Plaintiffs' Ability to Recover Under State-Sponsored Terrorism Exception to the FSIA*

Magistrate Judge Robinson raised in her report and recommendation the issue of whether plaintiffs, as relatives of active servicemen on duty at the time of their deaths, were able to recover for damages arising from those servicemen's deaths.  Plaintiffs argued that they are not excluded under the state-sponsored terrorism exception to the FSIA from recovering.

Previously, this Court has awarded damages to United States service members who were injured or killed as a result of state-sponsored terrorist attacks and their families.[10]  In *Peterson*, this Court held that a service member and his or her family may recover under the state-sponsored terrorism exception to the FSIA only if the service member was a non-combatant not engaged in military hostilities.  There, the Court established a two-prong test to determine whether a military service member was a non-combatant.  Under this test, a service member is deemed a non-combatant if he or she was: (1) engaged in a peacekeeping mission; and (2) operating under peacetime rules of engagement.  *Peterson*, 264 F. Supp. 2d at 60.

Here, plaintiffs have conclusively demonstrated that the servicemen who died at the Khobar Towers satisfy the two-prong test under *Peterson*.  Colonel Douglas Cochran testified on December 2, 2003, that the service members who died at the Khobar Towers were deployed as a part of a peacekeeping mission sanctioned by United Nations Resolutions.  (Dec. 12, 2003 Tr. at 12.)  He also stated that the decedents were operating under standing rules of engagement,[11] under which the decedents did not have the right to participate directly in hostilities.  *Id.* at 10-12, 15.  The decedents were not allowed to attack unless attacked or in peril of immediate attack resulting in death or serious bodily harm.  *Id.* at 15.  Moreover, as noted by the Reports of Casualty and personnel records for each of the decedents in this case, the cause of the service

---

[10] *See, e.g.*, *Blais*, 2006 WL 2827372 (D.D.C. Sept. 29, 2006) (Lamberth, J.); *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152 (D.D.C. Mar. 27, 2006) (Lamberth, J.); *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261 (D.D.C. 2005) (Bates, J.); *Salzar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) (Bates, J.); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) (Lamberth, J.).

[11] According to Col. Cochran, the term "standing rules of engagement" is synonymous with the term "peacetime rules of engagement."  (Dec. 2, 2003 Tr. at 15.)

members' deaths was indisputably the result of a terrorist bombing, and not a result of combat

hostilities.  (Dec. 1, 2003 Tr. at 29; *see also* Dec. 2, 2003 Tr. at 35-38.)  In light of the above-

mentioned evidence, this Court finds that plaintiffs have satisfied the two-prong test under

*Peterson*.  Therefore, this Court finds that plaintiffs are not excluded from recovering under the

state-sponsored terrorism exception to the FSIA.

> C.      *Apparent Conflict of Interest*

Next, in her discussion of the procedural history of the case, the magistrate judge

discussed an apparent conflict of interest resulting from plaintiffs' representation in this matter

by DLA Piper Rudnick Gray Cary US LLP (the "Firm"), and the Firm's representation of the

Government of Sudan ("Sudan"), the defendant in the separate matter of *Owens v. Republic of*

*Sudan* (Civ. Action No. 01-2244 (JDB)).[12]  The magistrate judge was concerned that the Firm's

representation in the *Owens* matter created a conflict of interest because defendants Iran, IRGC,

and MOIS were co-defendants with Sudan in *Owens*, and because the Firm's representation of

Sudan would cause the Firm to make an argument in *Owens* that was directly contrary to the

arguments it made on behalf of plaintiffs in this matter.  Plaintiffs raise an objection and allege

that no conflict of interest (apparent or otherwise) exists in this matter.

Under District of Columbia Rules of Professional Conduct 1.7, unless a lawyer obtains

informed consent from both clients, a lawyer shall not represent one client in a matter if the

position taken by that client is adverse to the position taken by another client.  D.C. Rule of Prof.

Conduct 1.7.  As the District of Columbia Bar Legal Ethics Committee has noted, "the lawyer

---

[12] The magistrate judge had the parties brief the issue of whether a conflict of interest existed.

may not, without informed consent of all parties, accept simultaneous representation of both clients where such representation creates a substantial risk that representation of one client will adversely effect the representation of the other." District of Columbia Bar Legal Ethics Committee Formal Op. 265 (1996).

Upon a review of the pleadings and evidence in this matter, the Court finds that no conflict of interest exists. First, the Firm's prior representation in another matter of a co-defendant to the defendants in this matter does not create a conflict of interest. Though the defendants in this matter were co-defendants along with Sudan in the *Owens* matter, the Firm has stated that it never represented Iran, MOIS, or IRGC in the *Owens* matter or any other matter. (Pl.'s Resp. to Apr. 16, 2004 Court Order 1.) Moreover, the Firm has withdrawn completely from representing Sudan in *Owens* as Rule 1.7 states it must in such situations.

Next, the Court is satisfied that no apparent conflict exists that would preclude the Firm from continuing to represent plaintiffs' interests in this matter. As the Firm's pleadings to the magistrate judge plainly show, upon discovering that an apparent conflict had arisen, the Firm took immediate steps to eliminate it. The Co-Chair of the Firm's Professional Responsibility function instructed the partners representing the Government of Sudan that they were not to continue to represent Sudan in light of the fact that such representation would force the Firm to argue conflicting positions in both matters. Unbeknownst to the heads of the Firm, however, the specific attorneys responsible for representing Sudan disregarded the partners' instruction, and continued to represent Sudan, entering filings on their behalf. Still, when the Firm's management discovered the actions of events, it promptly sought withdrawal as counsel for Sudan in the *Owens* matter, notified the D.C. Bar Counsel and this Court's Committee on

Grievances of the sequence of events, and wrote off fees and expenses otherwise due from Sudan as a former client.  In addition, the attorneys who disregarded the Firm's instructions to cease representation have left the Firm.[13]

Finally, this Court is persuaded that no conflict of interest exists by considering the manner in which the magistrate judge ultimately dealt with the issue.  After the Firm issued its responses on the conflict issue to Magistrate Judge Robinson's Orders dated April 13 and April 16, 2004,[14] the magistrate judge proceeded forth with the remaining portions of the trial, and never issued a ruling on whether a conflict existed as a result of the Firm's representation of plaintiffs in this matter, and their representation of Sudan in *Owens*.  Moreover, in her report and recommendation to this Court, the magistrate judge included the "apparent conflict of interest" issue solely within her discussion of the case's procedural history.  She neither issued nor recommended within her report and recommendation any finding that a conflict existed.  Surely, were the magistrate judge of the opinion that a conflict of interest did exist, she would have taken more substantive steps to ensure that such a representation would not continue.

In light of these facts, the Court finds that no conflict of interest exists arising from the Firm's representation of plaintiffs in this matter and Sudan in the *Owens* case.

D.      *Sufficiency of Liability Evidence Provided by Plaintiffs*

Magistrate Judge Robinson recommended that plaintiffs' motion for default judgment be

---

[13] Of additional import is the fact that the former attorneys at the Firm who represented Sudan–and who thereby placed the Firm in the position of a potential conflict of interest–did not take part in the Firm's work related to the present matter before the Court.

[14] *See* Docket Nos. [77] and [79], respectively (ordering plaintiffs to file memoranda addressing the conflict of interest issue).

denied on the grounds that she found plaintiffs had not submitted evidence satisfactory to the

Court of defendants' liability.  She found Director Freeh and Mr. Watson's respective testimony

to be unsatisfactory on the grounds that each witness' testimony was largely conclusory, and that

each was testifying in his personal capacity and not as a representative of the FBI.  She also

found that the testimony given by Doctor Clawson was conclusory as to defendants' liability, and

failed to provide evidence of the link between Saudi Hezbollah, Hezbollah, and Iran.

Plaintiffs objected to these findings on three grounds.  They argued that the evidence

submitted is legally sufficient to sustain a finding of liability against defendants.  They also argue

that the evidence presented is consistent with, nearly identical to and–in some instances–more

direct than liability evidence found by this Court to be sufficient as a matter of law in prior cases

arising under the state-sponsor of terrorism exception to the FSIA.  Finally, plaintiffs argue that

the Court may take judicial notice of the facts and findings in *Blais v. Islamic Republic of Iran*

2006 WL 2827372 (D.D.C. Sept. 29, 2006) (Lamberth, J.), a case arising out of the same attack

on the Khobar Towers.  They argue that the facts from *Blais*, combined with the evidence

submitted by plaintiffs in this matter, support a finding that defendants are liable in this matter.

### 1.    Testimony of Director Louis J. Freeh and Dale L. Watson

To establish the defendant's liability for the bombing, plaintiffs offered the testimony of

Louis J. Freeh, a former Director at the FBI, and Dale L. Watson, an agent and investigator at the

FBI and CIA with over 20 years experience in the counterterrorism and counterintelligence

fields.  Over the course of the approximately four year investigation into the Khobar Towers

bombing, both Freeh and Watson "reviewed all reports prepared by the FBI investigators, and

spoke directly with FBI agents and Saudi officials" all of which established a link between the

defendants and the bombing.  All of the information conveyed to both Freeh and Watson was communicated by FBI agents who were on the scene.

Based on this knowledge of the investigation, Mr. Freeh testified at the evidentiary hearing before the magistrate judge as to the defendants' involvement in the Khobar Towers attack.[15]  In his testimony, Director Freeh testified that, during the course of the investigation into the explosion, it was concluded that the Khobar Towers explosion was the cause of a fertilizer-based explosive device.  (Dec. 18, 2003 Tr. at 10.)  It was also concluded, Director Freeh testified, that the bombing was an act of terrorism.  *Id.*

According to Director Freeh, the FBI also obtained a great deal of information linking the defendants to the bombing from interviews with six individuals arrested by the Saudis shortly after the bombing.  *Id.* at 11-30.  These six individuals, who were members of the Saudi Hezbollah organization, admitted to the FBI their complicity in the attack on the Khobar Towers.  Exh. 7 at 11, 13-14, 27.  The six individuals admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers.  (*Id.* at 13-14; *see also* Dec. 18, 2003 Tr. at 24-30.)  The six individuals also indicated that the selection of the target and the authorization to proceed was done collectively by Iran, MOIS, and IRGC, though the actual preparation and carrying out

---

[15] Mr. Freeh's testimony mirrors the testimony he provided at a Joint Hearing before the United States House of Representatives Permanent Select Committee on Intelligence and the United States Senate Select Committee on Intelligence, in which he testified under oath as to the defendants' involvement in sanctioning, funding and directing the Khobar Towers attack.  A transcript of this testimony was admitted into evidence as Plaintiffs' Exhibit 24.  *See also* Pl.'s Exh. 25 (May 20, 2003, *Wall Street Journal* article written by Mr. Freeh in which Mr. Freeh indicated that the FBI's investigation indicated Iran, IRGC, and MOIS's involvement in funding and coordinating the attack on the Khobar Towers).

of the attack was done by the IRGC.  (Dec. 18, 2003 Tr. at 25.)

More specifically, Mr. Freeh testified, the FBI obtained specific information from the six about how each was recruited and trained by the Iranian government *in Iran* and Lebanon, and how weapons were smuggled into Saudi Arabia from Iran through Syria and Jordan.  One individual described in detail a meeting about the attack at which senior Iranian officials, including members of the MOIS and IRGC, were present.  (Dec. 18, 2003 Tr. at 23.)  Several stated that IRGC directed, assisted, and oversaw the surveillance of the Khobar Towers site, and that these surveillance reports were sent to IRGC officials for their review.  Another told the FBI that IRGC gave the six individuals a large amount of money for the specific purpose of planning and executing the Khobar Towers bombing.

Adding credence to Mr. Freeh's testimony is the reliability of the information he relied on in linking the defendants with the attack.  First, Director Freeh testified that the information obtained from the six individuals was communicated to the FBI on more than one occasion.  Second, there was a great deal of cross-corroboration among the individuals' stories, even when each was interviewed by the FBI separately.  Third, he testified that the material portions of each of the individuals' accounts of the bombing did not contradict.  Fourth, and perhaps most importantly, in many instances the FBI was able to corroborate independently the statements made by the six individuals.

As a result of this information and his direct participation in the four year investigation into the bombing, Director Freeh testified that it was his ultimate opinion that the bombing was the result of a terrorist attack by Saudi Hezbollah, organized and sponsored by the defendants in this case: Iran, MOIS, and IRGC.

Mr. Watson, who was also an active member in the investigation into the Khobar Towers bombing, testified similarly to Director Freeh.  According to Mr. Watson, the bases for his opinion were the direct conversations with the six Saudi Hezbollah members, the corroborating facts discovered from their confessions, his historical knowledge and public record of the Hezbollah organization and statements proffered in an indictment filed in the Eastern District of Virginia.  (Dec. 18, 2003 Tr. at 52, 63.)  All of this information was information Mr. Watson gleaned as a result either of his own personal research or his involvement in the Khobar Towers bombing investigation.  Most importantly, Mr. Watson reached the same conclusion as Director Freeh that the bombing was the result of a terrorist attack by Saudi Hezbollah members, organized and sponsored by the defendants.

> 2.   *Dr. Clawson's Expert Testimony as to Involvement by Iran, IRGC, and MOIS*

Plaintiffs also relied upon the testimony of Dr. Patrick Clawson to establish a more complete picture as to the involvement of Iran, MOIS, and IRGC in helping carry out the attack on the Khobar Towers.  At trial, Dr. Clawson testified as an expert in three areas: (1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy.  Dr. Clawson's expert opinion regarding the perpetrators of the Khobar Towers bombing is based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject.  Exh. 9 at 62-63.

Dr. Clawson testified that the government of Iran formed the Saudi Hezbollah organization.  *Id.* at 56.  He testified that the IRGC was responsible for providing military

training to Hezbollah terrorists as to how to carry out a terrorist attack. *Id.* at 28. He also testified as to the defendants' state-sponsorship of terrorism, noting that at the time of the Khobar Towers bombing, Iran spent an estimated amount of between $50 million and $150 million on terrorist activities. Exh. 10 at 46. In light of all these facts, Dr. Clawson stated conclusively his opinion that the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction. Exh. 9 at 67-68.

        3.     *Judicial Notice of Findings and Conclusions in* Blais v. Islamic Republic of Iran[16]

      Plaintiffs argue that the Court should take judicial notice of the facts and conclusions made by this Court in its recent consideration of the matter of *Blais v. Islamic Republic of Iran*, an action brought against the same defendants for damages resulting from the same 1996 attack on the Khobar Towers. As has recently been noted in a FSIA case within this Circuit, "[a] court may take judicial notice of related proceedings and records in cases before the same court." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (Bates, J.). As Judge Bates noted in *Salazar*, under Federal Rules of Evidence 201(e), a "party opposing judicial notice of a given fact must be afforded an opportunity to be heard . . . and may certainly make recognized objections to the admissibility of such judicially noticed facts as evidence in the case . . . ." *Id.* (internal citations omitted). Defendants in this case have failed to make such objections, or even make an appearance at all before this Court. Accordingly, in addition to the unopposed trial submissions made by plaintiffs in this matter, this Court will take judicial notice of the

---

[16] *Blais v. Islamic Republic of Iran*, 2006 WL 2827372 (D.D.C. Sept. 29, 2006) (Lamberth, J.).

findings made in *Blais* as to the defendants involvement in and liability for the Khobar Towers bombing.

In *Blais*, this Court found as fact that the Khobar Towers attack was carried out by individuals who referred to themselves as the group "Saudi Hezbollah."  *Blais*, 2006 WL 2827372, at *3.  The Court found that these individuals were recruited by Brigadier General Ahmed Sharifi, a senior official of the IRGC.  *Id.*  Brigadier General Sharifi planned the operation, and recruited the individual members of Saudi Hezbollah at the Iranian Embassy in Damascus, Syria.  *Id.*  He was also responsible for providing the funds, passports, and paperwork for the individuals who carried out the attack.  *Id.*  In addition to acknowledging General Sharifi's involvement in the attack, this Court found that the attack was approved by the Ayatollah Khameini, Iran's Supreme Leader at the time, and was approved and supported by Ali Fallahian, the head of MOIS at the time.  *Id.*[17]

This Court heard testimony from and accepted documentary evidence considered by Dr. Bruce Tefft.[18]  Dr. Tefft expressed his opinion "that defendants the Islamic Republic of Iran and

---

[17] This Court also found that Mr. Fallahian's representative in Damascus, Syria, a man by the name of Nurani, provided additional direct support for the operation.  *Id.*

[18] As noted in Finding of Fact #23 in the *Blais* opinion:
> Dr. Bruce Tefft was one of the founding members of the CIA's counterterrorism bureau in 1985. He served in the CIA until 1995, and has continued to work as a consultant on terrorism since that time, including work as an unofficial adviser to the New York Police Department's counterterrorism and intelligence divisions. *Id.* He retains a top-secret security clearance in connection with his work. *Id.* He has been qualified as an expert witness in numerous other cases involving Iranian sponsorship of terrorism. Ex. 1 at 3. He was qualified as an expert witness on terrorism in this case.

*Blais*, 2006 WL 2827372, at *4.

the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support." *Blais*, 2006 WL 2827372, at *4. Dr. Tefft's testimony and the evidence accompanying his testimony are consistent with the testimony and evidence from *Blais*, including testimony made by Mr. Freeh. In fact, Dr. Tefft not only relied upon the conclusions put forth by Messrs. Freeh and Watson in forming his own opinion in this matter, but Dr. Tefft stated that he agreed with their conclusions regarding the connection between Iran and Saudi Hezbollah in bringing about the bombing on the Khobar Towers. When asked as to the defendants' involvement in the attack, Dr. Tefft stated that there was "'no question about it. It wouldn't have happened without Iranian support..'" *Id.*

Finally, this Court considered written testimony from both former FBI Director Louis Freeh and former Deputy Counterterrorism Chief Dale Watson. In his written statement, Director Freeh stated that, based upon his involvement in the FBI's five year investigation into the attack on the Khobar Towers, Iran was responsible for supporting and funding the attack. *Id.* Mr. Watson likewise stated unequivocally that, based upon information uncovered in the investigation into the attack,[19] there was Iranian, MOIS, and IRGC involvement in the bombing. *Id.* As here, the Court found the conclusions of Messrs. Freeh and Watson in *Blais* to be amply reliable and probative as to the question of the defendants' involvement in the Khobar Towers bombing.

    4.    *Conclusion*

Upon *de novo* review of the evidence, the Court is convinced that the evidence is sufficiently satisfactory to establish liability. First, contrary to the magistrate judge's

---

[19] An investigation for which Watson was responsible for day-to-day oversight. *Id.*

recommendation, the testimony by Freeh and Watson is not conclusory because the asserted

statements made by Freeh and Watson do not lack supporting evidence.  Director Freeh and Mr.

Watson based their testimony upon their four year direct involvement in the investigation into the

bombing, and their extensive years of experience in the counterintelligence and counterterrorism

fields.  Throughout this time, Messrs. Freeh and Watson, and the FBI agents they directly

supervised, uncovered and synthesized a great deal of information about the attack on Khobar

Towers and its perpetrators.  The facts unearthed by this investigation led them to the six

captured participants in the bombing, each of whom implicated the defendants as having

organized, funded, and supported the attack.  Accordingly, the Court finds that the facts testified

to by Freeh and Watson were supported by more than a sufficient basis for the witnesses'

conclusions that Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing carried

out by Saudi Hezbollah.

The Court also fails to see the rationale behind Magistrate Judge Robinson's conclusion

that the testimony offered by Freeh and Watson was somehow less credible because it was made

in their individual capacities, and not on behalf of the FBI for whom they were no longer

employed.  The reliability of a witness' testimony should not and indeed does not hinge solely

upon that person's employment with a particular organization.  Rather, the reliability and

credibility of a witness' testimony is determined by considering a myriad of factors including,

*inter alia*, the witness' demeanor, the ability of the witness to observe the information about

which he is testifying, whether the testimony is corroborated by other facts introduced into

evidence, as well as the witness' prior experience.

Applying these factors to the testimony of Messrs. Freeh and Watson, this Court finds

their testimony to be undeniably credible and reliable. Each was directly involved in the investigation into the Khobar Towers bombing, and was personally familiar with the results from that investigation. This is bolstered by the fact that Freeh and Watson occupied leadership positions in overseeing the entirety of the investigation into the bombing. Such positions would undoubtedly place Freeh and Watson in the best possible position to assess *all* the information about the attack and make a logical conclusion as to the cause and perpetrators of the attack. In addition, their testimony was consistent with each other, with the testimony by Dr. Clawson, and with information available in the public record. Moreover, this Court has previously relied upon Freeh and Watson's conclusions as to the involvement of Iran, IRGC, and MOIS in the Khobar Towers attack, and sees no reason to discount the credence of their testimony as conclusive on the grounds that they are not currently employed by the FBI. *See Blais v. Islamic Republic of Iran*, 2006 WL 2827372, at *3-4 (D.D.C. Sept. 29, 2006) (Lamberth, J.) (finding as fact both Mr. Freeh and Mr. Watson's conclusion as to the involvement of Iran, IRGC, and MOIS in the Khobar Towers bombing).

The fact that neither testified about the attack as agents of the FBI does not nullify the credibility of their statements. Messrs. Freeh and Watson's intricate involvement with the investigation into the Khobar Towers bombing while they were with the FBI provides more than an adequate basis for their testimony and the conclusions each drew therein as to the perpetrators of the attack.

The Court also disagrees with the magistrate judge's recommendation that Dr. Clawson's testimony, whether evaluated alone or in conjunction with the testimony by Freeh and Watson, was unsatisfactory to establish liability. To the contrary–Dr. Clawson is a renowned scholar of

Middle Eastern politics, who has studied and written about Iran for years.  In over 20 cases, Dr.

Clawson has repeatedly provided this Court with reliable and credible testimony regarding the

involvement of Iran, MOIS, and IRGC in sponsoring and organizing acts of terrorism carried out

against citizens of the United States.[20]  The Court sees no reason to deviate from the judges in

prior cases who found Dr. Clawson's testimony to be satisfactorily reliable.

Accordingly, having considered the evidence and testimony admitted at trial in the

present case, this Court finds that plaintiffs have met their burden under the state-sponsored

terrorism exception of the FSIA by establishing their right to relief "by evidence that is

satisfactory to the Court[.]"  The totality of the evidence at trial, combined with the findings and

conclusions entered by this Court in *Blais*, firmly establishes that "the Khobar Towers bombing

was planned, funded, and sponsored by senior leadership in the government of the Islamic

Republic of Iran; the IRGC had the responsibility and worked with Saudi Hizbollah to execute

the plan, and the MOIS participated in the planning and funding of the attack."  Proposed

Findings and Conclusions at 9, ¶ 28.

V.      *Liability*

A.      *Proper Causes of Action Under the FSIA*

Once a foreign state's immunity has been lifted under Section 1605 and jurisdiction is

found to be proper, Section 1606 provides that "the foreign state shall be liable in the same

---

[20] *See, e.g.*, *Greenbaum v. Islamic Republic of Iran*, 2006 WL 2374241 (D.D.C. Aug. 10, 2006) (Lamberth, J.); *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152 (D.D.C. Mar. 27, 2006) (Lamberth, J.); *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56 (D.D.C. Mar. 24, 2006) (Lamberth, J.); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 2286 (D.D.C. 2003) (Lamberth, J.); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002) (Lamberth, J.).

manner and to the same extent as a private individual under like circumstances." 28 U.S.C. §
1606.  Section 1606 acts as a "pass-through" to substantive causes of action against private
individuals that may exist in federal, state or international law.  *Dammarell v. Islamic Republic of
Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32
(D.D.C. Mar. 29, 2005) (Bates, J.) [hereinafter *Dammarell II*].

 In this case, state law provides a basis for liability.  First, the law of the United States
applies rather than the law of the place of the tort or any other foreign law because the United
States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks
on United States citizens.  *See Dammarell II*, 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS
5343, at *63.

 B. *Applicable State Law Governing Causes of Action*

 Having established that the laws of the United States apply in this action, the Court must
determine the applicable state law to govern the action.  As the forum state, District of Columbia
choice of law rules apply to determine which state's law shall apply.  Under District of Columbia
choice of law rules, courts employ a modified government interest analysis under which they
"evaluate the governmental policies underlying the applicable laws and determine which
jurisdiction's policy would be most advanced by having its law applied to the facts of the case
under review."  *Hercules & Co. V. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations
and internal quotations omitted).  Generally, application of this governmental interest test points
to the law of *each* plaintiff's domicile at the time of the attack as having the greatest interest in
providing redress to its citizens.  *See Dammarell II*, 2005 WL 756090, at *20-21, 2005 U.S. Dist.
LEXIS 5343, at *66-67 (citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 402(3)

-34-

(1987)).

Plaintiffs' claims involve consideration of the law of thirteen different states. The estates and surviving family members of persons killed in the bombing have asserted wrongful death claims and intentional infliction of emotional distress claims. In order to avoid repetition, the discussion will be organized by state, with an initial overview of each state's law followed by a discussion of each plaintiff's asserted claims under those laws.

C.      *Vicarious Liability*

The basis of defendants' liability is that they provided material support and resources to Saudi Hezbollah, which personally completed the attack. One may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement. This Court finds that civil conspiracy provides a basis of liability for Iran, MOIS, and IRGC, and accordingly declines to reach the issue of whether they might also be liable on the basis of aiding and abetting and/or inducement.

The doctrine of civil conspiracy is recognized under the laws of each of the states each claimant has brought an action.[21]   Though each state has its own particular means of describing

---

[21] *Rusheen v. Cohen*, 128 P.3d 713, 722 (Cal. 2006) ("The elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design."); *Walters v. Blankenship*, 931 So.2d 137 (Fla. Dist. Ct. App. Apr. 28, 2006) (finding that a civil conspiracy exists under Florida law where there is "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy"); *Sims v. Beamer*, 757 N.E.2d 1021 (Ind. Ct. App. 2001) ("'Civil conspiracy' consists of a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means."); *Sullivan v. Wallace*, 859 So.2d 245, 248 (La. App. Ct. 2003) ("To recover under a civil conspiracy theory of liability, the plaintiff must prove that an agreement existed to commit an illegal or tortious act which resulted in plaintiff's injury."); *Harding v. Ohio Cas. Ins. Co. of*

civil conspiracy, upon inspection of each state's laws the elements of civil conspiracy are met in each state if it can be demonstrated that: (1) there is an agreement between two or more persons or entities; (2) to do an unlawful act, or an otherwise lawful act by unlawful means; (3) there was an overt act committed in furtherance of this unlawful agreement; and (4) damages were incurred by the plaintiff as a proximate result of the actions taken pursuant to the conspiracy.[22]

In this case, the elements of civil conspiracy between Iran, MOIS, the IRGC and Saudi Hezbollah have been satisfied.  As this Court has previously held, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks."  *Flatow*, 999 F. Supp. At

_____

*Hamilton, Ohio*, 230 Minn. 327, 41 N.W.2d 818, 824 (Minn. 1950) ("A conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means.") (quoting *Dairy Region Land Co. v. Paulson*, 199 N.W. 398 (Minn. 1924); *In re Appeal of Armaganian*, 784 A.2d 1185, 1189 (N.H. 2001) ("[U]nder New Hampshire law, the elements of a civil conspiracy are: "(1) two or more persons ···; (2) an object to be accomplished (i.e., an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.") (quoting *Jay Edwards, Inc. v. Baker*, 534 A.2d 706, 709 (N.H. 1987)); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157 (S.D.N.Y. 1998) ("Elements of a civil conspiracy under New York law are (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage.");  *Boyd v. Drum*, 501 S.E.2d 91, 96 (N.C. Ct. App. 1998) ("A civil conspiracy claim consists of: (1) an agreement between two or more persons; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) which agreement resulted in injury to the plaintiff."); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874 (S.D. Ohio 2002) ("Under Ohio law, the tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."); *Jenkins v. Entery Corp.*, 2006 WL 488580 (Tex. App. Corpus Christi 2006), reh'g overruled, (Apr. 7, 2006) ("Elements of a civil conspiracy claim include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."); *Onderdonk v. Lamb*, 255 N.W.2d 507, 510 (Kan. 1977) ("To state a cause of action for civil conspiracy, the complaint must allege: (1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts.").

[22] *See supra* note 21.

27.  It is undisputed that Saudi Hezbollah committed the attack on the Khobar Towers.  It has

been established by evidence satisfactory to this Court that Saudi Hezbollah and defendants Iran,

MOIS and the IRGC conspired to commit the terrorist attack on the Khobar Towers.[23]  The

evidence elicited from the FBI's investigation and interview of the six detained members of

Saudi Hezbollah shows that senior Iranian, MOIS and IRGC officials participated in the planning

of, and provided material support and resources to Saudi Hezbollah for the attack on the Khobar

Towers.  The evidence also shows that the defendants also provided money, training and travel

documents to Saudi Hezbollah members in order to facilitate the attacks.  Moreover, the sheer

gravity and nature of the attack demonstrate the defendants' unlawful intent to inflict severe

emotional distress upon the American servicemen as well as their close relatives.  The

defendants' acts of financing, training and providing travel documents ably satisfy the overt act

requirement for civil conspiracy.  Finally, as will be discussed below, the plaintiffs in this action

incurred damages resulting from the deaths caused by the conspiracy.  Accordingly, the elements

of civil conspiracy are established between Saudi Hezbollah and the defendants Iran, MOIS and

the IRGC.

     D.     *Cause of Death*

     Thomas R. Parsons, M.D., an associate medical examiner, was received by the Court as

an expert in the field of forensic pathology. (Feb. 9, 2004 A.M. Tr. at 82-83; Ex. 232.)  On June

25, 1996, Dr. Parsons was on active duty as a major in the United States  Air Force.  He was a

medical examiner with the Armed Forces Institute of Pathology ("AFIP").  Dr. Parsons first

---

[23] This Court also found in *Blais* that "Saudi Hezbollah, Iran, MOIS and the IRGC
reached an understanding to do an unlawful act, namely the murder and maiming of American
servicemen."

learned of the June 25, 1996 bombing at Khobar Towers in Dharan, Saudi Arabia on June 26,

1996.  Dr. Parsons and three other medical examiners performed the autopsies of the 19 officers

and airman killed in the Khobar Towers bombing at Dover AFB on June 27 and 28, 1996.  *Id.* at

83-84.

Based on his performance of several of the autopsies in June of 1996, his review

of the complete autopsy files and photographs from the AFIP, and his training and experience as

a forensic pathologist, Dr. Parsons testified that the cause of death of each of the 17 decedents

represented in the present litigation "was the explosion that occurred near their barracks [in

Dharan, Saudi Arabia]."  *Id.* at 105-106.  This conclusion, Dr. Parsons noted, was corroborated

by the types of severe blast injuries sustained by each of the deceased plaintiffs.  Dr. Parsons

testified that the injuries of these 17 decedents were "very severe.  As a matter of fact. This is

about as bad as you can get until you get to body fragmentation."  *Id.* at 110.

Based on his performance of several of the autopsies in June of 1996, his review of the

complete autopsy files and photographs from the AFIP, and his training and experience as a

forensic pathologist, Dr. Parsons testified as to his opinion to a reasonable degree of certainty

that 16 of the 17 individuals were rendered immediately unconscious and died immediately or

shortly after the explosion.  *Id.* at 110-111.  According to Dr. Parsons, Airman Christopher

Lester, the single plaintiff who did not die immediately after the explosion, died after a

significant post-injury survival period.  *Id.* at 111.

E.      *Damages*

Before assessing the merits of the individual claims, this Court must briefly discuss

damages in actions against foreign states arising under the FSIA.  To obtain damages against

defendants under the FSIA, the plaintiffs must prove that the consequences of the defendants' conduct were "'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit's] application of the American rule on damages." *Salazar*, 370 F. Supp. 2d at 115-16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted).

### 1.  *Compensatory Damages*

As a result of the wrongful conduct of defendants Iran, MOIS, and the IRGC, plaintiffs have suffered and will continue to suffer pain and mental anguish.  Under the FSIA, if a foreign state may be held liable, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Accordingly, plaintiffs are entitled to the typical bases of damages that may be awarded against tortfeasors under the laws under which each claim is brought.

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  *Prevatt*, 421 F. Supp. 2d at 160.  "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress."  *Haim*, 425 F. Supp. 2d at 71.

In determining the amount of compensatory damages awards to family members of a surviving victim, this Court has held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member."  *Haim*, 425 F. Supp. 2d at 75.  Spouses typically receive greater damage awards

—

than parents, who, in turn, receive greater awards than siblings.  *Compare, e.g.*, *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (Jackson, J.) (awarding $10 million to the wife of a hostage and torture victim); *Cicippio*, 18 F. Supp. 2d at 70 (same), *with Eisenfeld*, 172 F. Supp. 2d at 8 (awarding $5 million each to the parents and $2.5 million each to the siblings of victims of a suicide bombing on a passenger bus); *see also Flatow*, 999 F. Supp. at 31 (awarding parents each $5 million and siblings each $2.5 million of victim who was killed in the same passenger bus bombing in which Seth was injured).  Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Id.*  While the loss suffered by the plaintiffs in these cases is undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse,[24] approximately $5 million to a parent whose child was killed,[25] and approximately $2.5 million to a plaintiff whose sibling was killed.[26]

### 2.    Pain and Suffering Damages

---

[24] *See, e.g., Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (Jackson, J.) (awarding $10 million to the wife of a hostage and torture victim); *Weinstein* (granting $8 million to the widow of a bus bombing victim); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (awarding $10 million to the widow of a murder victim); *Salazar,* 370 F. Supp. 2d at 116 (awarding $10 million to the widow of a bombing victim).  As this Court noted in *Greenbaum*, however, "larger awards are typically reserved for cases with aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnaping of a spouse, or in which the victim survives with severe physical and emotional conditions that continue to cause severe suffering by the spouse." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. August 10, 2006) (Lamberth, J.) (citing *Cicippio*, 18 F. Supp. 2d at 70; *Acree*, 271 F. Supp. 2d at 222.)

[25] *Eisenfeld*, 172 F. Supp. 2d at 8.

[26] *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 161 (D.D.C. 2006) (Lamberth, J.).

Dr. Dana Cable testified as an expert for the plaintiffs concerning the grief process and the factors which cause it to be more extensive and intensive. (Feb. 10, 2004 Tr. at 9-28; Ex. 267.)  Dr. Cable testified concerning the impact of each decedent's death on his particular family. (Feb. 10, 2004 Tr. at 28-214.)  Dr. Cable is a licensed psychologist, a certified death educator, and a certified grief therapist.  (*Id.* at 5; Ex. 267.)

Dr. Cable described the grief process and the seven stages of grief: (1) shock; (2) disorganization; (3) volatile emotions; (4) guilt; (5) loss & loneliness (usually lasting 1-2 years); (6) relief (can go on with life, but experience some guilt for going on); and (7) reestablishment. (Feb. 10, 2004 Tr. at 9-11.)  Dr. Cable stated that each of the surviving family members were still in the "loss and loneliness" stage of the grief process.  *Id.* at 11.  Dr. Cable described this stage of the grief process as "the most intense part of the grief process."  *Id.* at 10.

Though a person who loses someone to death is only in the "loss and loneliness" stage for a year or two, Dr. Cable explained that a number of issues present in this case complicate the grieving process and cause the "loss and loneliness" stage to last much longer for family members of terrorism victims. *Id.* at 11-12; 19-23.  According to Dr. Cable, the grief process is made worse for the family members because none of them were present at the time the terrorist act took place at Khobar Towers. *Id.* at 26.

The Court's review of the testimony and the demeanor of the plaintiffs, as well as the testimony accepted via affidavit, leads the Court to agree with Dr. Cable's opinion that all of the plaintiffs are still in the "loss and loneliness" stage of the grief process, even seven and one-half years after the death of their loved ones.

3.    *Punitive Damages*

In addition to seeking compensatory damages against the defendants, plaintiffs have also sought punitive damages against the defendants.  Punitive damages, however, are not available against foreign states.  28 U.S.C. § 1606; *Blais*, 2006 WL 2827372, at *15.  Accordingly, plaintiffs' claim for punitive damages against defendant Islamic Republic of Iran cannot be maintained, and is denied.

Moreover, "punitive damages are not recognized against divisions of a foreign state that are considered to be the state itself, instead of an agent or instrumentality thereof."[27]  In order to determine whether the entity is sufficiently linked to the foreign state for punitive damages purposes, the court must assess the core functions of the entity.  *See Roeder*, 333 F.3d at 234.  Entities that are governmental are considered a part of the foreign state itself, while commercial entities are deemed agencies or instrumentalities of the foreign state, and thereby subject to punitive damages.  *Id.*   Plaintiff has an affirmative burden of producing evidence that the entity is commercial.  *Blais*, 2006 WL 2827372, at *15.

Here, there is inadequate evidence for this Court to determine that either MOIS or IRGC is sufficiently commercial as to justify the imposition of punitive damages against them.  Therefore, this Court lacks authority to grant plaintiffs' request for punitive damages against MOIS and IRGC because both MOIS and IRGC are governmental entities, and parts of the state of Iran itself.  Accordingly, plaintiffs' claim for punitive damages as to the remaining two defendants is denied.

VI.     *Specific Findings and Conclusions, By State*

---

[27] *Prevatt*, 421 F. Supp. 2d at 161(citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 222, 234 (D.C. Cir. 2003).

Plaintiffs' claims in this action involve the consideration of the laws of eleven different states.  The estates and family members of the seventeen servicemen killed in the attack on the Khobar Towers have asserted wrongful death claims and intentional infliction of emotional distress claims.  The following discussion is organized by state, first providing an overview of the causes of action under that state's law, and then discussing each plaintiff's individual claims as applied under those laws.

A.      *Florida*

1.      *Causes of Action*

a.      *Wrongful Death*

Under Florida law, a right of action exists for wrongful death in favor of the personal representative of the decedent's estate for the benefit of certain designated beneficiaries.  Fla. Stat. Ann. §§ 768.16-768.25 (2005).  Under the Florida Wrongful Death Act,

> When the death of a person is caused by the wrongful act . . . of
>
> any person [or entity] . . . and the event would have entitled the
>
> person injured to maintain an action and recover damages if death
>
> had not ensued, the person [or entity] . . . that would have been
>
> liable in damages if death had not ensued shall be liable for
>
> damages as specified in this act notwithstanding the death of the
>
> person injured, although death was caused under circumstances
>
> constituting a felony.[28]

Moreover, the Florida Wrongful Death Act allows the decedent's personal representative to bring

---

[28] Fla. Stat. Ann. §§ 768.19 (2005).

-43-

an action for the benefit of the decedent's estate *and* the decedent's "survivors." Fla. Stat. Ann. § 768.20-768.21. Under the Act, "survivors" who may be entitled to recovery include the decedent's: (1) spouse, (2) children, (3) parents, and (4) blood relatives, provided these blood relatives can demonstrate they are partly or wholly dependent on the decedent for support. Fla. Stat. Ann. § 768.18.[29]

If the decedent has a surviving spouse or lineal descendants or the decedent is an adult with a surviving parent but no dependents, then the decedent's personal representative may recover the present value of the "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death. Fla. Stat. Ann. § 768.21(6).[30] A personal representative may recover on behalf of minor children the value of lost support and services, the loss of parental companionship, instruction and guidance, and for mental pain and suffering from the date of injury. Fla. Stat. Ann. §§ 768.21(1), (3). A decedent's surviving spouse and children may recover for mental pain and suffering from the date of the injury. Fla.

---

[29] Accordingly, siblings of a decedent are not considered "survivors" unless evidence is presented demonstrating that sibling's dependence upon the decedent. Fla. Stat. Ann. § 768.18. As the Florida Supreme Court has held, a plaintiff's dependency upon the decedent must be proven irrespective of any relationship or legal right to support. *Benoit v. Miami Beach Electric Co.*, 96 So. 158, 159 (Fla. 1923). Moreover, in cases where adults–siblings or otherwise–claim dependency upon the deceased, the plaintiff must show "an actual inability to support themselves and an actual dependence upon some one for support, coupled with a reasonable expectation of support, or with some reasonable claim for support from the deceased." *Id.*

[30] The Act defines "net accumulations" as the portion of the decedent's expected net business or salary income that the decedent would have retained if the decedent had lived her or his normal life expectancy. Fla. Stat. Ann. § 786.18(5). "Net business or salary income" means the part of decedent's probable gross income after taxes and after the decedent's costs of maintenance. *Id.*

Stat. Ann. 768.21(2), (3).[31]  A decedent's surviving parents may also recover for mental pain and

suffering if the decedent is under 25 years old.  Fla. Stat. Ann. § 768.21(4).  If the decedent is 25

years old or older, then the decedent's surviving parents may only recover for mental pain and

suffering if there are no other survivors.  Fla Stat. Ann. § 768.21(4).

b.       *Intentional Infliction of Emotional Distress*

Florida courts have adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS (1965)

as the definition of the tort of intentional infliction of emotional distress.  *Metropolitan Life Ins.*

*Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985).  Specifically, under Florida law, a

defendant is liable for intentional infliction of emotional distress if the defendant's "extreme and

outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ."

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46(1) (1965)).

In evaluating the degree of severity of the defendant's conduct, Florida courts have held

that liability for intentional infliction of emotional distress is found "only where the conduct has

been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*McCarson*, 467 So.2d at 576 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).  A

defendant's conduct is deemed intentional where the defendant "knows that such distress is

certain, or substantially certain, to result from his conduct . . . ."  *McCarson*, 467 So.2d at 576

(quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. i (1965)).  Plaintiffs who are the spouse,

child, sibling, or parent of a decedent have standing to recover for intentional infliction of

---

[31] Each parent of an adult child may recover for mental pain and suffering if there are no other survivors.  *Id.*

-45-

emotional distress even though plaintiffs were not present at the scene.  *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App. 1991).

      *2.     Plaintiffs*

      *a.     Estate and Surviving Family Members of Brent Marthaler*[32]

      i.     Estate of Brent Marthaler

Airman First-Class Brent Marthaler was born in 1976, and was raised in Minnesota.  He is survived by his wife, plaintiff Katie Lee Marthaler, his parents plaintiffs Herman C. Marthaler III and Sharon Marthaler, as well as his brothers, plaintiffs Kirk and Matthew Marthaler.

Brent graduated from high school in June of 1994 and joined the U.S. Air Force.  Brent graduated from boot camp in September 1994, and Katie drove to Texas with Brent's parents to attend his graduation. (Dec. 2, 2003 Tr. at 62-63.)  Brent went to technical school in Texas after his graduation from basic training.  After graduation, Brent was then assigned to Shepherd AFB for his advanced technical training.  (Dec. 3, 2003 Tr. at 21.)  After advanced training, Brent was permanently assigned to Eglin AFB in Florida. (Dec. 2, 2003 Tr. at 62-63.)

Brent was scheduled to be deployed to Saudi Arabia in April 1996.  Two days prior to his deployment, however, Brent and Katie Lee Marthaler, his high school sweetheart of five years, were married to each other.  According to Katie, Brent "just felt better going to Saudi Arabia and knowing that we were married and that we were taking on the world together then."  *Id.* at 73-74.

---

[32] As will be discussed further below, plaintiffs Matthew and Kirk Marthaler, Brent's brothers, cannot recover under Florida's wrongful death statute because no evidence was put forth that they were dependent upon the decedent, their brother.  Accordingly, each must demonstrate that he may recover under a valid cause of action under the laws of Minnesota, the state in which each was domiciled at the time of the attack.  A more detailed discussion of both Matthew and Kirk's claims will be provided later in this opinion.  See *infra* Part VI.G.2.a.

While he was away, Brent stayed in regular contact with Katie and his family, talking with Katie on the phone once a week, and writing letters to her four or five times a week. Brent clearly had high hopes for his life ahead with Katie. In one letter to Katie, Brent told her that "I think of you and all the fun that we have had and all the fun that will come in the next 50 years or so. I can truly say that you are the person that keeps a smile on my face 24-7 and for that I can never repay you, but I'm going to try my hardest." *Id.* at 78-79. Brent was scheduled to return home from Saudi Arabia on June 27, 1996, a mere two days after the attack on the Khobar Towers.

Brent Marthaler's estate is represented by his wife, Katie Lee Marthaler. Brent's estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida. As the personal representative of Brent's estate, Katie Lee Marthaler is the proper plaintiff to bring a wrongful death action under Florida law. *See* Fla. Stat. Ann. § 768.20-768.21. Because Brent had no children, and no evidence was put forth at trial that his siblings were dependent upon him, any recovery under this wrongful death action is for the benefit of Brent's wife Katie, and his parents, Herman C. Marthaler and Sharon Marthaler. *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Brent Marthaler has made out a valid claim for wrongful death under Florida law, and the beneficiaries of this estate are entitled to recover the present value of any "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death. Fla. Stat. Ann. § 768.21(6). Additionally, as Brent's widow, Katie Lee Marthaler is entitled to recover personally for the loss of Brent's companionship and protection, as well as for

her mental pain and suffering she sustained as a result of her husband's death.  Fla. Stat. Ann. §

768.21(2).  Moreover, Brent's parents are entitled to recover for their own mental pain and

suffering due to the fact that Brent was under 25 years of age.  *See* Fla. Stat. Ann. § 768.21(4).

Dr. Herman Miller, an economic consultant testified as an expert that, were it not for

Brent's untimely death, he experienced a net economic loss of $1,598,688.00. The Court should

therefore award the Estate of Brent Marthaler, by Katie Lee Marthaler as personal representative,

$1,598,688.00 in economic damages for the benefit of Katie Lee Marthaler, Herman C.

Marthaler, and Sharon Marthaler, to be distributed in a manner consistent with the statute

governing intestate distribution of property under Florida law.  As for the intangible economic

damages of the wrongful death recovery, the Court will address those awards below, in an

individualized discussion of the claims of Katie Lee Marthaler, and Herman and Sharon

Marthaler.

### ii.   *Katie Lee Marthaler*

Plaintiff Katie Lee Marthaler is the widow of Brent Marthaler.  Katie is participating in

this lawsuit both as the personal representative to her husband's estate, and on her own behalf.

Ms. Marthaler is a United States citizen.  She is 25 years old and was born on March 15,

1978 in Robbinsdale, Minnesota.  (Dec. 2, 2003 Tr. at 52.)  Her parents are Dennis and Jennifer

Barthel who have been married for 30 years. She has one sister, Sarah, who is 22 years old. Katie

grew up in Rogers, Minnesota. When Katie was 17, her family moved to nearby St. Michael,

Minnesota. She attended elementary school in Rogers and junior and senior high school in Oak

River, Minnesota. *Id.* at 53-54.

Katie met Brent Marthaler in 1991 when she was in the eighth grade and had just turned

14. Brent had just turned 16, and was in the tenth grade. Brent lived in Cambridge, Minnesota. Soon after Katie and Brent met each other, they began dating. Katie dated no one other than Brent from the time she met him when she was 14 years old until his death at Khobar Towers in June 1996. *Id.* at 55-56. Katie described Brent as a thoughtful and caring person. Brent was also close to Katie's parents. Katie's family treated Brent as if he were part of their family for many years. *Id.* at 56-57.

Brent graduated from high school in June of 1994 and joined the U.S. Air Force. Katie kept in touch with him, but it was not easy to keep in touch during boot camp because the young airmen do not have much time to write or call. Once he was out of boot camp, they kept in regular touch. Even during boot camp Brent would write letters once or twice a week and would call Katie when he would get his "morale call." Brent graduated from boot camp in September 1994, and Katie drove to Texas with Brent's parents to attend his graduation. *Id.* at 62-63.

Upon graduation, Brent was permanently assigned to Eglin AFB in Florida. Brent and Katie spoke almost every night; some nights it was for a half hour, and other nights it was for hours. Brent came home for Katie's junior prom in May 1995. Brent came home to Minnesota in October of 1995 and asked Katie to marry him. Katie was only a junior in high school so they had much to do to convince their parents. Brent had prepared a strategic plan which he had written down. Katie remembers that her mother was crying and her father did not say a whole lot. Brent had brought home a registration form for Katie to go to college. Katie's father requested that they visit Father McLaughlin at St. Michael's Church. After they met with him, Father McLaughlin announced that Brent and Katie were the perfect couple and he did not see any reason why they should not get married, no matter what their ages were. As a result, by the

end of the weekend, everyone was excited. As Katie explained, Brent's "plan worked, so he had it all figured out." *Id.* at 71-72.

Katie visited Brent in Florida during her Spring vacation, which was in the first week of April 1996. Brent was scheduled to deploy with his squadron to Saudi Arabia two days after the end of Katie's vacation. Katie had just turned 18. Two days before Katie was scheduled to leave, Brent explained that he was worried about going to Saudi Arabia. He knew that it was an unfriendly place and he wanted to make sure that they had gotten married before he went there. Katie explained that Brent "just felt better going to Saudi Arabia and knowing that we were married and that we were taking on the world together then." *Id.* at 73-74.

So Brent and Katie went to the Courthouse and got married. They agreed not to tell anybody because they knew their parents would be upset. Invitations, a wedding dress, and a wedding cake for a September 1996 wedding had already been ordered. They agreed not to tell anybody until after Brent returned from Saudi Arabia. Brent did not want Katie to have to tell everyone by herself. *Id.* at 74-75.

In the weeks after Brent was killed, Katie was very angry. She did not want to eat. Her mother would make her eat by placing a plate of food in front of her and refusing to allow her to leave the table until she ate. Katie could not sleep but she still wanted to be in bed all the time. Her family would have to drag her out of bed. *Id.* at 90-91.

In the years since Brent's death, Katie has had many bad days. After September 11, 2001, Katie relived her experience and was very angry. She could not go to work for a couple of days because she felt so badly for the families. She was scared that terrorism was occurring in our country. *Id.* at 91. Katie has a recurring dream about Brent. She dreams that she is sleeping

with him, and she knows that he is behind her.  She wakes up and rolls over and puts her arm

around him, and he is laying in bed like he was in the coffin with his head wrapped in gauze and

a plastic device in place of his chin.  *Id.* at 91.

Katie still keeps mementos of Brent in her home.  She displays her wedding picture and

also a picture of Brent in his jet with a big smile and his arms stretched out.  She has a hope chest

with the gifts that Brent had given her, her wedding dress, and all the letters that he sent her.  *Id.*

at 91-92.

As Dr. Cable testified, Katie "is in loss and loneliness. . . .  She has tried to rebuild her

life. She has tried to go on . . . .  She still thinks about Brent all the time, and that will never

change . . . ."  When someone so close to you dies at 18, your new husband … you worry about

everybody else close to you. What if something happened to them, too? … She has had to grow

up very fast, and that's been difficult . . . .  And there will always be those questions of: the life

we should have had together; all the plans we had and all the promise. That will never fade. That

will always stay present."  (Feb. 10, 2004 Tr. at 69-71.)

Based on the evidence presented to the Court, it is clear that Katie Lee Marthaler has

experienced and continues to experience extreme mental anguish and suffering resulting from the

loss of her husband.  Accordingly, the Court shall award the Estate of Brent Marthaler, by Katie

Lee Marthaler as Personal Representative, $8 million for the benefit of his surviving wife, Katie

Lee Marthaler, to compensate her for the loss of Brent's companionship and protection, as well

as for her mental pain and suffering she sustained as a result of her husband's death.

### iii.    *Herman C. Marthaler & Sharon Marthaler*

Sharon A. Marthaler,  Brent Marthaler's mother and a United States citizen, was born in

Ortona, Minnesota on January 11, 1946. She was raised on a dairy farm where she lived with her mother, father and two brothers. After graduating from high school, Sharon took a one year course at the University of Minnesota to train as a medical technician. She then began working as a medical technician at Riverview Memorial Hospital in West St. Paul. On February 26, 1971, she married Herm Marthaler. (Dec. 3, 2003 Tr. at 2-5.)

Herman Charles Marthaler III,  Brent Marthaler's father and a United States citizen, was born in St. Paul, Minnesota on January 12, 1947.  He was raised on the Marthaler homestead in West St. Paul, Minnesota. Herm's parents were Donna Ann Merit and Herman Charles Marthaler, Jr. Herm's father served in the United States Air Corps as a navigator on a B-29 during World War II, flew 22 combat missions out of Guam and "was in the air with 400 planes when they dropped the atom bomb." After his discharge from the military, Herm's father owned Marthaler Calf and Cattle where he bought and sold feeder cattle. After graduating from high school in 1965, Herm went to the University of Minnesota for one year and then he enlisted in the Air Force in the Fall of 1966. Herm served in five campaigns in Vietnam. On February 26, 1971, he married Sharon Marthaler. (Dec. 3, 2003 Tr. at 41-44.)

Sharon and Herman Marthaler initially lived in West St. Paul and then moved to Emery Grove, Minnesota where they had three sons within 30 months.  The oldest, Kirk, was born in 1974. Matt was born in 1975 and Brent was born 1976.  After Brent was born, the Marthaler family moved to Cambridge, Minnesota. *Id.* at 5-7.

In the first years after Brent's death, it was extremely difficult for Sharon to go to work and get through each day.  She testified that as time goes on, it gets a little easier, "but it is always still there.  You finally come to realize things will never be the same."  Every once in a

while, Sharon has dreams about Brent, and he tells her that "things aren't as bad as you think." *Id.* at 36-37.

Sharon has visited Eglin AFB twice since Brent's death.  The first time was for a bricklaying ceremony in September of 1996. She went with Katie and Katie's mother.  The second time was January of 1998.  She and Herm went there to take pictures of a memorial that had been erected to honor the victims of the Khobar Towers bombing and to meet some of Brent's friends again.  By that time, however, most of the young airmen that Brent had served with had left Eglin AFB.  Sharon recalled "[t]here weren't a lot of the old crew there anymore." *Id.* at 37.  Sharon and Herm visit Brent's grave two or three times a year.  They usually go on Memorial Day, Columbus Day and Veteran's Day.  They leave a wreath by his grave on Veteran's Day because in Minnesota, the cemetery will leave the wreath in place until March when they do their Spring cleanup.  Herman and Sharon also have a flag garden and a flag in their yard where they plant flowers. *Id.* at 37.

Sharon and Herman keep numerous mementos of Brent around their house.  They have two tall cabinets in his old bedroom full of notes and cards that Brent wrote to them.  They have also kept his baseball and football cards.  Sharon also had a flag flown over the United States Capitol for Brent and the other 18 airmen killed at the Khobar Towers. *Id.* at 38.   The Marthalers put a poster on their mailbox every June 25th with a picture of Brent taken just before he left for Saudi Arabia and the words "Remember the 19."  Sharon contributes money in Brent's name to an organization called The Little Farm which is a nursery for disadvantaged children.  Sharon makes the contribution in Brent's name periodically because it makes her feel good to write his name. *Id.* at 40-41.

Herman testified about the impact of Brent's death on his wife, Sharon, "[s]he'll never be the same.  Absolutely never."  Herm thinks of Brent "every second of every day."  He testified "[w]hen I don't perform well enough is the day I wear [Brent's] T-shirt.  When I am not going fast enough [Brent]'s right here and he says, you can do this, pop, just bend with the knees and lift harder. So it's every second of every day. … This is why Sharon and I sit down every day for two and a half hours from the moment she gets home."  The holidays are difficult for the Marthaler family.  Herman testified "Christmas is tough because we know [Brent] really loved Christmas. Veteran's Day … is the one that we get to put the wreath down and they'll leave … it until Spring."  Herman believes that "the holidays that [Brent] liked the best is when it hurts us the most."  *Id.* at 77-80.

According to Dr. Cable, Herman "is still in loss and loneliness.  Brent was a very important part of his life. . . .  His grief will continue in the future . . . [and] there will be for him a very strong void that will never be filled [t]hat will continue to cause pain and just is never going to go away."  (Feb. 10, 2004 Tr. at 72-73.)  Similarly, Dr. Cable testified that Sharon "is still in loss and loneliness.  She thinks of [Brent] all the time, so very much a part of her life. … She, too, has grief that will continue in the future. I see her as one who slowly will recover, but who will experience what we sometimes refer to as waves of grief; that is, where it comes back and sort of hits us again and when we perhaps are least prepared and least expect it. . . .  [S]he is going to be contending with that in the years ahead."  *Id.* at 75.

Based upon the evidence presented at trial, both Herman and Sharon Marthaler have experienced severe mental anguish and suffering as a result of their son's untimely death. Therefore, this Court shall award to the estate of Brent Marthaler, by Katie Lee Marthaler as

Personal Representative, $5 million for the benefit of his father Herman Marthaler, and $5 million for the benefit of his mother Sharon Marthaler to compensate both for the mental pain and suffering both have sustained as a result of their son's death.

> b.     Estate and Surviving Family Member of Justin Wood[33]

> i.     Estate of Justin Wood

Airman First-Class Justin R. Wood was killed in the Khobar Towers bombing on June 25, 1996.  Pl. Ex. 2.  Justin was born on July 16, 1975 and was 20 years old when he died. (Dec. 4, 2003 P.M. Tr. at 11.)  Justin is survived by his father Richard Wood, his mother Kathleen Wood, and his older brother Shawn Wood.

From a very young age, Justin was always interested in sports.  He particularly loved soccer and basketball.  But as Justin got older, he played less soccer and devoted more and more time to basketball.  "Basketball was his love."  Justin was also a trivia whiz when it came to basketball and could recite the names and statistics of college basketball players, particularly players from his favorite teams.  (*Id.* at 107-108; Dec. 4, 2003 P.M. Tr. at 15.)  In addition to playing basketball and soccer, Justin also took karate and participated in karate tournaments. (Dec. 4, 2003 A.M. Tr. at 107-108.)

Soon after graduating from high school, Justin joined the Air Force. Rich and Kathy were surprised by this decision. Growing up, Justin always said he would not join the military because

---

[33] As will be discussed further below, plaintiff Shawn Wood, Justin Wood's brother, cannot recover under Florida's wrongful death statute because no evidence was put forth that he was dependent upon the decedent.  Accordingly, he must demonstrate that he may recover under a valid cause of action under the laws of California, the state in which he was domiciled at the time of the attack.  A more detailed discussion of his claim will be provided later in this opinion. *See infra* Part VI.B.2.c.

"when you go in the service you die."  Rich and Kathy do not know where Justin got this idea

from, but he never wanted to join the service.  Then one day, after Justin graduated from high

school, he came home and told his parents that he had enlisted in the Air Force along with his

friend Travis Hudson.  (*Id.* at 113-114; Dec. 4, 2003 P.M. Tr. at 19.)

One of the reasons Justin joined the service was because he wanted to attend college.

Justin knew that Rich and Kathy could not afford to send him to college and he knew that he

could get that college money by joining the Air Force. He told Kathy that in the Air Force, "'I

can build up a college fund, save money for college, and I can take college classes while I'm

there.'" (Dec. 4, 2003 A.M. Tr. at 113; Dec. 4, 2003 P.M. Tr. at 20.)

After joining the Air Force, Justin attended basic training at Lackland AFB, then went to

Albuquerque, New Mexico for specialized training. He ultimately became a loadmaster with a

search and rescue squad that was based at Patrick AFB in Florida. Justin was the first airman to

go straight from boot camp to a loadmaster position with search and rescue.  (Dec. 4, 2003 A.M.

Tr. at 114.)  Justin loved his job, particularly the crew of guys he was working with in the search

and rescue squad.  *Id.* at 117.

Justin Wood's estate is represented by his father, plaintiff Richard Wood.  Justin's estate

has asserted claims under Florida's wrongful death statute because he was last domiciled in

Florida.  As the personal representative of Justin's estate, Richard Wood is the proper plaintiff to

bring a wrongful death action under Florida law.  *See* Fla. Stat. Ann. § 768.20-768.21.  In light of

the fact that Justin had no spouse, or children, and that no evidence was submitted demonstrating

that his brother Shawn was financially dependent upon Justin, any recovery under this wrongful

death action is for the benefit of Justin's parents, Richard and Kathleen Wood.  *See* Fla. Stat.

Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Justin Wood has made out a valid claim for wrongful death under Florida law.  The beneficiaries of this estate, however, are not entitled to recover the present value of any "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death because Justin was under 25 years old when he died, and did not have either a surviving spouse or any surviving lineal descendants.  Fla. Stat. Ann. § 768.21(6)(a)(1).   Still, Justin's parents are entitled to recover for their own mental pain and suffering arising out of this wrongful death action due to the fact that Justin was under 25 years of age when he died.  *See* Fla. Stat. Ann. § 768.21(4).  A discussion of these intangible economic damages of the wrongful death recovery will be addressed below in an individualized discussion of the claims of Richard and Kathleen Wood.

### ii.      *Richard Wood & Kathleen Wood*

Richard ("Rich") Wood is the father of Justin Wood. He was born in Hillsboro, Wisconsin on November 12, 1945.  He is an American citizen. (Dec. 4, 2003 A.M. Tr. at 99.) Kathy Wood is the mother of Justin Wood. She was born in Los Banos, California on October 7, 1949. She is an American citizen. (Dec. 4, 2003 P.M. Tr. at 2.)

When Rich moved to Modesto to work at the Gallo's warehouse, he met his wife, Kathy Wood.  Rich worked at Ernest and Julio Gallo's winery in Modesto, California for 34 years before retiring.  (Dec. 4, 2003 A.M. Tr. at 103, 135.)  After Rich and Kathy married, they had two children: Shawn, who was born in March of 1971, and Justin, who was born in July of 1975. (Dec. 4, 2003 P.M. Tr. at 11.)

Rich does not remember what he and Kathy did after they learned about their son's death, other than hold each other and cry.  He felt numb.  (Dec. 4, 2003 A.M. Tr. at 122-24.)  Kathy was in shock. "All I could do is just sit and pray for it not to be true." (Dec. 4, 2003 P.M. Tr. at 31.)

The day Kathy learned of Justin's death, her doctor prescribed Xanax to help her deal with everything. She did not want the drug, but she did take it and it helped her sleep.  Days after Justin's death, Rich, Kathy, and Shawn attended a memorial service at Patrick AFB.  Upon arriving at Patrick AFB, they were met by Justin's flight squad, who whisked them away and took care of them for the next few days.   "They did not want us to be anxious about anything. They went overboard to make sure that we were comfortable and well taken care of."  The squad took Rich and Kathy to the hotel, to the base, to their squad room, and to a squad member's home, where they had a huge gathering and met the squad members' families.  (*Id.* at 36; Dec. 4, 2003 A.M. Tr. at 125-26.)

Since the Modesto ceremony and the burial service, Rich and Kathy have attended numerous Khobar Towers memorials and dedications. They attended the opening of the Khobar Towers display at Heritage Hall, which is the museum for enlisted men in Montgomery, Alabama.  (Dec. 4, 2003 A.M. Tr. at 118-19, 130.)  They attended the dedication ceremony for the monument to the victims of Khobar Towers at Patrick AFB.  They also attended the FBI briefing held in Quantico, Virginia, where certain family members were briefed about the status of the Khobar Towers criminal investigation.  *Id.* at 130.

After Justin's death, Rich "just shut down." He shut himself up in a room in his house and spent time on the computer and away from everyone else. "I couldn't talk to my wife because if I talked to my wife, she'd cry or if she talked to me I'd cry. I just had a real difficult time."

Rich became reclusive and did not want to have anything to do with anyone. *Id.* at 130-31. Rich even began showing physical manifestations of his problems and began breaking out in welts. (Dec. 4, 2003 P.M. Tr. at 41.)

Rich began seeing a psychiatrist two to three times a week after Justin died and continued seeing her throughout the year following Justin's death. (Dec. 4, 2003 A.M. Tr. at 130, 132.) The psychiatrist prescribed Rich a medication that helped with his emotional suffering. Rich stayed on this medication for three to four years. After Rich started taking the drug, he began to feel better and thought he could stop taking the drug. But shortly after he went off the medication, Rich "went bananas" and shut down again. The psychiatrist was so concerned that she placed him in a medical facility called Crossroads, where he stayed for a week. *Id.* at 132-33.

It has been difficult for Rich to get rid of any of Justin's possessions since he died and Rich's home is now full of them. He has Justin's Persian rug, aquarium, lamps, furniture, and all of his military uniforms. Moreover, Rich has encountered a hard time coping with life since Justin died. Rich finds it difficult to make decisions, he gets confused, and gets lost. He also cries at the drop of a hat. It is difficult for him to watch the news and see soldiers being killed because he knows what the parents are going through. September 11, 2001 was particularly difficult. Rich's relationship with his family has also been dramatically altered since Justin was killed. Today, Rich cannot talk about things with his family the way he used to. *Id.* at 140. Holidays are no longer enjoyable for Rich. *Id.* at 138.

Rich and Kathy have created a number of lasting memorials in Justin's honor. "I have his flag box on his coffee table. I have eagles all over the place. I put up a flag pole out in the front [of the house]. Together with the PTA at Rose Avenue School where he went to grade school,

we put in a rose garden . . . .   And then we have a plaque and planted a tree at the high school he

attended."  *Id.* at 141.

Today, Rich still has moments where he just falls apart. *Id.* at 131-132.  The biggest

problem is that the hurt never goes away. *Id.* at 136. "I think about Justin every single day.

There's no particular thing that sets it off. It's just always there."  *Id.* at 139.

> According to Dr. Cable, Rich
>
> is in extreme loss and loneliness. He is also having volatile emotions.
>
> I think the real difficulty for him, in terms of his loss and loneliness,
>
> he doesn't want to get better . . . .  He is very lonely. He is very bitter.
>
> He is withdrawn from all of those people who could support him, all
>
> of those people who love him . . . .  [His prognosis is] really very poor
>
> . . . .  His grief will last a lifetime. He doesn't want to forget. He
>
> doesn't want to let go of the pain, and I fear will permanently damage
>
> any family relationships.[34]

After Justin's death, Kathy was coping with her own profound grief but also was dealing

with her husband, who "was very angry, very upset, very distraught." Rich's reaction to Justin's

death caused a great deal of friction between Kathy and Rich, resulting in nearly constant

arguments between Kathy and Rich.  *Id.* at 39-40.  To help Kathy forced herself to go back to

work and this was helpful, because there was a support system in place for her there. "If

someone's having problems, we do what we can to make them feel good and strengthen them up

as well, and I needed my friends." Going back to work prevented Kathy from going into a deeper

---

[34] (Feb. 10, 2004 Tr. at 204-05.)

depression. *Id.* at 41-42.  But Kathy felt bad about going back to work because Rich could not bring himself to do the same thing and because she began shutting him out more, in the hope that doing so would prevent further anxiety for him. *Id.* at 41.

As a result of the rift between Kathy and Rich, Kathy began doing more things by herself. She regularly attends church-related events and has girls' night out with her friends. She still does not go out with Rich like she used to before Justin died. *Id.* at 45.  To this day, Kathy and Rich's relationship has not returned to normal.  *Id.* at 40.  Kathy and Rich's physical relationship has also not returned to normal.

Kathy still thinks about Justin all of the time and likes to keeps things around that remind her of him. She put together a scrapbook of pictures from Justin's childhood that she carries with her often.

As to her emotional state, Dr. Cable testified that Kathy is in loss and loneliness. She has tried to move on and I think really wants to, but there is a lot of personal grief still present. Then, of course, it's complicated by how her husband has dealt with all of this and then the anger and intense grief he has got. … [H]er grief will continue for a long period of time. I believe her marriage will suffer … may full break down." (Feb. 10, 2004 Tr. at 207.)

Based upon the evidence presented at trial, both Richard and Kathleen Wood have experienced severe mental anguish and suffering as a result of their son's untimely death. Therefore, this Court shall award to the estate of Justin Wood, by Richard Wood as Personal Representative, $5 million for the benefit of his father Richard Wood, and $5 million for the benefit of his mother Kathleen Wood to compensate both for the mental pain and suffering both have sustained as a result of their son's death.

 

            c.      *Estate and Surviving Family Members of Michael Heiser*

            i.      *Estate of Michael Heiser*

Michael ("Mike") Heiser was killed in the Khobar Towers bombing on June 25, 1996. (Dec. 5, 2003 A.M. Tr. at 29; Ex. 2.) Mike was born on September 20, 1960 and was 35 years old when he died. (*Id.* at 5, Ex. 67.)  Mike was unmarried and had no siblings.  Mike is survived by his parents, Francis ("Fran") and Gary Heiser.  Though Gary is not Mike's biological father, he legally adopted Mike. *Id.* at 8, 53-54.  Mike had a special and rewarding childhood in Germany. On weekends and holidays, he would travel with Fran and Gary to see the German countryside and became involved in collecting antiques and other items. Mike was a natural businessman and even at a young age, helped Fran and Gary purchase antiques, refurbish them, and sell them for a profit.  *Id.* at 7.

As a child, Mike was smart, funny, and considerate. He also had a passion for learning. Reading many books and participating in school activities. Through his travels, he had many friends all over the world. Mike was also a hard worker, both during his years as a student and after he joined the military. *Id.* at 8-11.

Mike enlisted in the Air Force on June 25, 1979.  Because Gary had served in the Army for 22 years, Mike initially talked to a recruiter about joining the Army.  Gary testified that he knew the benefits of being in the Air Force and persuaded Mike look at the Air Force.  Mike ultimately decided that the Air Force was a better career choice, so he enlisted soon after graduating from high school. *Id.* at 14, 55.

After attending boot camp and advanced training, Mike developed a specialty in the communications field and was sent to Mildenhall AFB in England. After spending three years at

Mildenhall, Mike was promoted and reassigned to Ramstein AFB in Germany, where he was responsible for communications operations on the Air Force's fleet of Gulfstream planes.  During Mike's three years at Ramstein, he took part in several exciting missions. For example, he was assigned to the first airplane escorted into the new, free Russia; he was assigned to General Schwarzkopf's personal plane during the Gulf War; and he was assigned to coordinate communications when President Clinton visited Ramstein. Mike loved working and flying on the Gulfstreams.  After spending three years in England and three years in Germany, Mike transferred back to the United States and was assigned to Patrick AFB in Florida, and was later assigned to Saudi Arabia.

Michael Heiser's estate is represented by his parents, Fran and Gary Heiser.  Michael's estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida.  As the personal representatives of Michael's estate, Fran and Gary Heiser are the proper plaintiffs to bring a wrongful death action under Florida law.  *See* Fla. Stat. Ann. § 768.20-768.21.  In light of the fact that Michael had no spouse or dependents, any recovery under this wrongful death action is for the benefit of Michael's parents, Fran and Gary Heiser.  *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Michael Heiser has made out a valid claim for wrongful death under Florida law.  Accordingly, the beneficiaries of this estate are entitled to recover the present value of any "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death.  *See* Fla. Stat. Ann. § 768.21(6).  Additionally, though Michael was over 25 years of age at the time of his death, Michael's parents are nonetheless entitled to recover for

their own mental pain and suffering arising out of this wrongful death action due to the fact that

Michael died without any other survivors.  *See* Fla. Stat. Ann. § 768.21(4).

Dr. Herman Miller, an economic consultant testified as an expert that, due to Michael's

untimely death, he experienced a net economic loss of $3,720,019.00. The Court should therefore

award the Estate of Michael Heiser, by Fran and Gary Heiser as personal representatives,

$3,720,019.00 in economic damages for the benefit of Michael's parents, Fran and Gary Heiser.

As for the intangible economic damages of the wrongful death recovery, the Court will address

those awards below, in an individualized discussion of the claims of Fran and Gary Heiser.

### ii.     *Francis and Gary Heiser*

Francis ("Fran") and Gary Heiser were Mike's parents. Fran was born in New Jersey on

December 23, 1941 and was 54 years old when Mike was killed. (Dec. 5, 2003 A.M. Tr. at 4.)

Gary was born in Pennsylvania on March 22, 1937 and was 59 years old when Mike was killed.

*Id.* at 52.  Gary was Mike's adoptive father.  *Id.* at 53-54.

Shortly after graduating from high school, Fran married and gave birth to Mike who was

her only child.  After six years of marriage, Fran and her husband divorced.  Fran's ex-husband,

who was Mike's biological father, did not play a a role in Mike's life after the divorce.  In Fran's

words, her ex-husband "divorced both of us."  *Id.* at 5-6, 8.   Later, Fran met Gary, and they were

eventually married on February 14, 1970. *Id.* at 6, 53.

When Fran and Gary married, Mike was only nine years old.  *Id.* at 6, 53. Gary could see

that Mike needed a male influence in his life, and Gary filled that role. In addition to raising

Mike as his own son, Gary formally adopted Mike.  *Id.* at 8, 53-54, Ex. 67.

Since burying Mike, Fran and Gary have dedicated themselves to attending numerous

memorials all around the country. "[W]e've been to any that we know about." Fran and Gary have also kept scrapbooks memorializing these events and have created a book called "The Story of a Lifetime," to preserve Mike's memory. By posting it on a website, they have shared this book with other victims of terrorism, including the other families of the victims of the Khobar Towers bombing. *Id.* at 33, 43, 68.

Fran has been deeply affected by the loss of her only child. After Mike's death, she did not want to see or speak with anyone. *Id.* at 34. It has been particularly difficult for her to see other people's children and grandchildren without becoming emotional. Mike's death dramatically impacted Fran's family life. She is upset how her already small family broke-down even further when Mike was killed. *Id.* at 36, 38. Fran does not even like holidays anymore.

Fran has experienced severe sleep problems ever since Mike died. This still occurs today. After Mike's death, Fran and Gary decided to sell the family business. There was no longer a reason to keep the business. The business had been growing fast, Gary was considering retiring, and with Mike gone, there was nobody to take over the business. So after Fran and Gary received an offer, they sold the company. *Id.* at 37.

Fran attended counseling for a short period of time after Mike died, but did not find it helpful. She then attended a support group meeting for the Tragedy Assistance Program for Survivors ("TAPS") in Washington, D.C., which was a support group for family members of deceased servicemen. Fran found several of the TAPS support groups helpful, and has made TAPS a beneficiary of her will. Fran also involved herself with an organization called Alive Alone, an organization for parents whose children have died at a young age. *Id.* at 34-35.

Since Mike's death, Fran has dedicated much of her life to being an advocate for victims

of terrorism. She has contacted congressmen about terrorism issues, has attempted to change the

laws to protect United States servicemembers, and has tried to place terrorism on the agendas of

politicians. She has also spent a great deal of time reading and educating herself about terrorism.

Some people think Fran is obsessed with it. *Id.* at 39-40.

To this day, much of Fran and Gary's home is decorated with mementos from Mike's life.

Fran and Gary have also set up the Michael G. Heiser Foundation, in remembrance of all victims

of terrorism. Money donated to the Foundation is used for ROTC scholarships and to assist

victims of terrorism, through TAPS, Alive Alone, and another support organization called No

Greater Love. *Id.* at 41-42.

As Dr. Cable stated, Fran

>is very much in loss and loneliness, and that's complicated or
>
>enhanced by the lack of family for her future. So it's not just present
>
>loneliness, but it's future loneliness as well; the family that can never
>
>be there. . . .  She will continue in grief the rest of her life, because
>
>there is nothing besides her husband to put herself into. There is no
>
>one to love. There is an emptiness there that's not going to go away
>
>for her. There will never be grandchildren. So that real emptiness is
>
>long term.

(Feb. 10, 2004 Tr. at 139.)

Gary's entire life has been affected by the death of his son. He and Fran always had a

small family, but now they are left without their only child, and their lives have been shattered.

"[O]ur future goes only to the point when I go and my wife goes. That's it. The family ceases to

exist." This has caused great emotional pain for Gary. It forced Gary and Fran to sell their family business, which they had planned on passing down to their son.  (Dec. 5, 2003 A.M. Tr. at 69-71.)

Like Fran, Gary does not celebrate holidays anymore. Until Mike died, Gary enjoyed Christmas. But he cannot enjoy the holiday anymore. Additionally, birthdays and other holidays are equally tough for Gary to handle.  As Dr. Cable testified, Gary

> is in loss and loneliness. As with his wife, there is no future. There was a very strong relationship because of the adoptive choice that was made between [Gary and Mike]. . . .  His grief will continue for a great deal of time. Again, the future is gone. He will move on with his life, but the grief will always be there. Part of that will always be also seeing the pain his wife is going  through.

(Feb. 10, 2004 Tr. at 141-42.)

Based upon the evidence presented at trial, both Fran and Gary Heiser have experienced severe mental anguish and suffering as a result of their son's untimely death.  Therefore, this Court shall award to the estate of Michael Heiser, by Fran and Gary Heiser as Personal Representatives, $5 million for the benefit of his mother Fran Heiser, and $5 million for the benefit of his father Gary Heiser to compensate both for the mental pain and suffering both have sustained as a result of their son's death.

> d.      *Estate and Surviving Family Members of Earl Cartrette, Jr.*[35]

---

[35] As will be discussed further below, plaintiff Lewis Cartrette, Earl Cartrette, Jr.'s brother, cannot recover under Florida's wrongful death statute because no evidence was put forth that he was dependent upon the decedent.  Accordingly, he must demonstrate that he may recover

i.      *Estate of Earl Cartrette, Jr.*

Senior Airman Earl Cartrette, Jr. ("J.R.") was born March 2, 1974, and was the eldest of

three sons; J.R.'s two younger brothers are Lewis, born on November 1, 1976; and Anthony

("Tony"), born on March 15, 1978.  He was killed on June 25, 1996 while stationed at Khobar

Towers. (Dec. 5, 2003 P.M. Tr. at 2-3; Ex. 9.)  J.R. attended grade and middle school at St.

Anthony's Catholic School in Sellersburg, Indiana, where his grandmother worked. His

grandmother was in charge of the school cafeteria. After St. Anthony's, J.R. attended Providence

High School, a catholic high school in Clarksville, Indiana.  J.R. played football from the third

grade through his junior year in high school. He also ran track all through grade school, middle

school and his junior year of high school. When he was younger he played soccer and basketball

and wrestled. *Id.* at 7-8.

J.R. decided to join the U. S. Air Force after high school. J.R. underwent basic training at

Lackland AFB and advanced technical school at Shepherd AFB, both in Texas. He was then

assigned to Eglin AFB in Florida.  *Id.* at 20-21.  He was deployed with the 58th Fighter Squadron

to Saudi Arabia in March 1996, and was scheduled to return on June 27, 1996, two days after the

bombing.

J.R.'s estate is represented by his mother, Denise Eichstaedt.  J.R.'s estate has asserted

claims under Florida's wrongful death statute because he was last domiciled in Florida.  As the

personal representative of J.R.'s estate, Denise Eichstaedt is the proper plaintiff to bring a

wrongful death action under Florida law.  *See* Fla. Stat. Ann. § 768.20-768.21.  In light of the

---

under a valid cause of action under the laws of Indiana, the state in which he was domiciled at
the time of the attack.  A more detailed discussion of his claim will be provided later in this
opinion. *See infra* Part VI.K.2.a.

fact that J.R. had no spouse or lineal descendants, and because no evidence was presented as to his siblings' financial dependence upon J.R., any recovery under this wrongful death action is for the benefit of J.R.'s mother, Denise Eichstaedt.  *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Earl Cartrette, Jr. has made out a valid claim for wrongful death under Florida law.  The beneficiaries of this estate, however, are not entitled to recover the present value of any "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death because J.R. was under 25 years old when he died, and did not have either a surviving spouse or any surviving lineal descendants.  Fla. Stat. Ann. § 768.21(6)(a)(1).   Still, J.R.'s mother is entitled to recover for her own mental pain and suffering arising out of this wrongful death action due to the fact that J.R. left no other survivors.  *See* Fla. Stat. Ann. § 768.21(4).[36]  A discussion of these intangible economic damages of the wrongful death recovery, will be addressed below in an individualized discussion of the claim of Denise Eichstaedt.

### ii.      Denise Eichstaedt

Denise Eichstaedt, a United States citizen, was Senior Airman Earl Cartrette, Jr.'s mother.  Denise was born on March 8, 1953 in Jeffersonville, Indiana. She had three brothers and a sister and grew up in the Jeffersonville area. Denise is married to James Eichstaedt. She is a nurse. Her first husband was Earl Cartrette, Sr. who died on February 18, 1992, the year that J.R.

---

[36] In addition to being survived by his mother, J.R. was survived by his two brothers. J.R.'s brothers, however, are not considered "survivors" under the Florida wrongful death statute because they have not put forth evidence of any dependence upon J.R.  *See supra* note 29. Therefore, any potential recovery under the wrongful death claim brought be J.R.'s estate shall be solely for the benefit of his mother, Denise Eichstaedt.  To the extent that J.R.'s brothers can recover, they must make a valid intentional infliction of emotional distress claim under the laws of the states in which each was domiciled at the time of the attack.

graduated from high school. Denise had three sons with Earl Cartrette, Sr.: J.R. who was born

March 2, 1974; Lewis who was born on November 1, 1976; and Anthony ("Tony") who was

born on March 15, 1978. Denise raised the three boys in Sellersburg, Indiana, a small town

approximately 6 miles north of Jeffersonville where Denise's parents still live. *Id.* at 4-5.

Denise did not attempt to return to work for two and one-half months after J.R. was

killed. When she did return to work, she was unable to perform her duties because she worked on

a floor with terminally ill patients, where it was difficult to work without crying. As a result, the

hospital gave her more time off, and she stayed home for six months. At that point, however, she

decided that it was in everyone's best interest for her to resign because she felt as though she

could not do that type of work anymore. In mid-February 1997, she went to work in a

pediatrician's office. In the days and weeks following J.R.'s death, Denise did not want to sleep.

That period of time is essentially "a blur" for her. *Id.* at 36-37.

Denise has attempted to obtain professional counseling over the years.  She went to see a

civilian psychiatrist and did not continue because he wanted to put her on medication for

depression.  Denise explained that she did not want to take drugs.  Denise believes that she is

better off sitting at home contemplating in her own mind, talking to herself, rather than taking

medication.  Denise also attempted to go to a couple of meetings of an organization called

Compassionate Friends which includes the parents of children who have been killed.  She

concluded, however, that she did not fit in because they did not understand what happens to a

parent when her child is killed by a terrorist.  *Id.* at 36-38.  When Denise looks at a picture of

J.R., she begins to cry.  Sometimes she cries for a short period of time and sometimes she cries

off and on for a couple of days.

As Dr. Cable testified, Denise

> is still certainly in the loss and loneliness [stage]. She is still having
>
> a very difficult time. The things that keep her going are her work and
>
> her faith. … [S]he has still got a room almost as a museum [which]
>
> shows that she is frozen in time at a point back where this happened.
>
> . . . Her pain will continue for quite a period of time.  She is trying to
>
> do better.  She works at it.  She  makes her own effort, but she is still
>
> have a difficult time and will.

(Feb. 10, 2004 Tr. at 121-22.)

Based upon the evidence presented at trial, Denise Eichstaedt has experienced severe mental anguish and suffering as a result of her son's untimely death.  Therefore, this Court shall award to the estate of Earl Cartrette, Jr., by Denise Eichstaedt as Personal Representative, $5 million for the benefit of his mother Denise Eichstaedt to compensate her for the mental pain and suffering she sustained as a result of her son's death.

### iii.    Anthony Cartrette

Anthony W. Cartrette ("Tony") is a United States citizen, and is one of the two brothers of Earl Cartrette, Jr.  Ex. 280 ¶¶ 1-3.  J.R. and Tony lived together in the same home for 14 years while both were growing up, and still in school.  J.R. was a very supportive big brother to Tony, and always took care of him.  Tony was always able to confide in J.R. and ask for his guidance. "J.R. was the glue that held everyone together." Ex. 280, ¶ 6.

After the memorial services, Tony had a "melt down."  He was unable to sleep for days and did not eat very much. Tony was only 17 years old when J.R. died.  It is very difficult for

Tony to accept that J.R. is gone.  Tony has not been able to talk to anyone else about J.R.'s death.

Ex. 280, ¶ 13.

Tony misses J.R. the most when he goes home to visit their family and realizes that J.R.

will not be joining them. Birthdays and holidays are also difficult for Tony. There are still times

when Tony is alone that he wants to pick up the phone and call J.R. and realizes that Tony can't.

J.R. is on Tony's mind every second of every day and Tony misses him more each day. J.R.'s

death was a shock. There is no closure because Tony didn't get to say good-bye. Ex. 280, ¶¶ 14-

16.

According to Dr. Cable, Tony

> is in loss and loneliness certainly. . . .  [H]e also has some unresolved
>
> issues with his brother, kind of unfinished business issues that
>
> probably evoke some earlier stages of grief as well. It's very intense
>
> grief and problems. . . .  He will have continuing difficulties for quite
>
> a period of time. . . .  He need to be able to talk about all of his
>
> feeling, including guilt feelings, unfinished business, and all.  So it's
>
> a long road ahead for him.

(Feb. 10, 2004 Tr. at 125-26.)

As the brother of Earl Cartrette, Jr., Anthony Cartrette has brought an intentional

infliction of emotional distress claim against the defendants for pain and suffering caused by the

death of his brother.  Based on the evidence presented to the Court, Anthony Cartrette has

satisfied the elements to establish a valid claim for intentional infliction of emotional distress

under Florida law.  First, defendants Iran, MOIS, and the IRGC provided material support to

Saudi Hezbollah with the intent that Saudi Hezbollah would carry out attacks that would cause severe emotional distress.  Second, the tragic bombing of the Khobar Towers by means of material support and civil conspiracy is an act that is nothing short of extreme, outrageous, and beyond all bounds of civil decency.  As is the nature of terrorism, terrorists seek to perform acts that are deliberately outrageous and bring about extreme suffering in order to achieve political ends.  Third, defendants' actions in facilitating and supporting the Khobar Towers bombing proximately caused Tony's emotional distress because the material support and direction given to Saudi Hezbollah ensured the event would occur.  Finally, the evidence shows that Tony suffered emotional distress, and that his emotional distress was severe.  Accordingly, the Court finds that Anthony Cartrette is entitled to recover from defendants $2.5 million in compensatory damages for the mental anguish and suffering associated with the loss of his brother.

*e.        Estate and Surviving Family Members of Patrick Fennig*[37]

*i.        Estate of Patrick Fennig*

Patrick Fennig ("Pat") is a United States citizen, who was born on April 17, 1962 in Wisconsin.  Pat had two older brothers, Mark who was born on March 24, 1959, and Paul who was born on January 17, 1961.  As a child, Pat loved airlines and reading. Cassie testified that Pat "liked being a little boy. He was a fun child, always busy."  Pat had a very good relationship with his two brothers. They played together and like each other. Ted testified that as a child Pat

---

[37] As will be discussed further below, plaintiffs Paul and Mark Fennig, Patrick's brothers, cannot recover under Florida's wrongful death statute because no evidence was put forth that either was dependent upon the decedent.  Accordingly, each must demonstrate that he may recover under a valid cause of action under the laws of Wisconsin, the state in which each was domiciled at the time of the attack.  A more detailed discussion of their claims will be provided later in this opinion. *See infra* Part VI.H.2.a, b.

"enjoyed doing everything."  (Dec. 9, 2003 Tr. at 8-9, 48-50.)

Ted testified that "[w]hen Pat was about six or seven years old, somehow – well, his interest in airplanes kind of came together. And he said, 'Dad, when I graduate from high school, I'm going to join the Air Force.' … And he graduated from high school and he lived up to his convictions and joined the Air Force." *Id.* at 50. Pat attended basic training at Lackland AFB and corresponded with his parents during this period of time. Pat had a great interest in maintaining jets in the Air Force, developed a high level of professional acuity and was selected maintenance maintainer of the year. Pat's first permanent assignment was Malmstrom AFB in Montana.  Pat's second permanent duty assignment was Ramstein AFB in Germany.  Pat received the Airman of the Year Award from the Air Force in 1990. Pat was "very proud that he won it, and happy that he came to that point in his life; that he did something that he was proud of."  After completing his assignment in Germany, Pat came home on leave for three weeks around Christmas.  (Dec. 9, 2003 Tr. at 18-21, 52.)

Next, Pat was assigned to Hill AFB in Utah, and then reassigned to England.  Pat was later deployed to Kunsan AFB in Korea. While stationed in Korea, Pat was selected with a few other mechanics and officers to retrieve and fix a plane that was forced to make an emergency landing on an island. Pat's next permanent assignment was Edwards AFB in California.  Ted testified that while he was stationed at Edwards AFB, Pat was recruited to work in the private sector by aircraft manufacturing companies. Pat loved the Air Force and decided to wait to seek employment in the private sector until after he retired from the Air Force.  (Dec. 9, 2003 Tr. at 21-24, 53-54.)  In July of 1993, Pat was reassigned to Eglin AFB in Florida. *Id.* at 24-27.  From Florida, Pat was assigned to Saudi Arabia.  Pat was scheduled to return from Saudi

Arabia on June 27, 1996.  *Id.* at 30-31.

Pat's estate is represented by his parents, Thaddeus C. Fennig and Catherine Fennig. Pat's estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida.  As the personal representatives of Pat's estate, Thaddeus C. Fennig and Catherine Fennig are the proper plaintiffs to bring a wrongful death action under Florida law. *See* Fla. Stat. Ann. § 768.20-768.21.  In light of the fact that Pat had no spouse or other survivors as defined by Fla. Stat. Ann. § 768.18, any recovery under this wrongful death action is for the benefit of Pat's parents, Thaddeus and Catherine Fennig.  *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Patrick Fennig has made out a valid claim for wrongful death under Florida law.  The beneficiaries of this estate are entitled to recover the present value of any "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death because Pat was over 25 years old when he died, and died with surviving parents, but without other dependents.  *See* Fla. Stat. Ann. § 768.21(6)(2).  Additionally, although Pat was over 25 years of age at the time of his death, Pat's parents are nonetheless entitled to recover for their own mental pain and suffering arising out of this wrongful death action due to the fact that Pat died without any other survivors.  *See* Fla. Stat. Ann. § 768.21(4).

Dr. Herman Miller, an economic consultant testified as an expert that, as a result of Pat's untimely death, he experienced a net economic loss of $1,120,304.00. The Court should therefore award the Estate of Patrick Fennig, by Thaddeus C. Fennig and Catherine Fennig as personal representatives, $1,120,304.00 in economic damages for the benefit of Pat's parents, Thaddeus C. Fennig and Catherine Fennig.  As for the intangible economic damages of the wrongful death

recovery, the Court will address those awards below, in an individualized discussion of the

claims of  Thaddeus C. Fennig and Catherine Fennig.

>  *ii.*        *Thaddeus C. Fennig & Catherine Fennig*

Catherine Fennig ("Cassie") and Thaddeus C. Fennig ("Ted") are United States citizens

and the parents of Patrick Fennig ("Pat").  (Dec. 9, 2003 Tr. at 3, 44.)  Cassie was born in

Marshfield, Wisconsin on May 13, 1933.  *Id.* at 3.  Ted was born on October 14, 1931 in

Milwaukee, Wisconsin to Charles and Marie Fennig.  *Id.* at 44.  For the first nine years of their

marriage the Fennigs lived in West Alice, Wisconsin and then moved to Greendale, Wisconsin, a

southwest suburb of Milwaukee, in August of 1965.  *Id.* at 6.

Cassie described the effect of Pat's death on her as follows:

> I was devastated.  You finally get to sleep; it takes days. You wake up
>
> in the morning and it's the first thing you thought of. When you went
>
> to bed at night, it's the last thing you thought of. . . .  And it was hard.
>
> I had many thank yous to write and it took me a couple of weeks, but
>
> I tried to do some each day. Music was no longer important to me. I
>
> always had music on in the home. It was hard to pick up a book and
>
> read. It took quite a while before I could get things together and – but
>
> it's always there. There's a pain in your chest that never goes away.

*Id.* at 42-43.

Ted testified that it was difficult to sleep following Pat's death.  Ted thinks of Pat

often.  He has regular dreams about Pat.  *Id.* at 63-64.

According to Dr. Cable, Cassie is

> in loss and loneliness. She, too, has done reasonably well. But she
> still expresses and demonstrates a strong sense of loss and that she is
> not through the real loneliness yet. She has found things that fill her
> time, but there is nothing that replaces Pat for her. . . . Her grief will
> continue. She will experience it. … [S]he will recover, but it will be
> waves of grief that will come back from time to time; special events,
> family affairs, holidays, and the like.

(Feb. 10, 2004 Tr. at 130.)  Additionally, Dr. Cable testified that  Ted, too,

> is in loss and loneliness. He has done reasonably well. He is the
> caretaker for the rest of the family, and he has certainly carried
> through on his sense of responsibility in that. But he still misses his
> son very much. … He will continue in his grief … [and later] be hit
> by waves of grief that may come back from time to time.

*Id.* at 127-28.

Based upon the evidence presented at trial, both Thaddeus and Catherine Fennig have experienced severe mental anguish and suffering as a result of their son's untimely death. Therefore, this Court shall award to the estate of Patrick Fennig, by Thaddeus and Catherine Fennig as Personal Representatives, $5 million for the benefit of his mother Catherine Fennig and $5 million for the benefit of his father Thaddeus C. Fennig to compensate both for the mental pain and suffering both have sustained as a result of their son's death.

f.      *Estate and Surviving Family Members of Christopher Adams*[38]

i.      *Estate of Christopher Adams*

Christopher Adams, a Captain in the Air Force, was born on April 18, 1966.  (Dec. 10,

2003 A.M. Tr. at 10.)  There were eight children in the Adams family, six boys and two

girls.  Christopher Adams was the oldest of the boys.  He is the son of Catherine and John

Adams.  On June 24, 1976, at the age of 36, John Adams died of kidney failure and a massive

heart attack, having been on dialysis for six to eight hours every day during the eight

months before he died. He died in a car while most the family was traveling to a Bar Mitzvah of

good friends.  Christopher was 10 years old when his father died.  *Id.* at 111, 113.

Ever since he was a little boy, Christopher wanted to become a pilot. (Dec. 10, 2003 A.M.

Tr. at 114.)  Even when he was in high school, he would go in airplanes with a certified pilot. *Id.*

at 3.  Christopher attended Daniel Webster College in New Hampshire because of its ROTC

program in which he could learn to be a pilot. *Id.* at 28.  After his 20 years in the Air Force,

Christopher intended to become a commercial airline pilot. (Dec. 10, 2003 A.M. Tr. at 45; Dec.

10, 2003 P.M. Tr. at 60.)  He knew that being a pilot of such a large plane would help in his

subsequent career. (Dec. 10, 2003 A.M. Tr. at 6.)

Christopher obtained his flight training in Texas around 1989 or 1990 and was

---

[38] As will be discussed further below, Christopher Adams' siblings, plaintiffs Mary
Young, Daniel Adams, Elizabeth Wolf, Patrick Adams, John Adams, William Adams, and
Michael Adams, cannot recover under Florida's wrongful death statute because no evidence was
put forth that any was dependent upon the decedent.  Accordingly, each must demonstrate that he
or she may recover under a valid cause of action for intentional infliction of emotional distress
under the laws of the state in which each was domiciled at the time of the attack.  A more
detailed discussion of their claims will be provided later in this opinion.  *See infra* Parts VI.I.2,
J.2.

commissioned as a First Lieutenant at Lubbock. Mrs. Adams attended the ceremony, along with two of the other children, her brother, and Christopher's best friend. *Id.* at 31.  Christopher mainly flew a C-130, a huge transport plane for troops, cargo, trucks, and other large items.  *Id.* at 31.  He was involved in many covert operations in foreign countries.  *Id.* at 32, 34. Christopher was responsible for airlifting over 1,000 passengers and over 250 tons of cargo to re-supply U.S. Forces in Operation Desert Storm in 1991. He was also chosen to fly a sensitive mission filming the oil fires of Kuwait and supported Operation Promise, a humanitarian airlift into Bosnia where he flew 16 missions under combat conditions delivering over 336 tons of food, equipment, and urgently needed medical supplies.  *Id.* at 54.

Sadly, Christopher had not originally been scheduled to be in Saudi Arabia in June 1996. The wife of one of his buddies was expecting a baby, and Christopher told his buddy to stay home and that he, Christopher, would take the tour of duty. (Dec. 10, 2003 A.M. Tr. at 44.)

Christopher's estate is represented by his mother, Catherine Adams.  Christopher's estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida.  As the personal representatives of Christopher's estate, Catherine Adams is the proper plaintiff to bring a wrongful death action under Florida law.  *See* Fla. Stat. Ann. § 768.20-768.21. In light of the fact that Christopher had no spouse or other survivors as defined by Fla. Stat. Ann. § 768.18, any recovery under this wrongful death action is for the benefit of Christopher's mother, Catherine Adams.  *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Christopher Adams has made out a valid claim for wrongful death under Florida law.  The beneficiaries of this estate are entitled to recover the present value of any "loss of the prospective net

accumulations" of the decedent that might reasonably have been expected but for the wrongful death because, at the time of his death, Christopher was over 25 years old, with surviving parents, but without other dependents.  *See* Fla. Stat. Ann. § 768.21(6).   Additionally, although Christopher was over 25 years of age at the time of his death, his mother is nonetheless entitled to recover for her own mental pain and suffering arising out of this wrongful death action due to the fact that Christopher died without any other survivors.  *See* Fla. Stat. Ann. § 768.21(4).

Dr. Herman Miller, an economic consultant testified as an expert that, as a result of Pat's untimely death, he experienced a net economic loss of $3,153,953.00. The Court should therefore award the Estate of Christopher Adams, by Catherine Adams as personal representative, $3,153,953.00 in economic damages for the benefit of Christopher's mother, Catherine Adams. As for the intangible economic damages of the wrongful death recovery, the Court will address those awards below, in an individualized discussion of the claims Catherine Adams.

### ii.    *Catherine Adams*

Catherine Adams is the mother of Christopher Adams.  (Dec. 10, 2003 A.M. Tr. at 8.) Catherine Adams was raised in Brooklyn, and went to public schools in Brooklyn, but did not go to college.  *Id.* at 8.  Between high school and marriage, she worked in the credit and collection department of International Paper Company.  She married her husband, John, when she was 20 years old. Her husband was an only child, born in Brooklyn in 1939.  The first of the eight children was born when Mrs. Adams was 21 and the last was born when she was 31. *Id.* at 9-10.

While her husband was alive, Catherine Adams stayed at home taking care of the growing family. Just a few months before he died, she went to work for Eastern Airlines in its security department, beginning each day at 2:00 A.M. Id at 17. When he died, his mother moved in to

help with the eight children, but she only lived for four more years. *Id.* at 17-18. After her husband died, Catherine Adams had to work two jobs, both for United Artists, beginning at 9:00 A.M. and going until after midnight, working usually 14-16 hours a day. *Id.* at 19.  For the last 23 years, Catherine Adams has been a secretary at Hofstra University.  *Id.* at 20.

During the first year after Christopher died, Catherine Adams went to the cemetery every week, and after that at least once a month.  She still goes to visit once every other month. *Id.* at 65.  Catherine Adams and many members of her family have attended virtually every memorial service held in Florida, Virginia, and Washington after 1996.  *Id.* at 71-72.  There are many memorials in Long Island for him, and the family itself set up a scholarship at Christopher's college.  *Id.* at 73.

Catherine Adams was not able to return to work until the late summer 1996.  Even then, it was very hard for her. *Id.* at 74-75.  She thinks about Christopher every day.  During the last years, September 11, the bombing of the USS Cole, and other terrorist attacks are difficult for her. They bring back all of her terrible memories and make her relive Christopher's death. *Id.* at 84.

According to her son, John, Catherine Adams figuratively died on the day Christopher died. John, who has been a mental health counselor, has never seen anyone so sad.  John has worked with a lot of hurt people, but Christopher's death changed his mother in a terrible way. "She kept everybody together and Chris' death changed her. She's different, she's not the same. (Dec. 10, 2003 P.M. Tr. at 68.)

According to Dr. Cable, Catherine Adams

is still in the stage of loss and loneliness. She still continues to miss

> [her son], to miss the support he gave. The daydreaming is significant
> … because he is continuing to age in her mind. One of the things that
> implies is the grief is a changing kind of grief. … So that makes it
> very intense with the grief. Difficult for her to realize now he will
> never be married, there never will be grandchildren. … Her grief will
> continue … her pain will ease with time, but it's never going to go
> away. She will experience ongoing bouts of grief in the future.

(Feb. 10, 2004 Tr. at 98-99.)

Based upon the evidence presented at trial, Catherine Adams has experienced severe mental anguish and suffering as a result of her son's untimely death.  Therefore, this Court shall award to the estate of Christopher Adams, by Catherine Adams as Personal Representative, $5 million for the benefit of his mother Catherine Adams to compensate her for the mental pain and suffering she sustained as a result of her son's death.

g.      *Estate and Surviving Family Members of Thanh (Gus) Nguyen*

i.      *Estate of Thanh (Gus) Nguyen*

Thanh ("Gus") Nguyen was born in South Vietnam in 1959.  He had 14 brothers and sisters. (Dec. 11, 2003 A.M. Tr. at 9.)  Gus came to the United States when he was approximately 14 years old.  He had a sister, Maria, who was already in the United States, and had married an American serviceman.  *Id.* at 10-11.  When he first arrived, he went to Illinois with a host family, with whom he lived for about a year.  He then moved to Panama City, Florida, where his sister Maria and her husband were living.  *Id.* at 11.  Eventually, he became an American citizen.  He lived in Panama City until he went into the military in 1979.  *Id.* at 12-13.

In the Air Force, Gus became a jet engine mechanic. He did his boot camp training in Texas and his technical training in Illinois. *Id.* at 15. In 1983, Gus married his wife, Teresa. He and Teresa had one child, Christopher, who was born in 1984. Eventually, Gus and Teresa were divorced in 1988. *Id.* at 8.

After the divorce, Christopher lived with his father for about eight months of the year and with his mother for approximately four months of the year. *Id.* at 21-22. Gus' life revolved around Christopher. His career was harmed by spending all of his time with Christopher when he would be home. Even though he was a jet engine mechanic on the F15's, there were many engines that he just didn't have time to study because he wanted to spend all of his spare time with his son. *Id.* at 25. Teresa testified that Gus was "father of the year material." *Id.* at 42.

Gus was deployed to Saudi Arabia in April 1996. At that time, Christopher went to Ohio with his mother for Gus' three-month tour of duty. Gus was supposed to return to America on the morning after the bombing. (Dec. 11, 2003 P.M. Tr. at 24, 65.) Gus had planned to spend three more years in the Air Force after 1996, and then he was going to obtain a college degree. He ultimately wanted to build and develop better airplanes. *Id.* at 17.

Gus' estate is represented by his son, Christopher. Gus' estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida. As the personal representative of Christopher's estate, Christopher Nguyen is the proper plaintiff to bring a wrongful death action under Florida law. *See* Fla. Stat. Ann. § 768.20-768.21. In light of the fact that Gus is only survived by his son, any recovery under this wrongful death action is for the benefit of his son Christopher. *See* Fla. Stat. Ann. § 768.18; 768.21.

Based upon the pleadings and evidence presented to the Court, the estate of Thanh "Gus"

Nguyen has made out a valid claim for wrongful death under Florida law.  The beneficiaries of

this estate are entitled to recover the present value of any "loss of the prospective net

accumulations" of the decedent that might reasonably have been expected but for the wrongful

death because, at the time of his death, Christopher was survived by a lineal descendant: his son

Christopher.  *See* Fla. Stat. Ann. § 768.21(6).   Additionally, as Gus' child, Christopher is entitled

to recover for "lost parental companionship, instruction, and guidance and for mental pain and

suffering from the date of injury" arising out of this wrongful death action.  *See* Fla. Stat. Ann. §

768.21(3).

Dr. Herman Miller, an economic consultant testified as an expert that, as a result of Pat's

untimely death, he experienced a net economic loss of $596,905.00. The Court should therefore

award the Estate of Thanh "Gus" Nguyen, by Christopher Nguyen as personal representative,

$596,905.00 in economic damages for the benefit of Gus' son, Christopher Nguyen.  As for the

intangible economic damages of the wrongful death recovery, the Court will address those

awards below, in an individualized discussion of the claims Christopher Nguyen.

*ii.     Christopher Nguyen*

Christopher knows in reality that his father is dead but his heart doesn't accept it.  He gets

a "blissful look in his eyes when he looks at his dad." *Id.* at 30.  He cried a lot after returning to

Ohio, but eventually he stopped crying in front of other people.  He would just go into his

bedroom, lock the door, and cry by himself.  *Id.* at 36-37.

When he moved back to Ohio, his grades went down because he lacked the motivation.

He would often get angry, and break things.  Christopher also began to withdraw socially.  He

became much more shy, and has stayed that way ever since.  *Id.* at 61-64.  He is much more

-84-

reserved, and has a harder time making friends and trusting people.  *Id.* at 42.

Shortly after Gus died, Teresa tried to get Christopher to see a psychologist, but Christopher refused to talk to the psychologist about his father.  Nothing worked in terms of counseling because Christopher wouldn't open up.  *Id.* at 40.  He thinks about his father all the time.  Each year, June 25 is understandably a very sad day for Christopher.

According to Dr. Cable, Christopher

> is in loss and loneliness. He has been forced to grow up very quickly.
> He lost not only his father, but his best friend and his real support
> system. So there is a deep sense of loss and loneliness for him. … He
> will continue in grief. Those significant markers down the road are
> going to be real trial times for him. Just as he indicated "Dad wasn't
> there for my high school graduation," [his Dad] won't be there for
> college or when Chris gets married or any of those kind of things. So
> once again you get those waves of grief that come back because the
> person is missing from those significant events in life that should be
> shared.

(Feb. 10, 2004 Tr. at 182-83.)

Based upon the evidence presented at trial, Christopher Nguyen has experienced severe mental anguish and suffering as a result of his father's untimely death.  Therefore, this Court shall award to the Estate of Thanh "Gus" Nguyen, by Christopher Nguyen as personal representative, $5 million for the benefit of Christopher Nguyen to compensate him for the mental pain and suffering he sustained as a result of his father's untimely death.

h.      *Estate and Surviving Family Members of Brian McVeigh*

i.      *Estate of Brian McVeigh*

In June 1996, Brian McVeigh, was a twenty-one-year-old Assistant-Crew-Chief in the Air

Force. Ex. 16. Although regularly stationed at Eglin AFB, in June 1996, Brian was on assignment

in Dhahran, Saudi Arabia, where he resided at the Khobar Towers Complex. *Id.* On June 25,

1996, Brian was killed at Khobar Towers. Ex. 9.

Brian McVeigh was born in Sanford, Florida on March 27, 1975. Ex. 168 at 7-8; Depo.

Ex. 1. When Brian was three years old, his parents divorced. Ex. 168 at 8. Sandra had custody of

Brian, whose father took no interest or part in rearing Brian. *Id.* In fact, Mr. McVeigh only saw

Brian three times after the divorce (in 1978) and never after Brian turned ten. *Id.* As a result,

Sandra, a single parent, was both mother and father to Brian for most of his life. *Id.* at 27.

Brian grew up in Debary, Florida. *Id.* at 9. Brian was the quintessential American boy. He

attended middle school in Deltona, Florida. *Id.* at 11.  Brian participated in scouting for most of

his childhood.  He was a tiger cub, a cub scout, and a boy scout.  *Id.* According to Sandra, Brian

was a good boy who never caused any trouble.  *Id.* at 13.

Brian attended his freshman year of high school at Deltona High School, Deltona,

Florida.  *Id.* at 15.  He attended his sophomore year at a private Christian school, which was also

located in Deltona. *Id.* Brian returned to Deltona High School for his junior and senior years in

order to be on the wrestling and weightlifting teams. *Id.* Brian excelled at wrestling and

weightlifting. *Id.* He graduated from Deltona High School in August 1994.  *Id.*; Depo. Ex. 8.

Unlike many high school teenagers, Brian was unaffected by peer pressure.  *Id.* at 17.  He did not

drink alcohol or smoke cigarettes.  *Id.*  He was also very respectful of others.  *Id.* at 18.  After

consulting with his parents, Brian decided to join the Air Force to get some life training. *Id.* at

19; Ex. 170 at 16.  After completing his military service in the Air Force, Brian planned on

earning a college degree. Ex. 168 at 17.

Brian's estate is represented by his mother and stepfather, Sandra M. Wetmore and James

V. Wetmore.  Brian's estate has asserted claims under Florida's wrongful death statute because

he was last domiciled in Florida.  As a personal representative of Brian's estate, Sandra M.

Wetmore is a proper plaintiff to bring a wrongful death action under Florida law.  *See* Fla. Stat.

Ann. § 768.20-768.21.[39]  In light of the fact that Brian had no spouse or lineal descendants, any

recovery under this wrongful death action is for the benefit of Brian's mother, Sandra M.

Wetmore.  *See* Fla. Stat. Ann. § 768.18; *supra* note 39.

Based upon the pleadings and evidence presented to the Court, the estate of Brian

McVeigh has made out a valid claim for wrongful death under Florida law.  The beneficiaries of

---

[39] As the evidence before this Court shows, James Wetmore is a non-adoptive stepparent to Brian.  Under Florida law, a non-adoptive stepparent is deemed *in loco parentis* to the child, as distinct from being considered as the child's parent.  *K.A.S. v. R.E.T.*, 914 So.2d 1056, 1062-63 (Fla. Dist. Ct. App. 2005).  This distinction is important because "a stepparent . . . or other person standing *in loco parentis* to a child does not acquire all of the rights or assume all of the obligations of a natural parent." *Id.* at 1063.  This is in large part due to the fact that a person *in loco parentis* is under no binding obligation to care for the child, whereas–absent an adoption order–the bond between a natural parent and child is permanent.  *Id.*  In light of Florida's stance limiting the rights of non-adoptive stepparents as to their stepchildren, this Court finds that a non-adoptive stepparent under Florida law may not seek personal recovery under Florida's wrongful death statute.  *Cf. Florida East Coast Ry. Co. v. Jackson*, 62 So. 210, 211 (Fla. 1913) (holding under a previous version of Florida's wrongful death statute that it was error for the child's stepfather to join the mother as a plaintiff in the wrongful death action because only parents–and not stepparents–had the right to sue for wrongful death on behalf of their children). Accordingly, though both Sandra and James Wetmore are listed as the personal representatives of Brian's estate, only Sandra Wetmore, as Brian's mother, may properly maintain the action on her son's behalf.  To the extent that James Wetmore has sought any damages in his personal capacity as Brian's non-adoptive stepfather, his claim must be denied.

this estate, however, are not entitled to recover the present value of any "loss of the prospective

net accumulations" of the decedent that might reasonably have been expected but for the

wrongful death because Brian was under 25 years old when he died, and did not have either a

surviving spouse or any surviving lineal descendants.  Fla. Stat. Ann. § 768.21(6)(a)(1).   Still,

Brian's mother is entitled to recover for her own mental pain and suffering arising out of this

wrongful death action due to the fact that Brian left no other survivors.  *See* Fla. Stat. Ann. §

768.21(4).  A discussion of these intangible economic damages of the wrongful death recovery,

will be addressed below in an individualized discussion of the claim of Sandra M. Wetmore.

*ii.      Sandra M. Wetmore*

In addition, Sandra became clinically depressed following Brian's death. She saw a

psychiatrist and took medications to control her depression for six years. *Id.* at 39-40. For about

two years, Sandra lost herself in television and refused to entertain guests at her house. To help

his wife rediscover life, James got Sandra involved in horse back riding, something she had

enjoyed as a child.  *Id.* at 41.  Sandra blames her failing health on Brian's death.  Two years after

Brian's death, she was diagnosed with fibromyalgia.  *Id.* at 39. In 2000, she was diagnosed with

diabetes.  Finally, Sandra was diagnosed with cancer in 2003. *Id.* at 40.

Sandra finds it hard to see parents with their children, especially when the parents are

complaining about their children. She testified: "I wish mine was here to misbehave, that would

be all right." Although the pain of Brian's death has not gone away, Sandra tries to have a

"positive attitude" because Brian would want her to embrace the way he lived and not the way he

died. *Id.* at 42. It is hard to be positive, however, because Sandra is forced to remember the

tragedy with each new terrorist act, especially since the September 11th attacks on the United

-88-

States. *Id.* at 35.

As Dr. Cable stated, Sandra

> is in loss and loneliness. It's complicated or compounded by her own
>
> health issues now. The loss and loneliness is very deep because of the
>
> extreme closeness of the relationship she had with her son. They were
>
> a team for a lot of years in there, and that makes it very difficult. …
>
> Her grief will continue for the foreseeable future. I don't think she
>
> will ever fully recover.

(Feb. 10, 2004 Tr. at 167.)

Based upon the evidence presented at trial, Sandra Wetmore has experienced severe

mental anguish and suffering as a result of her son's untimely death.  Therefore, this Court shall

award to the Estate of Brian McVeigh, by Sandra M. Wetmore as personal representative, $5

million for the benefit of Sandra M. Wetmore to compensate her for the mental pain and

suffering she sustained as a result of her son's untimely death.

> i.      *Estate and Surviving Family Members of Joseph Rimkus*

> i.      *Estate of Joseph Rimkus*

In June 1996,  Joseph Edward Rimkus was twenty-two years old.  Ex. 19.  Although

regularly stationed at Eglin AFB in Florida, in June 1996, Joseph was on assignment in Dhahran,

Saudi Arabia where he resided at the Khobar Towers Complex.  *Id.*  On June 25, 1996, Joseph

was killed in the terrorist bombing at Khobar Towers. Ex. 9.

Mrs. Brooks married Joseph John Rimkus ("Mr. Rimkus") in October 1973.  Mr. Rimkus

was in the military when they married. Ex. 19, at 7. Mrs. Brooks and Mr. Rimkus had three

children: Joseph Rimkus, born April 13, 1974, James Rimkus, born September 12, 1975, and

Anne Rimkus, born December 28, 1976. *Id.* at 4-5, 44, 71; Ex. 183.  Joseph was born at Keesler

AFB in Mississippi.  Ex. 183.  James and Anne were born at Scott AFB in Illinois.  (Feb. 5, 2004

Tr. at 44, 71.)

      With the exception of a brief stay at Scott AFB, Illinois and two years in Turkey, Joseph

and his siblings were raised in the family home in Crestview, Florida. All three children attended

grammar school in Crestview. Mrs. Brooks was a stay-at-home mother who would work

occasionally and only when the children were in school. Accordingly, she spent a great deal of

time with all of her children.  Ex. 19, at 8-9.

      Mrs. Brooks described Joseph as a "wonderful" and "responsible" boy with a passion for

learning. Mrs. Brooks testified that she had a special "connection" with Joseph because he almost

died at birth.  Joseph's importance within the family unit changed significantly when Mr. Rimkus

deployed to Korea when Joseph was a freshman in high school. *Id.* at 11.  When the family

dropped Mr. Rimkus off at the airport to deploy to Korea, Mr. Rimkus told Joseph that he was

the man of the house and charged him with taking care of his mother and siblings. *Id.* at 74.  Mr.

Rimkus never communicated with his family since the time of his deployment.  *Id.* at 11-12.

From that point on, Joseph took charge of the family.  Mrs. Brooks testified how Joseph would

do the laundry, watch after James and Anne, plan the menu and do the grocery shopping, and

keep a family budget. James explained how Joseph delegated and did chores and made "sure that

there wasn't anything going on behind my parents back." *Id.* at 12.  Mrs. Brooks later divorced

Mr. Rimkus in 1991. *Id.* at 4.

      Anne testified that Joseph was a parental figure to her, advising her not to drink alcohol,

to respect herself, and taught her how to play chess and change the oil in her car. *Id.* at 73-74. Indeed, even at such a young age, Joseph took up his responsibilities with ease and without complaint. Joseph's attitude and assistance was invaluable to Mrs. Brooks, who was working full time and taking college courses in the evening. *Id.* at 11-12.

In addition to running the Rimkus home, Joseph worked several part-time jobs in high school. He worked at a local gym and fish restaurant. Joseph, along with James, even found time to volunteer at a camp for disabled children.  Mrs. Brooks testified that Joseph was a "good saver" and was "generous" with his money, giving money to his siblings and his paternal grandmother regularly. *Id.* at 13.

Joseph graduated from Crestview High School in June 1992. Ex. 185.  In addition to wanting to serve his country, Joseph joined the military to earn money to pay for college.  (Feb. 5, 2004 Tr. at 11.)  Joseph's entry into the Air Force did not diminish the closeness of the Rimkus family.  Joseph regularly wrote, sent care packages, and/or telephoned to Mrs. Brooks, James, and Anne while he was in the Air Force. *Id.* at 23, 52, 80.  Joseph left for Saudi Arabia on his twenty-second birthday. *Id.* at 22.

Joseph's estate is represented by his mother, Bridget Brooks.  Joseph's estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida.  As a personal representative of Joseph's estate, Bridget Brooks is a proper plaintiff to bring a wrongful death action under Florida law.  *See* Fla. Stat. Ann. § 768.20-768.21.  In light of the fact that Joseph had no spouse or lineal descendants, any recovery under this wrongful death action is for the benefit of his mother, Bridget Brooks.  *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Joseph

Rimkus has made out a valid claim for wrongful death under Florida law.  The beneficiaries of

this estate, however, are not entitled to recover the present value of any "loss of the prospective

net accumulations" of the decedent that might reasonably have been expected but for the

wrongful death because Joseph was under 25 years old when he died, and did not have either a

surviving spouse or any surviving lineal descendants.  Fla. Stat. Ann. § 768.21(6)(a)(1).   Still,

Joseph's mother is entitled to recover for her own mental pain and suffering arising out of this

wrongful death action due to the fact that Joseph left no other survivors.  *See* Fla. Stat. Ann. §

768.21(4).  A discussion of these intangible economic damages of the wrongful death recovery,

will be addressed below in an individualized discussion of the claim of Bridget Brooks.

*ii.*      *Bridget Brooks*

Mrs. Brooks resides at 432 Barbados Way, Niceville, Florida.  (Feb. 5, 2004 Tr. at 3.)

She was born on December 6, 1955 in St. Charles, Missouri. Mrs. Brooks is a United States

citizen. She is an operations analyst for the United States Air Force at Eglin AFB, where she was

worked for 17 years.  *Id.* at 3, 26.  Mrs. Brooks is married to Donald Brooks, whom she married

after divorcing her first husband, Joseph John Rimkus in 1991. *Id.* at 3-4.  Mrs. Brooks married

Joseph John Rimkus ("Mr. Rimkus") in October 1973.  Mr. Rimkus was in the military when

they married. *Id.* at 7.

Joseph's death dramatically affected Mrs. Brooks. Mrs. Brooks visits Joseph's grave,

which is an hour away from her house, regularly and on special anniversary dates. Mrs. Brooks

also visits Joshua Woody's grave on Joshua's birthday.  (Feb. 5, 2004 Tr. at 35.)  Mrs. Brooks

sought help to cope with Joseph's death. She relied heavily on her faith and has consulted with

several priests about her grief. She also participated in a grief support group named "Under

Pressure," which is comprised of several women who lost loved ones in the Khobar Towers bombing.  *Id.* at 37-39.  Mrs. Brooks involvement with Under Pressure helped her immensely with Joseph's death.  *Id.* at 37.

Even today, Mrs. Brooks misses Joseph terribly around the holidays.  *Id.* at 42.  She still hangs Joseph's Christmas stocking in his honor.  *Id.* at 68.  Mrs. Brooks becomes particularly depressed on the anniversary of the bombing.  She experiences additional grief each and every time she learns of another terrorist act committed in the United States or abroad.  *Id.* at 42.

According to Dr. Cable:

> [Mrs. Brooks] is in loss and loneliness. Her son was her real strength.
> Her emotions are till very raw. It's still hard for her to talk about what
> happened.   Quite a bit of pain there. … I believe her grief will
> continue for a long time into the future. She will go on with life, but
> the grief will keep coming back if she thinks about what should be or
> what should have been now. So it's not going away.[40]

Based upon the evidence presented at trial, Bridget Brooks has experienced severe mental anguish and suffering as a result of her son's untimely death.  Therefore, this Court shall award to the Estate of Joseph Rimkus, by Bridget Brooks as personal representative, $5 million for the benefit of Bridget Brooks to compensate her for the mental pain and suffering she sustained as a result of her son's untimely death.

*iii.     James Rimkus*

James Rimkus lives in Crestview, Florida. He was born on September 12, 1975, in

---

[40] (Feb. 10, 2004 Tr. at 186.)

Illinois and is United States citizen. James is married to Christina Renee Rimkus, with whom he has a daughter and a stepson.  (Feb. 5, 2004 Tr. at 44.)

James Rimkus was completely devastated by his brother's death. Joseph was James' best friend. *Id.* at 47. James looked up to Joseph and considered him a role model and father figure. *Id.* at 48-49.  Indeed, Joseph was the first person James wrote to when he was at boot camp.  *Id.* at 52.  James testified how Joseph and he were like twins.

James' grief was intensified because he was in the Navy and was not allowed to remain with his family following Joseph's death.  He had to return to his ship and deploy to the Mediterranean.  The Navy also did not offer James any counseling.  *Id.* at 63.

James testified that he began drinking more and more after his brother's death and became a severe alcoholic. *Id.* at 64. James did take Adavan, an anti-depressant, for a few months to help him cope with Joseph's death. The prescription did not work because of his drinking. Apparently, James was self-medicating with alcohol. James entered into a Christian rehabilitation clinic after leaving the Navy and has been sober for more than four years. *Id.* at 65.

James has only visited his brother's grave once. It is just too painful for him to visit Joseph's grave. Even today, James is terribly saddened because his children and Anne's future children will never know their uncle Joseph. *Id.* at 67.  Although James has had good dreams about Joseph since his death, James tries not to dream about Joseph because it causes him too much grief afterwards. He testified that he misses Joseph especially around the holidays, and on Joseph's birthday.

As Dr. Cable testified, James

        is in loss and loneliness. He has had to grow up very quickly in a very

> difficult way. He is, I think, much older than his years. He sounds it;
> he acts it. It's really aged him. Very emotional, very haunted by his
> brother's death. . . .   Grief will always be with him.  Family is his
> strength. That's the thing that will get him through. But the grief
> process is still very present.

(Feb. 10, 2004 Tr. at 188-89.)

Because plaintiffs offered no evidence that James Rimkus was financially dependent upon Joseph Rimkus prior to his death, and because damages are only available to siblings under Florida's wrongful death statute when there is evidence that the sibling was wholly or partly dependent upon the decedent, James Rimkus cannot recover for his loss under that statute. See Fla. Stat. Ann. § 768.18(1).  Instead, James Rimkus is proceeding under an intentional infliction of emotional distress claim. Because James Rimkus was domiciled in Florida on the date of his brother's death in the bombing, Florida law will govern his intentional infliction of emotional distress claim.

As the brother of Joseph Rimkus, James Rimkus has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of James Rimkus' intentional infliction of emotional distress claim are met.  The defendants conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to James Rimkus.  Finally, it is clear that James Rimkus has continued to experience emotional distress since that time due to the fact that his

brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court

shall award to James Rimkus $2.5 million to compensate him for the emotional distress, pain and

suffering that he sustained as a result of his brother's untimely death.

iv.   Anne Rimkus

Anne Rimkus lives in Gainesville, Florida. She was born on December 28, 1976 in

Illinois and is a United States citizen.  (Feb. 5, 2004 Tr. at 71.)  Anne, like Mrs. Brooks and

James, is still grieving over Joseph.

Anne was particularly close to Joseph. She testified how grateful she is for Joseph

stepping in when her father left for Korea and never returned to the family unit. *Id.* at 74-75. As

an adult, she now realizes just how much Joseph did for her growing up.  *Id.* at 75.

Anne noted that Joseph was the emotional rock that mediated the family relationships. *Id.*

Anne misses Joseph's great sense of humor and "uplifting spirit." *Id.* at 75, 79.  Anne testified

that she has only just now begun to cope with Joseph's death. *Id.* at 86.  To deal with these

wounds, Anne has recently started to see a counselor at the University of Florida, where she

studies sociology.  *Id.* at 72, 87.

Anne testified that Joseph's death caused James to close off and distance himself from

her.  *Id.* at 89.  In contrast, Joseph's death caused Mr. Rimkus to reach out to both Anne and

James. *Id.* at 88.  As Dr. Cable stated, Anne

> is still in loss and loneliness, but complicated by guilt issues that have
>
> not been resolved. … She has a lot of regrets, a lot of unfinished
>
> business…She will continue in grief. … There is not a really good
>
> support system for her, and so she is sort of dealing with everything

-96-

on her own, and I think that's going to be difficult for her in the years

ahead.

(Feb. 10, 2004 Tr. at 190-91.)

Because plaintiffs offered no evidence that Anne Rimkus was financially dependent upon

Joseph Rimkus prior to his death, and because damages are only available to siblings under

Florida's wrongful death statute when there is evidence that the sibling was wholly or partly

dependent upon the decedent, Anne Rimkus cannot recover for her loss under that statute. See

Fla. Stat. Ann. § 768.18(1).  Instead, Anne Rimkus is proceeding under an intentional infliction

of emotional distress claim.  Because Anne Rimkus was domiciled in Florida on the date of her

brother's death in the bombing, Florida law will govern her intentional infliction of emotional

distress claim.

As the sister of Joseph Rimkus, Anne Rimkus has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of her

brother.  Based upon the evidence presented to the Court, the elements of Anne Rimkus'

intentional infliction of emotional distress claim are met.  The defendants conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Anne Rimkus.  Finally, it is clear that Anne

Rimkus has continued to experience emotional distress since that time due to the fact that her

brother was taken away from her in such a tragic and horrific manner.  Therefore, this Court shall

award to Anne Rimkus $2.5 million to compensate her for the emotional distress, pain and

suffering that she sustained as a result of her brother's untimely death.

j.      *Estate and Surviving Family Members of Kendall Kitson*[41]

i.      *Estate of Kendall Kitson, Jr.*

In June 1996, Kendall Kitson ("Kenny"), deceased, was a 39 year old mechanic for F15s

and F16s in the United States Air Force.  Ex. 292, at 13. Although regularly stationed in Florida,

in June 1996, Kenny was on assignment in Dhahran, Saudi Arabia where he resided at the

Khobar Towers Complex.  *Id.*  On June 25, 1996, Kenny was killed at Khobar Towers.

Plaintiffs Kendall Kitson, Sr., Nancy R. Kitson, Nancy A. Kitson, and Steve Kitson are Kenny's

father, mother, sister, and brother respectively (collectively, the "Kitson family"). The Kitson

family, through counsel, offered affidavits of their testimony in this matter, and their affidavits

were admitted into evidence by the Court on February 9, 2004.  (Feb. 9, 2004 Tr. at 67-68.)

Kenny was born in 1956 in Virginia.  Ex. 292, at 4.  The Kitson children, like their parents, are

all United States citizens.  *Id.* at 1.

When Kenny was in high school, he went to a vocational and technical school

where he learned about aircraft. Ex. 291 at 8.  After high school, Kenny went to college for two

years, but did not enjoy college, and wanted to use his hands.  After two years in college, Mr.

Kitson remembers Kenny coming home from school one day and holding up a T-shirt that read

"United States Air Force."  Mr. Kitson was surprised to learn that Kenny had joined the military,

but he knew how interested he was in aviation since taking the classes in high school.  *Id.*

---

[41] As will be discussed further below, plaintiffs Steve K. Kitson and Nancy A. Kitson, Kendall Kitson, Jr.'s siblings, cannot recover under Florida's wrongful death statute because no evidence was put forth that either was dependent upon the decedent.  Accordingly, each must demonstrate that he may recover under a valid cause of action for intentional infliction of emotional distress under the laws of the state in which each was domiciled at the time of the attack, Texas and Oklahoma, respectively.  A more detailed discussion of their claims will be provided later in this opinion.  *See infra* Parts VI.E.2.b, L.2.a.

Kenny's sister, Nancy, was not surprised when Kenny joined the military and felt that he wanted to follow in their father's footsteps. Ex. 292, at 13.

Kenny wanted to be a pilot when he joined the Air Force, but could not work as a pilot because he did not have perfect vision.  Instead, Kenny worked as a mechanic for F15s and F16s. On military operations, Kenny would be one of the first people to arrive and one of the last people to leave. Kenny enjoyed the Air Force, and kept reenlisting, and was promoted to Technical Sergeant. He was a flight line expediter, flight chief, and production superintendent. *Id.*

Kenny had been in the Air Force for 17 years when he was killed.  He was only three years away from being able to fully retire.  Kenny volunteered to stay in Saudi Arabia during his last tour to help one of his friends who was married and had two daughters, one of whom was ill. *Id.* at 10.

Kenny's estate is represented by his parents, Kendall Kitson, Sr., and Nancy R. Kitson. Kenny's estate has asserted claims under Florida's wrongful death statute because he was last domiciled in Florida.  As the personal representatives of Kenny's estate,  Kendall Kitson, Sr., and Nancy R. Kitson are the proper plaintiffs to bring a wrongful death action under Florida law.  *See* Fla. Stat. Ann. § 768.20-768.21.  In light of the fact that Kenny had no spouse or other survivors as defined by Fla. Stat. Ann. § 768.18, any recovery under this wrongful death action is for the benefit of his parents,  Kendall Kitson, Sr., and Nancy R. Kitson.  *See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Kendall Kitson, Jr., has made out a valid claim for wrongful death under Florida law.  The beneficiaries of this estate are entitled to recover the present value of any "loss of the prospective net

accumulations" of the decedent that might reasonably have been expected but for the wrongful death because Kenny was over 25 years old when he died, and died with surviving parents, but without other dependents. *See* Fla. Stat. Ann. § 768.21(6)(2).   Additionally, although Kenny was over 25 years of age at the time of his death, Kenny's parents are nonetheless entitled to recover for their own mental pain and suffering arising out of this wrongful death action due to the fact that Kenny died without any other survivors. *See* Fla. Stat. Ann. § 768.21(4).

Dr. Herman Miller, an economic consultant testified as an expert that, as a result of Kenny's untimely death, he experienced a net economic loss of $2,183,460.00.  The Court should therefore award the Estate of Kendall Kitson, Jr., by Kendall Kitson, Sr., and Nancy R. Kitson as personal representatives, $2,183,460.00 in economic damages for the benefit of Kenny's parents, Kendall Kitson, Sr., and Nancy R. Kitson.  As for the intangible economic damages of the wrongful death recovery, the Court will address those awards below, in an individualized discussion of the claims of Kendall Kitson, Sr., and Nancy R. Kitson.

ii.     *Kendall Kitson Sr. & Nancy R. Kitson*

Kendall Kitson, Sr., met and married his wife, Nancy R. Kitson, in the late 1930s.  He then joined the Navy and served his country in the Navy for approximately 22 ½ years. Ex. 291, at 3.  The Kitsons now reside in Yukon, Oklahoma and Ft. Walton Beach, Florida. *Id.*

Kenny's death has dramatically affected Kendall and Nancy R. Kitson and their lives together. As Mr. Kitson testified in his affidavit:

> Kenny's death has ruined my entire family. . . .  My life has
>
> changed dramatically since Kenny's death. If Kenny were alive, he
>
> wouldn't let me sit around like I do.  He never let me sit down. . . .

> We miss Kenny all the time, every day. Some days are harder than
> others. We miss him terribly on his birthday and on certain days
> because he loved his mother's potato salad. . . .  I miss just seeing
> Kenny and talking to him. He always used to drive by the house.
> It's hard to laugh now or have any fun. It's difficult when my wife
> and I run into his classmates on the street or in a store. We hardly
> eat or sleep. I used to be a lot more outgoing. My wife and I used to
> be more social before Kenny's death. Now, we don't do anything.

Ex. 291 at 12, 17-19.

Since Kenny's death, Mr. Kitson sometimes flies into rages about Kenny's death and the news on our country's fight against terrorism. Nancy feels as though her parents now hate the world. Ex. 292, at 26.  Mr. and Mrs. Kitson do not like to go out or visit with anyone since Kenny's death.  In fact, Mr. Kitson will not visit his daughter Nancy's home because she has so many of Kenny's things on display. *Id.* at 30.

Mrs. Kitson is terminally ill with cancer. Mr. Kitson, as well as his children, are convinced that her declining health is related to their loss of Kenny. Exs. 291, at 23; 292, at 31; 293, at 26.  Mrs. Kitson used to visit Kenny's grave all the time and put fresh flowers on it.

As Dr. Cable testified, Mrs. Kitson

> is in loss and loneliness. That, of course, is complicated by her own
> physical condition at this point. She misses her son terribly. Her life
> was gone with his death, and now literally her life is going. … She
> will never recover. She will die still very much enmeshed in the grief

that she is in right now.

(Feb. 10, 2004 Tr. at 144.)

Additionally, Dr. Cable stated that Kendall Kitson, Sr.,

is in intense loss and loneliness. He is also in volatile emotions with a tremendous amount of anger over what happened. He is still experiencing a lot of rage over that.  He cannot seem to move on with his grief. … [H]e is one of these individuals for whom the grief will never end. I don't think he will ever be able to put things forward in his life. With his wife's death, I think he is one of these individuals who probably will see very little reason for even fighting for himself after that.

*Id.* at 146-147.

Based upon the evidence presented at trial, both Kendall Kitson, Sr., and Nancy R. Kitson have experienced severe mental anguish and suffering as a result of their son's untimely death. Therefore, this Court shall award to the estate of Kendall Kitson, Jr., by Kendall Kitson, Sr., and Nancy R. Kitson as Personal Representatives, $5 million for the benefit of his mother Nancy R. Kitson, and $5 million for the benefit of his father Kendall Kitson, Sr., to compensate both for the mental pain and suffering both have sustained as a result of their son's untimely death.

k.    *Estate and Surviving Family Members of Jeremy Taylor*[42]

---

[42] As will be discussed further below, plaintiff Starlina Taylor, Jeremy Taylor's sister, cannot recover under Florida's wrongful death statute because no evidence was put forth that she was dependent upon the decedent, her brother.  Accordingly, she must demonstrate that she may recover under a valid cause of action under the laws of Kansas, the state in which she was domiciled at the time of the attack.  A more detailed discussion of her claim will be provided

i.      *Estate of Jeremy Taylor*

In June 1996, Jeremy Taylor, deceased, was a 23 year old Senior Airman in the United

States Air Force. Although regularly stationed in Florida, in June 1996, Jeremy was on

assignment in Dhahran, Saudi Arabia where he resided at the Khobar Towers Complex.  Ex. 20.

On June 25, 1996, Jeremy was killed at Khobar Towers. Ex. 9.

Plaintiffs Lawrence Taylor, Vickie Taylor, and Starlina Taylor are Jeremy's father,

mother, and sister, respectively (collectively, the "Taylor family"). The Taylor family, through

counsel, offered affidavits of their testimony in this matter, and their affidavits were admitted

into evidence by the Court on February 9, 2004.  (Feb. 9, 2004 Tr. at 66-67.)

Jeremy was born in 1973 in Tennessee.  Jeremy is remembered by his parents as a "fun

person; the class clown who had friends from all different social sections of school. He was very

athletic and played soccer almost his entire life. . . . Jeremy was also very creative.  Everyone

who met Jeremy loved him; he was very talkative and open." Ex. 289, at 10, 15-16.

Jeremy's estate is represented by his parents, Lawrence and Vickie Taylor.  Jeremy's

estate has asserted claims under Florida's wrongful death statute because he was last domiciled

in Florida.  As a personal representative of Jeremy's estate, Lawrence and Vickie Taylor are

proper plaintiffs to bring a wrongful death action under Florida law.  *See* Fla. Stat. Ann. §

768.20-768.21.  In light of the fact that Jeremy had no spouse or lineal descendants, any recovery

under this wrongful death action is for the benefit of his parents, Lawrence and Vickie Taylor.

*See* Fla. Stat. Ann. § 768.18.

Based upon the pleadings and evidence presented to the Court, the estate of Jeremy

_____

later in this opinion.  *See infra* Part VI.M.2.a.

Taylor has made out a valid claim for wrongful death under Florida law.  The beneficiaries of this estate, however, are not entitled to recover the present value of any "loss of the prospective net accumulations" of the decedent that might reasonably have been expected but for the wrongful death because Jeremy was under 25 years old when he died, and did not have either a surviving spouse or any surviving lineal descendants.  Fla. Stat. Ann. § 768.21(6)(a)(1).   Still, Jeremy's parents are entitled to recover for their own mental pain and suffering arising out of this wrongful death action due to the fact that Jeremy left no other survivors.  *See* Fla. Stat. Ann. § 768.21(4).  A discussion of these intangible economic damages of the wrongful death recovery, will be addressed below in an individualized discussion of the claims of Lawrence and Vickie Taylor.

<em>ii.     Lawrence and Vickie Taylor</em>

Mr. and Mrs. Taylor were born in 1950 and 1951, respectively, in Tennessee, and are United States' citizens.  Exs. 288, at 3; 289, at  3.   When they met, the Taylors were still in high school, but, as Mrs. Taylor describes, "it was love at first sight." The Taylors finished high school and married in 1969. Ex. 289,  3. Soon after they married, Mr. Taylor joined the United States Air Force, and served his country as an aircraft mechanic for 20 years.

A couple of years after the Taylors married, Mrs. Taylor gave birth to their daughter, Starlina, in 1971. *Id.* at 9. Twenty-one months later, in 1973, the Taylors' son Jeremy was born. Jeremy was born prematurely and Mrs. Taylor had several complications during her pregnancy. Ex. 289, at 10.

Jeremy's death has dramatically affected Lawrence and Vickie Taylor and their lives together. As Mr. Taylor testified in his affidavit:

-104-

> I feel like my life has not been worth anything since Jeremy's death.
> It doesn't matter what you do or how much money you have or how
> many good jobs you have, there's just a big chunk missing.  A part of
> my life is gone. Jeremy is gone. Half of our world is gone. I'll never
> see him again, I'll never see his kids, I'll never know who is wife
> was, nothing. It stopped. But I can't move on, I'm just there. I drive
> by his grave every morning going to work and I drive by on my way
> home. Even though we try to go on with our lives and be there for our
> grandson, until I die, I just feel like it's another day. . . . I realize that
> my life could be worse and I have much to be grateful for, like my
> material possessions, but it doesn't matter if I lived in the White
> House or if I lived in a trailer in Alabama, my son is gone. This pain
> is going to be with me forever, regardless.

Ex. 288, at 25, 30.

Mrs. Taylor drives by her son's grave everyday.  The Taylor family decorates Jeremy's grave for the holidays such as Christmas, Valentine's Day, Memorial Day, and Halloween, and they plant flowers nearby.  On Jeremy's birthday, the family goes to the cemetery and releases balloons in his memory.  Ex. 289,  27.  Since Jeremy's death, holidays are especially difficult for the Taylor family.  Mr. Taylor does not celebrate holidays anymore.  Jeremy's death has totally changed Mrs. Taylor's way of thinking. Ex. 289,  29, 36.

Jeremy's death also had a negative impact on the Taylors' health. For example, Mr. Taylor now takes a pill every night to help him sleep, and another pill twice a day to calm his

heart.  Exs. 288, at 29; 289, at 33.  Mrs. Taylor health has suffered greatly since Jeremy's death.

She has gained weight and has had to have knee replacement surgery.  Mrs. Taylor is now living

in constant pain because she has fibromyalgia, and she doesn't sleep unless she takes sleeping

pills. Mrs. Taylor also takes an antidepressant and has arthritis. Ex. 288, at 30.

The Taylors visited a counselor for a year or so after Jeremy's death.  They also did

individual counseling and parents of murdered children and compassionate friends. Both Mr. and

Mrs. Taylor have given up on counseling. Jeremy's death has also been very hard on the Taylors'

marriage.  Mrs. Taylor feels that her husband is much more distant since Jeremy's death, while

also being more affectionate at times than he used to be. Many times he goes to his workshop and

stays there in his own little world. Exs. 288, at 28; 289, at 34.

According to Dr. Cable, Lawrence

> is in loss and loneliness, but he is also back in the guilt, and also
>
> volatile emotions [stages].  There is a lot of anger and such there.  So
>
> he has got a very complicated kind of grief going on right now. Very
>
> bitter, a lot of self blame as well as anger toward others. . . .  [H]e is
>
> one of these who will never really recover from his grief, because he
>
> doesn't see anything that can make it better. The only thing that
>
> would be better is if his son would come back. Since that's not going
>
> to happen, nothing will ever in his mind make it better.

(Feb. 10, 2004 Tr. at 195-96.)

Similarly, Dr. Cable testified that Vickie

> is in loss and loneliness, and that's complicated by the fact that she

> really has a minimal support system because of her husband's
>
> difficulties.  He is not able to be a support to her, and he is not willing
>
> to get support for himself.  So her loss and loneliness is very difficult.
>
> Then she is bothered by the premonition, and that complicates it, too.
>
> . . .  She will continue in her grief for a long period of time.  I don't
>
> know that she can ever really come out of it.

*Id.* at 197-98.

Based upon the evidence presented at trial, both Lawrence and Vickie Taylor have experienced severe mental anguish and suffering as a result of their son's untimely death. Therefore, this Court shall award to the estate of Jeremy Taylor, by Lawrence and Vickie Taylor as Personal Representatives, $5 million for the benefit of his mother Vickie Taylor, and $5 million for the benefit of his father Lawrence Taylor to compensate both for the mental pain and suffering both have sustained as a result of their son's untimely death.

     B.     *California*

          1.     *Causes of Action*

               a.     *Wrongful Death*

Under California law, a wrongful death cause of action arises "for the death of a person caused by the wrongful act or neglect of another."  Cal Civ. Proc. Code § 377.60(a).  Such a cause of action may be asserted by a number of individuals, including the decedent's surviving spouse, children, personal representative, and, when the decedent has no surviving spouse or children, the decedent's parents.  *Id.*; *Nelson v. County of Los Angeles*, 6 Cal. Rptr. 3d 650, 654-56 (Cal. Ct. App. 2003).

A plaintiff asserting a wrongful death claim is entitled to such damages that, under the circumstances of the case, may be just.  Cal Civ. Proc. Code § 377.61.  In California, "just" damages that a wrongful death plaintiff may recover include "lost present and future economic support as well as the pecuniary (as opposed to sentimental) value of such factors as lost comfort, society, companionship, care and protection."[43]  The amount of available damages in claims brought by a decedent's personal representative are limited, however, and do not include damages for pain, suffering or disfigurement.[44]

> b.      *Intentional Infliction of Emotional Distress*

In California, the elements of the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffering severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress.  *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982).  Under California law, in order for a plaintiff to have standing to recover for an intentional infliction of emotional distress claim, there is a requirement that the conduct either is directed at

---

[43] *Fox v. Pacific Southwest Airlines*, 184 Cal.Rptr. 87, 89 (Cal. Ct. App. 1982), *disavowed on other grounds by*, *Canavin v. Pacific Southwest Airlines*, 196 Cal.Rptr. 82 (Cal. Ct. App. 1983).

[44] Cal. Civ. Proc. Code § 377.34 ("In an action or proceeding by a decedent's personal representative . . . , the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."); Cal. Civ. Proc. Code § 377.61 (stating that "just" damages arising out of a wrongful death action *do not include* those damages allowed under Section 377.34)

a plaintiff or occur within the plaintiff's presence.  *See Christensen v. Superior Court*, 820 P.2d

181, 203-204 (Cal. 1992).  The plaintiff's presence is not, however, always required, and is

deemed unnecessary in situations where the defendant is aware of the high probability that the

defendant's acts will cause a plaintiff severe emotional distress.  *Id.*

As has been noted by this Court and courts of other jurisdictions, "a terrorist attack-by its

nature-is directed not only at the victims but also at the victims' families."  *Salazar*, 370

F.Supp.2d at 115 n.12 (citing *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F.Supp.2d 86, 107

(D.D.C. 2003)).  In this case, the evidence demonstrates that the defendants' motives in planning

the attack on the Khobar Towers, and indeed their motives in carrying out a systematic plan of

funding and organizing terrorist attacks, were intended to harm both the victims of the attack, and

to instill terror in their loved ones and others in the United States.  Accordingly, in the case of a

terrorist attack as this, the Court finds that the presence element does not need to be proven in

order to successfully bring a cause of action for intentional infliction of emotional distress under

California law.

In its discussion of the tort of intentional infliction of emotional distress, comment l to

Section 46 of the RESTATEMENT (SECOND) OF TORTS notes that recovery for third-parties has

typically been granted to members of the victim's "near relatives."  RESTATEMENT (SECOND) OF

TORTS § 46, cmt. l.   The Court finds this approach to be a logical one.  Accordingly, under

California law, a victim's near relatives, as defined by California's probate code, who were not

present may nonetheless have standing to seek redress under a claim of intentional infliction of

emotional distress.

2.      *Plaintiffs*

a.        *Estate and Surviving Family Members of Joshua Woody*

i.        *Estate of Joshua Woody*

Josh was killed at Khobar Towers in Dharhan, Saudi Arabia, on June 25, 1996.  (Feb. 6,

2004 Tr. at 3, 27; Ex. 9.)  Josh was a happy child.  Josh loved the outdoors and would go hunting

and fishing with his father. Josh also loved motorcycles. *Id.* at 7.

During high school, Josh was a good student who made the honor roll.  To stay in shape,

Josh ran, swam, and lifted weights. Josh wrestled, played football and worked two jobs during

high school, at McDonald's and Beekman Electric. Josh graduated in 1994.  *Id.* at 10-11, 32-33.

According to his stepfather, Josh was a "very conscientious, very thorough and very

proud of everything he did."  He was mechanically talented, and could read a manual once and

then rebuild an engine or weld a diamond plate in the bed of a truck. *Id.* at 34-35.

As soon as he turned 16, Josh got his driver's license and started working at McDonald's

as a cook. Once the owner of McDonald's learned that Josh was handy mechanically Josh was

promoted to the maintenance manager for that store and later for three stores.  *Id.* at 37.

After high school, Josh decided to join the United State Air Force.  Josh wanted to go to

college and he knew that his cousin Joseph had gone into the Army to obtain money for college.

Josh had the same plan. Josh enlisted in the Air Force in August 1995 and attended basic training

at Lackland AFB in Texas. Josh wrote letters to Bernie from Texas. Josh was next assigned to

Sheppard AFB for advanced training to load armaments onto F-16 fighter jets.  *Id.* at 11-13, 38.

While Josh was stationed at Sheppard he and a friend took a weekend trip to Oklahoma.

During this trip, Josh met Dawn. Josh next received his permanent assignment to the 58th Fighter

Squadron at Eglin AFB in Florida. Eventually, Josh and Dawn moved to Florida together and on

February 22, 1996, Josh and Dawn were married in Oklahoma. Bernie and George attended the wedding. The day after the wedding, Josh and Dawn and Bernie and George spent the day together looking through antique stores. This was the last time that either George or Bernie saw Josh alive. *Id.* at 13-14, 38-40; Ex. 204 at 109-111, 116.

Josh was deployed to Saudi Arabia on April 3, 1996 and was scheduled to return to Eglin at the end of June 1996. Josh was in very good health.  He worked out and used to run on the beach. Josh was a weapons loader on F-15s in the 58th Fighter Squadron.  After completing his six years in the Air Force, Josh had plans to go to college and to work for American Airlines. (Feb. 6, 2004 Tr. at 63-64.)  Josh was buried next to his best friend Joseph Rimkus on July 5, 1996. Josh and Joe were roommates at Khobar Towers.

Josh's estate is represented by his wife, Dawn Woody.  Josh's estate has asserted claims under California's wrongful death statute because he was last domiciled in California.  As the personal representative of Josh's estate, Dawn Woody is the proper plaintiff to bring a wrongful death action under California law.  *See* Cal Civ. Proc. Code § 377.60(a).  Because Josh was married at the time of his death, any recovery under this wrongful death action is for the benefit of his wife Dawn Woody.  *See* Cal Civ. Proc. Code § 377.60(a).

Based upon the pleadings and evidence presented to the Court, the estate of Joshua Woody has made out a valid claim for wrongful death under California law, and the beneficiaries of this estate are entitled to recover the present value of any lost present and future economic support of the decedent that might reasonably have been expected but for the wrongful death. *See supra* note 43 and accompanying text.  Though, as Josh's widow, Dawn Woody is entitled to recover personally for the loss of Josh's companionship and protection, the California wrongful

death statute does not allow for recovery of damages for any mental pain and suffering Dawn Woody sustained as a result of her husband's death.  *See supra* note 44.  Accordingly, this Court will limit its analysis presently to a discussion of lost present and future economic earnings of Joshua Woody.  A discussion of the intangible economic damages resulting from Dawn Woody's mental anguish shall be dealt with in a discussion of Dawn Woody's individual intentional infliction of emotional distress claim, below.

Dr. Herman Miller, an economic consultant testified as an expert that, were it not for Josh's untimely death, he experienced a net economic loss of $1,981,521.00. The Court therefore awards the Estate of Joshua Woody, by Dawn Woody as personal representative, $1,981,521.00 in economic damages for the benefit of Dawn Woody.

ii.    *Dawn Woody*

Dawn Woody, a United States citizen, is the widow of Joshua Woody.  Josh was murdered on June 25, 1996 at Khobar Towers in Saudi Arabia.  (Feb. 6, 2004 Tr. at 54.)  Dawn was born on May 18, 1972 in Dubuque, Iowa.  Dawn met Josh at a party in Miami, Oklahoma during the summer of 1995. Josh was stationed at Sheppard AFB at the time and he and a friend had taken a weekend trip to Oklahoma. *Id.* at 56.

Josh received his orders to transfer to Eglin AFB in Florida. Josh and Dawn "decided [they] didn't want to be apart." Josh and Dawn moved to Ft. Walton Beach, Florida and got an apartment. They were young and broke but they were happy. *Id.* at 58, Ex. 207.  Josh proposed to Dawn in the Fall of 1995 while they were in their car driving home after he picked her up from work. Dawn's family was very happy for Dawn and Josh.  Josh and Dawn were married in Claremore, Oklahoma on February 21, 1996.

-112-

After the attack on the Khobar Towers, Dawn didn't eat or drink for two days. On Friday, June 28, 1996 the military personnel returned to tell Dawn that Josh was dead and his body had been identified.  For a long time, Dawn visited Josh's grave every weekend.  *Id.* at 73, Ex. 212.

Dawn testified regarding the effect of Josh's death on her life:

> I don't have the self-confidence I used to have.  I'm not married.  I
> don't have children. . . .  It's difficult and it's just hard.  There are
> certain things I can't do. . . .  I don't want people in my home.  I used
> to be social. . . .  [I'm] just a lot more closed off than I used to be.
> I'm not the same person  that I was.

(Feb. 6, 2004 Tr. at 77.)

Dawn tried to go back to work a couple months after Josh's death but was unable to cope. It took Dawn about two years to return to work. Dawn eventually decided to return to graduate school to work on her master's degree. The first year was about attending the various memorial services which made it very difficult to function. Dawn was proud of Josh, wanted him to be remembered and believed he deserved all the recognition he received but it was hard for Josh's family. Dawn too was in a lot of pain.  *Id.* at 78.

After the attack, Dawn did not initially seek professional help. She joined a support group with the other widows and Bridget Brooks. These women bonded together and became friends. In the past year, at the encouragement of her family, Dawn began seeing a therapist. The therapist told Dawn that Dawn hadn't yet dealt with Josh's death. The therapist recommended that Dawn write a letter to Josh to tell him goodbye. Dawn stopped seeing that therapist because she didn't want to do that and she didn't want to be medicated. *Id.* at 79.

Dawn doesn't like the holidays anymore. Josh's birthday, their wedding anniversary, and the anniversary of Josh's death are especially difficult for Dawn. Dawn sometimes dreams about Josh and wakes up crying. *Id.* at 80. Dawn thinks about Josh every day. *Id.* at 82.

As Dr. Cable testified, Dawn

> is still in loss and loneliness. ... She has put her life back together to
> a degree with her work and so on, but she still has a lot of sense of
> missing him, a lot of sense of emptiness, and a lot of the "What ifs?"
> for her life. ... She will continue in loss and loneliness for the period
> ahead; slowly, ... move on to where the grief will re-occur from time
> to time, but be able to reshape a life.

(Feb. 10, 2004 Tr. at 83-84.)

As the wife of Joshua Woody, Dawn Woody has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of her husband. Based upon the evidence presented to the Court, the elements of Dawn Woody's intentional infliction of emotional distress claim are met. The defendants conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous. As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Dawn Woody. Finally, it is clear that Dawn Woody has continued to experience emotional distress since that time due to the fact that her husband was taken away from her in such a tragic and horrific manner. Therefore, this Court shall award to Dawn Woody $8 million to compensate her for the emotional distress, pain and suffering that she sustained as a result of her husband's untimely death.

-114-

###### iii.      *Bernadine Beekman*

Bernadine Rose Beekman ("Bernie"), a United States citizen, is the mother of Airman

First-Class Joshua E. Woody ("Josh").  (Feb. 6, 2004 Tr. at 2-3.)  In 1989, Bernie met George

Beekman who was born in Los Angeles, California on December 29, 1939, at the anniversary

party of a mutual friend.  George was an aerospace engineer who retired in December 1989

before he turned 50.  On August 22, 1971, Bernie married John Edward Woody. Bernie and John

had four children: Tracy in August 1971; Jonica in April 1974; Josh in October 1975; and

Timothy in March 1978. Bernie and Edward were divorced in April 1989.  *Id.* at 4.

Bernie testified that even though she has other children, she will never get over losing her

son, Josh. Bernie had trouble sleeping in the days and weeks after Josh's death. Sometimes

Bernie dreams of Josh.  Bernie thinks about Josh every day. Additionally, other terrorist attacks

like September 11, 2001 devastate her emotional state.

Bernie has been given some assistance through attending grief counseling sessions.  *Id.* at

23-24.  Still, as Dr. Cable testified, Bernie "is in loss and loneliness. She was very close to her

son and is obviously in a lot of pain right now.  That's not about to subside. ... I would see a good

many years yet of continued pain, loss and loneliness, and a need for some real counseling."

(Feb. 10, 2004 Tr. at 85.)

As the mother of Joshua Woody, Bernadine Beekman has brought an intentional

infliction of emotional distress claim against the defendants for pain and suffering caused by the

death of her son.  Based upon the evidence presented to the Court, the elements of Bernadine

Beekman's intentional infliction of emotional distress claim are met.  The defendants' conduct in

facilitating, financing, and providing material support to bring about this attack was intentional,

extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants'

planning and assistance brought immediate emotional distress to Bernadine Beekman.  Finally, it

is clear that Bernadine Beekman has continued to experience emotional distress since that time

due to the fact that her son was taken away from her in such a tragic and horrific manner.

Therefore, this Court shall award to Bernadine Beekman $5 million to compensate her for the

emotional distress, pain and suffering that she sustained as a result of her son's untimely death.

<em>iv.     George Beekman</em>

In 1989, Bernie met George Beekman who was born in Los Angeles, California on

December 29, 1939, at the anniversary party of a mutual friend. George was an aerospace

engineer who retired in December 1989 before he turned 50. Bernie and George were married in

Carson City, Nevada in April 1990, and they bought a house together in Corning, California.

(Feb. 6, 2004 Tr. at 9-10.)  Josh was 15 years old.  During the remainder of high school, Josh

lived with George and Bernie.  George was active in Josh's life, attending his football games and

other sports activities.  *Id.* at 36.

As Josh's stepfather, George Beekman has brought an intentional infliction of emotional

distress against the defendants.[45]  Based on the evidence presented to the Court, however, Mr.

Beekman is not entitled to recover under an intentional infliction of emotional distress claim due

to the fact that, as a stepparent, Mr. Beekman lacks sufficient standing to recover for Josh's

death.

---

[45] Because Josh was survived by his wife, Dawn, and because damages are only available to parents under California's wrongful death statute when there is no surviving spouse or children, Mr. Beekman cannot recover for his loss under that statute. *See* Cal Civ. Proc. Code § 377.60.

Under California law, standing to bring a claim against a defendant resulting from the death of an individual is conferred on those who are entitled to inherit property of the deceased under the provisions of the California Probate Code. *See* Cal. Civ. Proc. Code § 377.60; Cal. Prob. Code § 6402. Inheritance is reserved to near relatives of the deceased. Cal. Prob. Code § 6402. Accordingly, in order for Mr. Beekman to have standing to bring an intentional infliction of emotional distress claim arising from the death of his stepson, Mr. Beekman must qualify as a near relative of Joshua Woody as defined by California's Probate Code.

Under California's Probate Code, parents of the deceased are deemed near relatives for the purposes of inheritance. Cal. Ann. Prob. Code § 6402. In California, however, a parent-child relationship only exists in certain circumstances: (1) between a child and the child's natural parents; and (2) in the case of an adoption, the parent-child relationship exists between the child and the child's adoptive parents. *See* Cal. Ann. Prob. Code § 6450(a), (b). Indeed, as the California Supreme Court has held, "a stepchild . . . does not automatically become the 'child' of the stepparent . . . for purposes of inheritance." *Estate of Joseph*, 949 P.2d 472, 479 (Cal. 1998) (quoting *Estate of Cleveland*, 22 Cal. Rptr. 2d 590, 599 (Cal. Ct. App. 1993)). It stands to reason, then, that a person cannot automatically establish a legally binding parent-child relationship for purposes of inheritance merely by becoming a stepparent.

Instead, California courts have determined that stepparents are deemed parents for purposes of inheritance in one of two situations. First, a stepparent is deemed a parent if the stepparent legally adopts the child as his or her own.[46] Second, if the stepparent has not legally

---

[46] *See, e.g.*, *Estate of Cleveland*, 22 Cal.Rptr.2d at 595. Such a requirement makes sense because adoption of a child "extinguishes the rights of natural parents [as to that child] forever," whereas mere guardianship by a stepparent "only suspends the rights of parents." *Id.*

adopted the child, California law will nonetheless deem a stepparent a parent if the stepparent

can show the stepparent-stepchild relationship was created during the stepchild's minority, and

show by clear and convincing evidence that the stepparent would have adopted the stepchild but

for a legal barrier.  Cal. Ann. Prob. Code § 6454.

In this case, notwithstanding the relationship Mr. Beekman and Josh had while Josh was

alive, there is no evidence presented by plaintiffs that Mr. Beekman legally adopted Josh.

Moreover, though the relationship between Mr. Beekman and Josh began while Josh was still a

minor, there is no evidence presented before this Court that Mr. Beekman would have adopted

Josh, but for a legal impediment.  As a result, Mr. Beekman cannot be considered a parent under

California law, and is therefore precluded from recovering for damages resulting from his

stepson's death.  Accordingly, Mr. Beekman's claim for intentional infliction of emotional

distress fails for lack of standing, and must therefore be denied.

<em>v.    Tracy Smith</em>

Tracy M. Smith, a United States citizen, was born on August 27, 1971 in San Jose,

California. Ex. 283 at 1.  Tracy is married to Todd Smith and has two children: Joshua, born on

April 15, 1998, and Nicholas, born on July 30, 1999.  Id at 3.  Tracy is a sister of Joshua Edward

Woody ("Josh"), who died as a result of a terrorist bombing at the Khobar Towers in Dhahran,

Saudi Arabia, on June 25, 1996. Tracy graduated from Los Gastos High School in Los Gatos,

California, in June 1989, and is presently employed as a deli clerk for Publix in Kennesaw,

Georgia.  *Id.* at 4-5.

Josh's death affected Tracy in many ways.  Immediately after Josh's death, Tracy

experienced trouble sleeping.  Even when she did fall sleep, Tracy would wake herself crying.

-118-

To this day, Tracy constantly thinks of Josh. Each time she does think about him, her heart sinks. Tracy is particularly emotional on Josh's birthday and on the anniversary of his death. *Id.* at 22. Moreover, celebrating the holidays has also become less fun for Tracy since Josh's death. Even though Tracy now has her own family, she cannot overcome the emptiness caused by Josh's death. Tracy is saddened that Josh is not alive to celebrate the holidays with her and her sons.

According to Dr. Cable, Tracy is "in loss and loneliness. Like her stepfather, a lot of her grief energies have really gone into worrying about her mother. So there are issues in her own grief that she has not yet been able to deal with . . . . Her grief will continue for a considerable period of time." (Feb. 10, 2004 Tr. at 88.)

As the sister of Joshua Woody, Tracy Smith has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of her brother. Based upon the evidence presented to the Court, the elements of Tracy Smith's intentional infliction of emotional distress claim are met. The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous. As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Tracy Smith. Finally, it is clear that Tracy Smith has continued to experience emotional distress since that time due to the fact that her brother was taken away from her in such a tragic and horrific manner. Therefore, this Court shall award to Tracy Smith $2.5 million to compensate her for the emotional distress, pain and suffering that she sustained as a result of her brother's untimely death.

### vi.    *Jonica Woody*

Jonica Woody, a United States citizen, was born on April 28, 1974 in San Jose,

-119-

California.  Jonica is a mother of a five-year old son named Brendan, who was born on December 5, 1998.  (Dec. 19, 2003 Tr. at 47-48.)  Jonica is the sister of Joshua Woody.  She is eighteen months older than Josh.  *Id.* at 48, 57.

Since Josh's death, Jonica has had quite a few dreams about Joshua continuously throughout each passing year.  *Id.* at 59.  Jonica testified that Josh's death has affected her in dramatic ways.  She lost her emotional rock, close friend and brother in Josh.

Jonica has not received any counseling to help her deal with Josh's death.  *Id.* at 59-60.  Josh's birthday, October 6th, Christmas, and other holidays when the family gathers together, are still difficult for Jonica.  *Id.* at 60.  Jonica testified that Joshua's death spoiled their future plans.  She thinks of Josh "[d]aily, more than once a day, all the time."  *Id.* at 61.  As Dr. Cable testified, Jonica

> is still very much in loss and loneliness. It is helped by the fact that she has a son, and that has been something to occupy her. ... Her grief will continue for quite a period of time. She is one who really significantly needs grief therapy. When someone is talking about their grief, everything being as it was seven years ago, there is a lot of unresolved grief there to deal with.

(Feb. 10, 2004 Tr. at 90.)

As the sister of Joshua Woody, Jonica Woody has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of her brother.  Based upon the evidence presented to the Court, the elements of Jonica Woody's intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

-120-

financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Jonica Woody.  Finally, it is clear that Jonica Woody has continued to experience emotional distress since that time due to the fact that her brother was taken away from her in such a tragic and horrific manner.  Therefore, this Court shall award to Jonica Woody $2.5 million to compensate her for the emotional distress, pain and suffering that she sustained as a result of her brother's untimely death.

<i>vii.</i>     <i>Timothy Woody</i>

Timothy Allen Woody ("Tim"), a United States citizen, was born on March 28, 1978 in California. Ex. 278, at 1.  Tim is the younger brother of Josh Woody, who died as a result of a terrorist bombing at the Khobar Towers in Dhahran, Saudi Arabia, on June 25, 1996.  *Id.* at 3. In June 1996, Tim entered the United States Navy after graduating from Corning Union High School.  He spent four years in the Navy.  Tim is currently employed as a stock-person at Wal-Mart in Geneva, New York.  *Id.* at 4.

Growing up, Tim remembers always looking up to Josh. Josh was his role model.  In his childhood years, Tim would always follow Josh around the house and try to involve himself in whatever Josh was doing. Tim was the typical little brother, and Josh was the typical big brother. *Id.* at 5.  Tim lived with his father for several years before starting high school, while Josh lived with their mother.  Nevertheless, they remained close, and saw each other regularly.  Josh and Tim attended the same high school and they saw each other every day.  *Id.* at 6.

After learning about Josh's death, Tim needed to be alone in order to control his emotions. Tim had just graduated from high school and was waiting to enter the Navy.  Josh's

death was a severe blow to Tim's outlook on life. His big brother, his role model, was gone.  Tim

was also saddened by the fact that he did not get to say goodbye to Josh.  The last time Tim saw

Josh was before he left for basic training at Lackland AFB, Texas, around August 1995. *Id.* at

13.

Tim thinks about Josh all the time.  Tim keeps pictures of Josh in his wallet as well as

mementos of his brother.  Tim has often dreamed about Josh since his death.  Although he thinks

about Josh often in a week, there are certain times of the year when Tim's grief is greater. For

example, he becomes particularly moody and sad on Josh's birthday and on the anniversary of his

death. On the anniversary of his death, Tim always lights a candle for Josh in his house. *Id.* at 16.

Josh's death changed everything in Tim's life. He no longer has a brother. The holidays

and special family events are less joyous. There is a marked emptiness at family events and

Josh's absence is overwhelming. Because Tim cannot replace his brother, he fears that he will

not recover from the sense of emptiness he feels. Josh's death was devastating to Tim and his

entire family. *Id.* at 19-20.  As Dr. Cable testified, Tim is

> still in loss and loneliness. . . .  There was a lot of pent up emotion
>
> still inside. . . .  He had a very difficult time expressing his feelings
>
> . . . . [H]e will continue in grief for a long time to come.  He would
>
> benefit greatly from some grief therapy, and that would be advised for
>
> him.

(Feb. 10, 2004 Tr. at 92-93.)

As the brother of Joshua Woody, Timothy Woody has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of his

brother.  Based upon the evidence presented to the Court, the elements of Timothy Woody's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Timothy Woody.  Finally, it is clear that

Timothy Woody has continued to experience emotional distress since that time due to the fact

that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this

Court shall award to Timothy Woody $2.5 million to compensate him for the emotional distress,

pain and suffering that he sustained as a result of his brother's untimely death.

### b.    Estate and Family Members of Leland ("Tim") Haun

#### i.    Estate of Leland ("Tim") Haun

Leland T. ("Tim") Haun was killed in the Khobar Towers bombing on June 25, 1996.

(Dec. 19, 2003 Tr. at 33; Ex. 2.)  Tim was born on April 25, 1963 and was 33 years old when he

died. Ex. 4.  Tim left behind his wife Ibis ("Jenny") Haun and two step-children: Senator Haun

and Milagritos ("Milly") Perez-Dalis.

Tim's estate is represented by his wife, Ibis "Jenny" Haun.  Tim's estate has asserted

claims under California's wrongful death statute because he was last domiciled in California.  As

the personal representative of Tim's estate, Jenny Haun is the proper plaintiff to bring a wrongful

death action under California law.  *See* Cal Civ. Proc. Code § 377.60(a).  Because Tim was

married and had children at the time of his death, any recovery under this wrongful death action

is for the benefit of his wife, Jenny Haun, and his two stepchildren Senator Haun and Milly

Perez-Dallis.  *See* Cal Civ. Proc. Code § 377.60(a).[47]

Based upon the pleadings and evidence presented to the Court, the estate of Leland "Tim" Haun has made out a valid claim for wrongful death under California law, and the beneficiaries of this estate are entitled to recover the present value of any lost present and future economic support of the decedent that might reasonably have been expected but for the wrongful death.[48] Though, as Tim's widow, Jenny Haun is entitled to recover personally for the loss of Tim's companionship and protection, the California wrongful death statute does not allow for recovery of damages for any mental pain and suffering Jenny Haun sustained as a result of her husband's death.  *See supra* note 44.  Accordingly, this Court will limit its analysis presently to a discussion of lost present and future economic earnings of Tim Haun.  A discussion of the intangible economic damages resulting from Jenny Haun's mental anguish shall be dealt with in a discussion of her individual intentional infliction of emotional distress claim, below.

Dr. Herman Miller, an economic consultant testified as an expert that, were it not for

---

[47] Senator Haun and Milly Perez-Dallis are the decedent's non-adopted stepchildren, and may therefore only recover if plaintiffs show evidence that the stepparent-stepchild relationship between Tim Haun and his stepchildren was created during the time they were minors, and show clear and convincing evidence that Tim Haun would have adopted the Senator and Milly but for a legal barrier.  *See* Cal. Ann. Prob. Code § 6454.  Here, the Court finds there is sufficient evidence that both elements are met.  Tim became Senator and Milly's stepfather when both were still minors.  (Dec. 19, 2003 Tr. at 13.)  And plaintiffs have presented evidence that he wished to adopt his stepchildren, and would have but for the inability to locate their biological father, which this Court finds to be a sufficient legal barrier to prevent the legal adoption.  Ex. 286.  This Court is also persuaded by the litany of evidence plaintiffs have submitted that shows Tim Haun held Senator and Milly as his own children, and provided sole financial care for them.  *See, e.g.*, (Dec. 19, 2003 Tr. at 13-14.)  Accordingly, this Court finds that Senator Haun and Milly Perez-Dallis may recover as beneficiaries to the estate of Leland "Tim" Haun.  Consequently, they may also recover for own personal claims arising out of Tim Haun's death, provided the elements of their claims are satisfied.

[48]   *See supra* note 43 and accompanying text.

Tim's untimely death, he experienced a net economic loss of $2,822,796.00. The Court therefore awards the Estate of Leland "Tim" Haun, by Jenny Haun as personal representative, $2,822,796.00 in economic damages for the benefit of Jenny Haun, Senator Haun, and Milly Perez-Dallis, to be distributed in accordance with the method of intestate distribution under California law.  As for the intangible economic damages of the wrongful death recovery, the Court will address those awards below, in an individualized discussion of the claim of Ibis "Jenny" Haun.

ii.      *Ibis ("Jenny") Haun*

Jenny Haun is the wife of CPT Tim Haun.  She was born in Lima, Peru on July 9, 1959. She is an American citizen.  (Dec. 19, 2003 Tr. at 3.)  Jenny was raised in Peru by her extended family, including her mother, father, grandparents, uncles, and cousins. Jenny's childhood was a happy one.  She attended the best of schools in Peru and participated in activities like gymnastics, drama, and acting.  At 14 years of age, Jenny left Peru for the United States to live with her aunt and uncle in New York.  Soon after moving in with her aunt and uncle, though, Jenny decided to get a job and live on her own.  *Id.* at 3-4, 7.

When Jenny was 15 years old, she married and had her first child, whom she named Jose Perez.  Years later, he changed his name to Senator Haun.  At age 16, Jenny had a second child, who she named Milagritos ("Milly") Perez.  Jenny's husband had a drug problem, which wreaked havoc on her young family.  "Every time he came home, he stole things from me and took my money and my paycheck. . . ."  Even though she was only 16 years old, Jenny worked hard to support her children, while also dealing with a husband who tried to steal the money she brought home.  *Id.* at 5-6.

At age 19, Jenny divorced her husband, obtained custody of her two children, and moved to Chicago, where there was better pay and more opportunities for her kids. The biological father of Jenny's children never had contact with them again. "The kids don't know their father. My kids call him the sperm donor."  *Id.* at 5, 7.

Upon arriving in Chicago, Jenny began working a job and attending school at the Central YMCA Community College.  It was difficult for Jenny to make money, attend classes, and raise her children, so she decided to quit school to spend more time with her children.  After living in Chicago for five years, Jenny and her children moved to Tucson, Arizona.  It was here that Jenny met Tim Haun. *Id.* at 8.  Jenny met Tim in April 1990 at a nightclub in Tucson.  They married on October 6, 1990.  *Id.* at 13.

Jenny was crushed by Tim's untimely death.  Jenny also suffered by seeing how Tim's death affected her children.  Milly was so unstable after Tim's death that she was put in a mental institution for a short period of time.

Since Tim died, Jenny's entire family has fallen apart. "We don't have any family after Tim's death." *Id.* at 38. Holidays are difficult and the family does not even get together for Christmas anymore. "This [year] is the first time we're going to be together." Other holidays are difficult for Jenny as well - Father's Day, Mother's Day, Easter, Halloween, Thanksgiving, the children's birthdays, and her wedding anniversary.  *Id.* at 42-43.

The pain of Tim's death has not subsided for Jenny in the six and a half years since the bombing.  She "feel[s] a lot of pain . . . [her] heart never stops hurting."  *Id.* at 41.  As Dr. Cable testified, Jenny

is in loss and loneliness. Her loss and loneliness includes this issue of

future plans, particularly this having a child together, which creates

a real sense of emptiness that they were not able to do that and that

that can never be fulfilled. And also loss and loneliness not just for

herself, but the impact this has had on her children, because it's had

a dramatic impact on them. So she has her own pain for her loss, but

her pain for her children as well. . . . She will . . . also experience

significant grief into the future. She has not been able to move off of

this "What if?" and the issue of having a child.

(Feb. 10, 2004 Tr. at 40-41.)

Based upon the evidence presented to the Court, the elements of Jenny Haun's intentional

infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing,

and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Jenny.  Finally, it is clear that Jenny has

continued to experience emotional distress since that time due to the fact that her husband was

taken away from her in such a tragic and horrific manner.  Therefore, this Court shall award to

Ibis "Jenny" Haun $8 million to compensate her for the emotional distress, pain and suffering

that she sustained as a result of her husband's untimely death.

### iii.    Senator Haun

Senator Haun is the step-son of Leland "Tim" Haun.  He was born in Newark, New

Jersey on June 1, 1975. He is an American citizen.  Ex. 286 at 1, 3.  Senator spent part of his

childhood in New Jersey and Chicago, but when Senator was eight years old, he moved with his

mother and sister to Tucson, Arizona.  Senator spent the remainder of his childhood in Arizona.
*Id.* at  4.  Senator's birth father has never been a part of his life. He has only seen his birth father
in pictures. *Id.* at 3.

After Jenny and Tim married, the whole family moved into a house on base with Tim.
Senator's life quickly changed for the better. The family began eating dinner together, had special
family brunches, and took family vacations. Senator developed a close relationship with Tim and
began calling him "Dad."  (*Id.* at 13-17; Dec. 19, 2003 Tr. at 20.) Senator had a great affection
for Tim. Ex. 286 at 14, 20.  Tim treated Senator as if he was Tim's own son. (Dec. 19, 2003 Tr.
at 22.)  In fact, Tim wanted to adopt Senator, but was unable to because nobody could locate
Senator's birth father.  Senator ended up changing his last name to "Haun" when he was old
enough to do so.  *Id.* at 21.

After Tim's funeral, Senator had a difficult time accepting that he was gone.  Senator
never saw his Dad's body and part of Senator still wonders whether Tim really died or whether
the military had it all wrong. Senator began feeling depressed and lonely. These feelings were
compounded by the fact that it was difficult for Senator to talk to his mother because talking with
her and hearing the sadness in her voice made him feel worse. Ex. 286 at 29-30.

Months after Tim died, Senator's wife Clavel left him.  Senator's relationship with his
wife Clavel began to deteriorate soon after Tim died. They began arguing often and as the
relationship regressed, the marriage began falling apart. Clavel left Senator in February of 1997,
filed for divorce, and moved to Tucson with their son, Tim, Jr.  Senator has not seen his son
since 1998.  Tim junior is now seven years old and Senator does not even know where Clavel
and Tim junior live.  *Id.* at 31-32.

Soon after Clavel left Senator, his depression and feelings of loneliness worsened. Senator began drinking and smoking marijuana in the hopes that this would take away the pain he was feeling. Senator's condition continued to decline, however, and in 1999, Senator began hearing voices in his head. He had never heard voices before. Senator began thinking that people were planning something against him. When someone spoke to him, Senator would hear what they were saying, but would also hear other voices. On one occasion, Senator smashed his arm into a glass window at an apartment complex because he heard voices telling him to do it. During this period, Senator felt like the whole world was against him. *Id.* at 33-34.

Throughout 2000 and 2001, Senator's problems continued. He lost his job, then lost his apartment and became homeless. Senator felt depressed and lonely and was still hearing voices in his head. *Id.* at 36.  In 2001, Senator eventually sought help and was diagnosed with paranoia and schizophrenia.  Over the last two years, Senator has worked with doctors at COPE to address his psychological problems and eliminate the voices in his head. Senator has been seeing a psychiatrist regularly and has also been prescribed different combinations of medication in an attempt to eliminate the voices he hears.  Senator currently takes, or has recently taken, multiple medications, including Haldol, Cogentin, Abifill, and Ativan. Today, Senator no longer hears voices in his head. *Id.* at 37.

According to Dr. Cable, Senator Haun

> is still clearly in the loss and loneliness [stage]. . . . [H]e even still is
> back to some degree in the volatile emotions [stage]. There is still an
> awful lot of anger and sadness. . . .  His father's death has had a
> tremendous impact on him and has really changed him forever. …

> [H]e very definitely needs professional grief therapy because the
>
> impact on him has been so severe. . . . [H]is prognosis is guarded …
>
> I would be concerned that without good psychological help, he could
>
> have major problems in the future."

(Feb. 10, 2004 Tr. at 44-45.)

As a recognized survivor to Leland "Tim" Haun, Senator Haun has brought a claim of intentional infliction of emotional distress against the defendants.  Based upon the evidence presented to the Court, the elements of Senator Haun's intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Senator.  Finally, it is clear that Senator has continued to experience emotional distress since that time due to the fact that his father was taken away from him in such a tragic and horrific manner.  Therefore, this Court shall award to Senator Haun $5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his father's untimely death.

### iv.     Milly Perez-Dallis

Milly Perez-Dalis is the step-daughter of CPT Tim Haun. She was born in Livingston, New Jersey on December 26, 1977. She is an American citizen. Ex. 287,  1, 3.  Milly spent portions of her childhood in New Jersey and Chicago. But when she was five or six years old, Milly moved to Tucson, Arizona with her mother and brother.  Milly never knew or spoke to her birth father.  She has never even seen him in person. Milly's birth father never provided her, her

brother, or her mother with money or support of any kind. *Id.* at 3, 5. Milly was 12 or 13 years old when her mother Jenny began dating Tim. *Id.* at 7.

Dealing with Tim's death was especially difficult for Milly because she had only recently moved to Florida and did not have any close friends there to support her or anyone to talk to. *Id.* at 30. Milly started feeling depressed soon after Tim's death. These feelings of depression intensified when Milly's marriage began falling apart. She was overwhelmed trying to handle things with the military for Jenny, taking care of her children, and at the same time coping with the loss of her Dad and the break-up of her marriage. *Id.* at 34.

After Milly's psychological problems got worse, she was placed in a state mental institution. Nearly two months after Tim's death, Milly's husband sought a divorce and petitioned the court for custody of the children. In his petition for divorce, Milly's husband stated that Tim's death had a great impact on Milly and that as a result of Tim's death, Milly had been placed in a state mental institution, was unstable, and was unable to raise her children. *Id.* at 37-38.

Milly fell apart after this incident. She swallowed a bottle of pills, started drinking heavily, and felt like committing suicide. Milly had never felt this way before. In a short period of time, she went from being perfectly fine to being entirely unstable. *Id.* at 39.

As a result of her declining mental and psychological state, Milly was again institutionalized. When she was released, Milly returned home to find her husband packing up the house. Milly asked what he was doing and he showed her temporary custody papers that a court had just issued. He informed Milly that he was taking the children and leaving town. Milly ultimately moved back to Tucson, Arizona to be close to her children. Milly was ordered that she

could not see her children without supervision.  To this day, Milly must still be supervised when she spends time with her kids.  *Id.* at 40-43.  Beginning in 1999, Milly began receiving psychological help from an agency in Arizona that provided her with a psychiatrist to visit every month. This psychiatrist listened to Milly and diagnosed her with major depression, an anxiety disorder, and a compulsive disorder.  *Id.* at 44.

Since Tim's death, Milly has experienced difficulties keeping a job.  She gets nervous around people and sometimes struggles with doing normal things that she would never have thought twice about before Tim died.  *Id.* at 46.   Father's Day, Christmas, and the anniversary of Tim's death are particularly difficult days for Milly.  *Id.* at 47.  September 11, 2001 was also a difficult day for Milly.  *Id.* at 49.

According to Dr. Cable, Milly

> is still looking to recapture the past, which she can't get, but she wants to be the way it was before. Her life has simply not been the same since Tim's death. She wants everything to be the way it was. So very much loss and loneliness. … I believe her grief is going to continue for a long time into the future. She, too, … really needs some intensive grief therapy to help her get through this. She is going to have a difficult time moving on in life, regaining her balance, really being able to get back to a normal kind of life.

(Feb. 10, 2004 Tr. at 48-49.)

As a recognized survivor to Leland "Tim" Haun, Milly Perez-Dallis has brought a claim of intentional infliction of emotional distress against the defendants.  Based upon the evidence

presented to the Court, the elements of Milly Perez-Dallis' intentional infliction of emotional

distress claim are met.  The defendants' conduct in facilitating, financing, and providing material

support to bring about this attack was intentional, extreme, and outrageous.  As the evidence

shows, this horrific act precipitated by the defendants' planning and assistance brought

immediate emotional distress to Milly.  Finally, it is clear that Milly has continued to experience

emotional distress since that time due to the fact that her father was taken away from her in such

a tragic and horrific manner.

Though the Court typically awards children of terrorist attack victims $5 million to

compensate them for the severe emotional distress associated with losing a parent, the Court does

have discretion to adjust the amount of the award in cases where the victim's emotional distress

is significantly more extreme.  Based upon the evidence presented to this Court, Milly's

emotional distress is of such an extreme nature as to warrant an increase in the award for her

emotional distress.  Therefore, this Court shall award to Milly Perez-Dallis $7 million to

compensate her for the emotional distress, pain and suffering that she sustained as a result of her

father's untimely death.

c.      *Shawn Wood*

Shawn Michael Wood is an older brother of Justin Wood.  He was born in Modesto,

California on March 27, 1971. He is an American citizen.  (Dec. 4, 2003 P.M. Tr. at 50.)  Shawn

was raised in Modesto, where he attended and graduated from public school.  After graduating

from high school, Shawn attended junior college for a short period of time, then left junior

college to pursue a career in music.  During the day, Shawn worked at a local restaurant and

during the evenings, he practiced guitar, wrote songs, and played in bands with his friends. After

playing in bands for a short period of time, Shawn decided that he wanted to further pursue a career in the music industry and he enrolled in the Art Institute in Seattle, Washington to study audio production.  *Id.* at 51-52.

The days following Justin's death are a blur to Shawn.  He remembers being with his family and his girlfriend's family, seeing people he had not seen in a long time, and receiving many flowers and cards.  *Id.* at 61.  He could not stay focused on school after Justin's death, so he took a semester off from the Art Institute. When Shawn returned to school, his grades suffered.  *Id.* at 65.

Justin's death deeply affected Shawn's relationships with his family, especially his father. It was difficult for Shawn to interact with his father because they did not communicate well and because they dealt with Justin's death differently.  *Id.* at 72-73.

Shawn has created a web site in Justin's honor and he talks to people through email who have lost loved ones in terrorist attacks.  He talks to people who cannot sleep at night, who cannot close their eyes.  *Id.* at 77-78.  Today, Shawn still thinks of Justin every day.  Shawn still keeps some of Justin's possessions on display in his home.  Shawn still feels hate and rage as a result of Justin's death.  *Id.* at 74.  As Dr. Cable testified, Shawn

> is in loss and loneliness. It's tempered by his wife and children, which
> really are a help to him, but it's compounded by his parents' issues,
> particularly the father in the sense of not only losing his brother, but
> he doesn't count in his father's life any more either. His loss and
> loneliness is not just for his brother, but he is very much devoted to
> all of those who died and honoring all of them. . . .  His grief will

continue. There will always be reminders, things that make it difficult

for him.

(Feb. 10, 2004 Tr. at 211-12.)

As Justin Wood's brother, Shawn Wood has brought a claim of intentional infliction of

emotional distress against the defendants.  Based upon the evidence presented to the Court, the

elements of Shawn Wood's intentional infliction of emotional distress claim are met.  The

defendants' conduct in facilitating, financing, and providing material support to bring about this

attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act

precipitated by the defendants' planning and assistance brought immediate emotional distress to

Shawn.  Finally, it is clear that Shawn has continued to experience emotional distress since that

time due to the fact that his brother was taken away from him in such a tragic and horrific

manner.  Therefore, this Court shall award to Shawn Wood $2.5 million to compensate him for

the emotional distress, pain and suffering that he sustained as a result of his brother's untimely

death.

    *C.*    *Louisiana*

        *1.*    *Causes of Action*

           *a.*    *Wrongful Death*

In Louisiana, the decedent's survivors[49] may bring a wrongful death action when the

decedent dies "due to the fault of another."  La. Civ. Code Ann. Art. 2315.2(A).  Such a cause of

---

[49] According to Louisiana Civil Code, the decedent's surviving spouse and children may bring such an action.  If there are none, however, then the decedent's parents, siblings, or grandparents—in that order—may bring the action for wrongful death. See La. Civ. Code Ann. Art. 2315.2(A).

action is intended to "compensate the victim's beneficiaries for their compensable injuries following the victim's moment of death." *Mathieu v. Louisiana Dep't of Transp. & Dev.*, 598 So.2d 676, 681 (La. Ct. App. 1992).  Potential beneficiaries entitled to recovery include the surviving spouse, children, parents, siblings, and grandparents of the deceased, but do not include children who were not legally adopted at the time of the decedent's death. La. Civ. Code Ann. Art. 2315.2(A).  Recoverable damages for a wrongful death claim include lost wages, "loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses." *Id. But see* La. Civ. Code Ann. Art. 2315.2(B) (stating that damages do not include costs for future medical treatment).  Surviving relatives under Article 2315.2 may also recover for their own individual pain and suffering sustained as a result of the wrongful death to the decedent. *Robertson v. Town of Jennings*, 55 So. 375, 379-80 (La. 1911).

### b.      Intentional Infliction of Emotional Distress

Louisiana courts follow Section 46 of the RESTATEMENT (SECOND) OF TORTS in recognizing the tort of intentional infliction of emotional distress.  *See White v. Monsanto Co.*, 585 So.2d 1205, 1208-1210 (La. 1991).  The elements of the tort of intentional infliction of emotional distress in Louisiana are that: (1) the defendant's conduct was extreme and outrageous; (2) the plaintiff suffered severe emotional distress; and (3) the "defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."  *Id.* at 1209.  Under Louisiana law, however, there is a requirement that, in order for a plaintiff to recover for a damages caused by injury to another, that plaintiff must have either viewed or immediately come upon the scene of the injury.  *See* La. Civ. Code Ann. Art. 2315.6.  Louisiana courts have interpreted the term "view" to require the plaintiff's

actual presence at the event causing the injury.  *See Daigrepont*, 663 So.2d 840, 841 (La. 1995) (finding that plaintiffs were entitled to no recovery if "viewing" of injury was only by videotape). Moreover, the Louisiana Supreme Court has left little room for interpretation of this provision, stating that such a law is clear and unambiguous, and therefore no further interpretation of the provision may be made with regard to the legislature's intent in enacting it.  *Id.*  Accordingly, to the extent that any plaintiffs may not recover under the wrongful death statute, they may not recover under Louisiana law if they were not actually present at the site of the attack.

    2.    *Plaintiffs*

        a.    *Estate and Surviving Family Members of Kevin Johnson, Sr.*

            i.    *Estate of Kevin Johnson, Sr.*

Kevin Jerome Johnson, Sr., was killed in the Khobar Towers bombing on June 25, 1996. (Dec. 4, 2003 A.M. Tr. at 64-65; Ex. 2.)  Kevin was born on January 25, 1960.  He was 35 years old when he died.  Ex. 284, ¶ 4; Ex. A.  Kevin is survived by his wife, Shyrl, his biological sons, Kevin Johnson, Jr. and Nicholas Johnson, and his stepson, Che Colson.  He is also survived by his mother, Laura Johnson, and his brother, Bruce Johnson.

When he was growing up, Kevin was a very good student.  In high school, he was always on the Dean's List and he was accepted to attend Grambling State University. *Id.* at ¶ 14.  Kevin was also a hard-worker.  He got his first job when he was 15 or 16 years old, helping a local man raise worms, which were then sold to fishermen.

After Kevin finished college at Grambling, he entered into the Air Force.  He was eventually assigned to Little Rock Air Force Base in Arkansas upon finishing his military

training.  Kevin planned on making the military his career and wanted to make sure his three little boys and wife were taken care of.  *Id.* at ¶ 23.

Kevin's estate is represented by his wife, Shyrl Johnson.  Kevin's estate has asserted claims under Louisiana's wrongful death statute because he was last domiciled in Louisiana.  As the surviving spouse and children of Kevin's estate, Shyrl Johnson, Kevin Johnson, Jr., and Nicholas Johnson are the proper plaintiffs to bring a wrongful death action under Louisiana law.  *See* La. Civ. Code Ann. Art. 2315.2(A).  Any recovery under this wrongful death action is for the benefit of Shyrl Johnson, Kevin Johnson, Jr., and Nicholas Johnson as the surviving children and spouse.  *See* La. Civ. Code Ann. Art. 2315.2(A).[50]

Based upon the pleadings and evidence presented to the Court, the estate of Kevin Johnson, Sr., has made out a valid claim for wrongful death under Louisiana law, and the beneficiaries of this estate are entitled to recover the present value of any lost present and future economic support of the decedent that might reasonably have been expected but for the wrongful death.  Dr. Herman Miller, an economic consultant testified as an expert that, due to Kevin's untimely death, he experienced a net economic loss of $1,171,477.00.  The Court therefore awards the Estate of Kevin Johnson, Sr., by his surviving spouse and children, $1,171,477.00 in economic damages for the benefit of Shyrl Johnson, Kevin Johnson, Jr., and Nicholas Johnson, to be distributed  in accordance with the method of intestate distribution under Louisiana law.  A

---

[50] Under Louisiana's wrongful death code, surviving parents and siblings may not recover if there is a surviving spouse or surviving children.  *See See* La. Civ. Code Ann. Art. 2315.2(A)(2), (3).  Accordingly, neither Kevin's mother, Laura Johnson, nor his brother, Bruce Johnson, may bring a wrongful death action under Louisiana law.  Additionally, as will be discussed below, Che Colson is not a proper plaintiff under Louisiana's wrongful death statute due to the fact that non-adopted stepchildren are not considered "children" under Louisiana's wrongful death code.  *See infra* Part VI.C.2.a.vii.; La. Civ. Code Ann. Art. 2315.2(D).

discussion of intangible economic damages of the wrongful death recovery, will be addressed

below in an individualized discussion of the claims of Shryl Johnson, Kevin Johnson, Jr., and

Nicholas Johnson.

*ii.*     *Shryl Johnson*

Shyrl Johnson is the wife of Kevin Johnson, Sr.  She was born in Shreveport, Louisiana

on October 22, 1958.  She is an American citizen.  (Dec. 4, 2003 A.M. Tr. at 4.)  Shyrl was

raised in Shreveport, Louisiana by her mother, who was a nurse, and her stepfather, who was an

electrician.  She attended public school and after graduating from high school, attended college at

Northwestern State University.  *Id.* at 4-5.  During Shyrl's first year at college, she met Greg

Colson, whom she later married.  Ironically, Kevin Johnson, Sr., was the piano player for Shyrl

and Greg's wedding ceremony.

In 1982, Shyrl and Greg had a son, who they named Che.  *Id.* at 5-7.  Soon after Shyrl had

Che's birth, her marriage with Greg fell apart due to Greg's drug addiction. Greg had a severe

drug problem and Shyrl did not want her young son being around drugs or people caught up in

the drug community.  Shyrl and Greg were divorced in 1984. *Id.* at 7, 43-44.  After Shyrl and

Greg divorced, Greg's relationship with Che continued to be a distant one. Greg would come see

Che once in a while on the weekends, but did not visit him on a regular basis. Greg and Che

never shared a traditional father-son relationship. *Id.* at 7.

Shyrl has always worked since she graduated from college. When Shyrl was married to

Greg, she worked at the Southwestern Electric Power Company as a stenographer.  She then

transferred to the Shreveport Area School District, where she worked for the school

-139-

superintendent as a stenographer and secretary.  At one point, Shyrl joined the Air Force

Reserves as a second job, which she worked on the weekends. *Id.* at 7-8.

Shyrl and Kevin did not meet again until 1986, when Shyrl was going through the

confirmation process in the Catholic church.  Kevin's mother, Laura Johnson was Shyrl's

sponsor through the confirmation process.  Shyrl, who had recently divorced her husband Greg,

was pleased to become reacquainted with Kevin, whom she remembered from her wedding

ceremony, and they quickly became friends.  *Id.* at 10.

In the weeks and months following their reacquaintance, Shyrl and Kevin talked on the

telephone often. Kevin was stationed at Little Rock AFB at the time and Shyrl was still living in

Shreveport, so the two could not see each other often, but they frequently talked to each other on

the telephone over the course of three or four months before they began dating.  During this

period, Kevin went on rotation to Mildenhall AFB in England, but even when he was travelling,

Kevin kept in touch with Shyrl. Their phone bills were quite high during these three to four

months. *Id.* at 12-13.  Kevin and Shyrl also kept in touch through letters.  *Id.* at 13.

About six months after becoming reacquainted, Shyrl and Kevin began dating.  Shyrl was

taken with Kevin's smile, his honesty, and his easygoing nature.  Shyrl and Kevin dated for four

years and were married in 1990.  *Id.* at 15; Ex. 51.  After Shyrl and Kevin married, Kevin

transferred to Patrick AFB in Florida. Kevin wanted to spend more time with the children and the

Air Force told him that he would not have to travel as much.  Kevin and Shyrl were also told that

Kevin would not have to travel to Saudi Arabia, which they both viewed as another benefit of

transferring. *Id.* at 48-49.

Kevin was a wonderful husband. Kevin would cook, would clean, would fold clothes. He always listened and would help Shyrl make important decisions in her life. Kevin also encouraged Shyrl to do things that she always wanted to do, like go back to school to become a teacher. (Dec. 4, 2003 A.M. Tr. at 36-37, 39.)

Kevin was also a great father. "He treated Che just like he was his biological father." Kevin played sports with Che, took him to church, and was the father figure that Che never had. *Id.* at 20-23, 38. Kevin and Shyrl also had two children of their own: Kevin and Nicholas. Kevin was a great father with these boys as well. Kevin spent a lot of time with all of the children and enjoyed being a father. He arranged family trips that the kids would enjoy to places like Disney World, St. Louis, and Mud Island, Tennessee and spent his free time with the kids. *Id.* at 46-48.

Shyrl and Kevin had great plans for the future. In the days before Kevin died, he and Shyrl were talking about transferring to Mildenhall AFB in England, which they thought would be great for the children. Shyrl had actually gone to pick up information about Mildenhall on the day she learned about the Khobar Towers bombing. Kevin planned on staying in the military for at least 25 years, then eventually going to work for a commercial airline. *Id.* at 50-53.

Shyrl broke down emotionally immediately after finding out that Kevin had been killed. *Id.* at 66.  After the funeral, Shyrl held herself together for about six months, before she just "fell apart."  Shyrl has experienced breakdowns since this initial episode, but they have not been quite as bad.  She especially misses Kevin "[w]hen things start piling up . . . because he was always there to balance me out and I miss that. I can talk to him but he's not answering back." *Id.* at 77-79.

Certain days are particularly difficult for Shyrl. September 11, 2001 was one of those days. Shyrl's reaction to the September 11 attack was so severe that she had to leave the classroom she was teaching in and have another teacher take over the class. She left work early that day to pick up her children, so they wouldn't be afraid. "I tried to shelter them as much as I could in not seeing so much of it. But [little] Kevin said, 'it's just like Khobar Towers, mommy. They're just never going to catch them.'" (Dec. 4, 2003 A.M. Tr. at 87-89.)

As Dr. Cable stated, Shyrl

> is also in loss and loneliness. She is a widow who sees herself under a great deal of pressure with her job, her children. … She has really held herself together as best she could, more for the children than for anything else. … She will … continue to grieve in the future. … [A]s her children get older, she will be more open to letting her grief come out more.  A lot of it is still kept behind closed doors, so to speak. … [T]here is going to be a lot of recurrence of grief when the children reach milestones.  When they graduate from college, when a child marries, that will tend to bring back a lot of grief for her, because those are times that Kevin should be there to support and be a part of all of that.

(Feb. 10, 2004 Tr. at 53-55.)

As Kevin Johnson's wife, Shyrl Johnson has brought a wrongful death claim arising from the death of her husband, Kevin Johnson, Sr.  Based on the evidence presented to the Court, Shyrl Johnson has experienced severe mental anguish and suffering as a result of her husband's

untimely death.  Therefore, this Court shall award to the estate of Kevin Johnson, Sr., by Shyrl

Johnson as Personal Representative, $8 million for the benefit of his wife Shyrl Johnson to

compensate her for the mental pain and suffering she sustained as a result of her husband's

untimely death.

### iii.     Kevin Johnson, Jr.

Kevin Johnson, Jr., ("Kevin Jr.") is the son and namesake of Kevin Johnson, Sr.  Kevin,

Jr., was born in July 1991 and was only four years old when his father was killed.  *Id.* at 46.

For a while after Kevin died, Kevin Jr. thought that his dad might just be hurt and lost

somewhere in Saudi Arabia.  Shyrl believes that Kevin's death hit Kevin Jr. the hardest because

he was so young.  Kevin Jr. would have nightmares, and often thought he saw ghosts.  *Id.* at 61.

To this day, Kevin still has issues related to his father's death.  Shyrl enrolled him in Big

Brothers, Big Sisters with the hope that he could have a male figure in his life.  Six months after

enrolling, however, Kevin's big brother was transferred to a different military base, and Kevin

lost another male role model. *Id.* at 70-71.

Kevin has issues that Shyrl believes are related to the loss of his father. For example,

Kevin is overweight, has low self-esteem, and has other physical issues.  As Dr. Cable testified,

Kevin is in the loss and loneliness stage but still

> [shows] behaviors that go back into some of the earlier stages [of
>
> emotional grieving.]  There is still a lot of emotional reaction there,
>
> so the volatile emotions [stage].   Probably even some of the
>
> disorganization; just not being able to kind of get things in focus. . .
>
> .  He will continue in significant grief reactions in the foreseeable

future. . . .  [He is] at risk for developing other kinds of problems as

a result of the grief experience.

(Feb. 10, 2004 Tr. at 57-58.)

As Kevin Johnson's son, Kevin Johnson, Jr., has brought intentional infliction of

emotional distress and wrongful death claims arising from the death of his father, Kevin Johnson,

Sr.  As the evidence shows, Kevin Johnson, Jr., was not physically present to witness the harm

done to his father.  In light of this fact, and the strict construction Louisiana courts place on the

presence requirement in intentional infliction of emotional distress claims, Kevin Johnson, Jr.,

may not recover under an intentional infliction of emotional distress claim relating to his father's

death.  Accordingly, to the extent that Kevin Johnson, Jr., may recover, he must make a valid

claim under Louisiana's wrongful death statute.

Based on the evidence presented to the Court, Kevin Johnson, Jr., has experienced severe

mental anguish and suffering as a result of his father's untimely death.  Therefore, this Court

shall award to the estate of Kevin Johnson, Sr., by Shyrl Johnson as Personal Representative, $5

million for the benefit of his son Kevin Johnson, Jr., to compensate him for the mental pain and

suffering he sustained as a result of his father's untimely death.

iv. <em>Nicholas Johnson</em>

Nicholas Johnson is the son of Kevin Johnson, Sr.  Nicholas was born in April 1996, and

was only two months old when his father was killed.  (Dec. 4, 2003 A.M. Tr. at 46.)  Nicholas

never knew his father, but he has learned about him from Shyrl and from Che Colson.  *Id.* at 71.

As Nicholas has gotten older, Shyrl has given him more information about his

father. Nicholas is "proud of his father and who he is even though he didn't know him." *Id.* at

-144-

96.

Even though Nicholas never knew his father, his life has been impacted dramatically by Kevin's death.  As Shyrl stated,

> [T]he thing that broke my heart just this year, we were coming back from school and I think they had this thing where the fathers come in and my poor baby said, we were driving back home, "I wish I had a daddy, too, just like the other kids."  That really just broke my heart.  What do you say to a seven-year-old that misses something that he didn't even have but for a short period of time?  When you go to functions and there's the mother and the father, that's when he gets kind of like he wishes he had both.

*Id.* at 71.

> According to Dr. Cable, Nicholas

> is really just beginning the grief process. . . .  He was so young when all of this happened, that it's a blur to him, obviously.  As future events unfold in his life, then he is going to have more of a sense of loss, just like now with the school events and no father present. . . . [H]e is at a real loss in that sense of not having personal memories as part of his life. . . .  He will have good support from his mother and from his brothers, but he will have significant grief along the way. . . .  So there is a long-term impact here for him.

(Feb. 10, 2004 Tr. at 59-60.)

As Kevin Johnson's son, Nicholas Johnson has brought intentional infliction of emotional distress and wrongful death claims arising from the death of his father, Kevin Johnson, Sr.  As the evidence shows, Nicholas Johnson was not physically present to witness the harm done to his father.  In light of this fact, and the strict construction Louisiana courts place on the presence requirement in intentional infliction of emotional distress claims, Nicholas Johnson may not recover under an intentional infliction of emotional distress claim relating to his father's death. Accordingly, to the extent that Nicholas Johnson may recover, he must make a valid claim under Louisiana's wrongful death statute.

Based on the evidence presented to the Court, Nicholas Johnson has experienced severe mental anguish and suffering as a result of his father's untimely death due to the fact that he will never know his father.  Therefore, this Court shall award to the estate of Kevin Johnson, Sr., by Shyrl Johnson as Personal Representative, $5 million for the benefit of his son Nicholas Johnson to compensate him for the mental pain and suffering he sustained as a result of his father's untimely death.

*v.     Laura Johnson*

Laura Elizabeth Johnson is the mother of Kevin Johnson.  Mrs. Johnson was born in Shreveport, Louisiana in 1933 and was 63 years old when Kevin was killed. She is an American citizen. Ex. 284, ¶¶ 1-2.  Mrs. Johnson was raised and attended school in Shreveport, Louisiana. After graduating from high school, she attended a year-long nursing school program and graduated from the program on May 24, 1954. She has been a nurse for 49 years and still practices on a part-time basis. She has lived in Shreveport her entire life. *Id.* at ¶ 3.

-146-

When Mrs. Johnson heard that Kevin had died in the attack, she was devastated.  She left work immediately and headed home, and prayed that Kevin was still alive.  *Id.* at ¶ 29.  Mrs. Johnson did not work for a few months after Kevin's funeral. She returned to work in September. It was difficult for Mrs. Johnson to return to work, "but I knew I had to."  *Id.* at 32.

Since Kevin died, Mrs. Johnson has hung a picture of him in the house so she could see him when she walked in the door.  Mrs. Johnson is still grieving over Kevin's death, but she can function in a normal life now. *Id.* at 35.  Mrs. Johnson has relied on her faith in coping with Kevin's death.  *Id.* at 36.  Before Kevin died, Mrs. Johnson relied on him to take care of things in case she ever became ill or could not take care of herself. Kevin was responsible, so Mrs. Johnson added his name to her bank account and other important accounts. When Kevin died, Mrs. Johnson realized she was on her own.  (*Id.* at 37; Dec. 4, 2003 A.M. Tr. at 12.)

According to Dr. Cable, Mrs. Johnson "is still in loss and loneliness. Nothing will ever replace Kevin in her life. … She will continue to grieve for some time to come. … [S]he will manage to go on, but [may not] ever fully recover the loss of her son." (Feb. 10, 2004 Tr. at 62.)

As Kevin Johnson's mother, Laura Johnson has brought intentional infliction of emotional distress and wrongful death claims arising from the death of her son, Kevin Johnson, Sr.  As the evidence shows, Laura Johnson was not physically present to witness the harm done to her son.  In light of this fact, and the strict construction Louisiana courts place on the presence requirement in intentional infliction of emotional distress claims, Laura Johnson may not recover under an intentional infliction of emotional distress claim relating to her son's death. Accordingly, to the extent that Laura Johnson may recover, she must make a valid claim under Louisiana's wrongful death statute.

-147-

Laura Johnson, however, may not maintain a valid wrongful death claim due to the fact that her son Kevin Johnson, Sr., died with a surviving spouse and surviving children.  Under Louisiana's wrongful death code, surviving parents may not recover for wrongful death if there is a surviving spouse or surviving children.  *See* La. Civ. Code Ann. Art. 2315.2(A)(2). Accordingly, Laura Johnson's wrongful death claim must also be denied.

*vi.*      *Bruce Johnson*

Bruce Johnson is the brother of Kevin Johnson. Bruce was born in Shreveport, Louisiana in 1961 and was 35 years-old when Kevin was killed. He is an American citizen. Ex. 285, ¶¶ 1, 3.  Bruce attended the Blessed Sacrament Elementary School until sixth grade, then went to Lake Shore Middle School and Washington High School. He graduated from high school in 1978. After high school, he attended and graduated from Louisiana Technical School, where he studied automotive education and automotive technologies. *Id.* at ¶ 3.

Bruce currently works as a paraprofessional for Southern University, where he supervises a unit that oversees special education children and helps them prepare for becoming independent. Bruce is married and has a wife named Connie and two children: Bruce Jr., who is 16, and Broderick, who is 14. Bruce also has a step-daughter named Chavondria. *Id.* at ¶ 4.

Growing up, Bruce and Kevin were close brothers.  From an early age, Kevin was very protective of Bruce. He would make sure Bruce did not do anything he wasn't supposed to do. This protective relationship continued until the day Kevin died.  Bruce would talk to Kevin about work, personal, or even family issues. Kevin would always listen and always give him helpful guidance.  *Id.* at ¶ 7.

Soon after Kevin joined the Air Force, he sat down with Bruce and had a talk about plans for the future. Kevin planned on spending 20 years in the service, then going to work for a commercial airline. *Id.* at ¶ 11.  The last time Bruce spoke with Kevin, he asked about Bruce's boys' shoe sizes.  Kevin wanted to bring the boys some sneakers from Saudi Arabia when he returned to the United States. *Id.* at ¶ 12.

When Kevin died, Bruce took care of making all the funeral arrangements and contacting people from the military and the local police department. Bruce arranged to have the funeral at St. John's Cathedral, which is where Kevin and Bruce were first baptized and where they had their First Communion. Because Bruce was making all of the arrangements, he could not attend the memorial service at Patrick AFB.  Bruce did, however, attend the dedication of the memorial at Patrick AFB a few years after the bombing.

Today, Bruce still visits Kevin's grave often. *Id.* at ¶ 17.  After Bruce learned of Kevin's death, everything "just went black for about two straight years. I felt lost because I didn't have Kevin to give me direction in life."  *Id.* at ¶ 18.  After Kevin died, Bruce began drinking every day. This led to some trouble with the law and Bruce received two DUIs in a short period of time. Bruce received the first one on December 22, 1996, and the second that following July. Bruce also got into some financial difficulties. *Id.* at ¶ 19.  Bruce stayed home from work for about three or four weeks after Kevin's death.  But after returning to work, he had to take a day or two off every week because going back was just something he was not ready for.  Bruce continued to take a day or two off a week for about six months. *Id.* at ¶ 20.

Today, Christmas and Thanksgiving are particularly difficult days for Bruce.  Kevin's birthday and the days leading up to Kevin's birthday are also tough.  In Dr. Cable's expert opinion, Bruce

> is in loss and loneliness. He still thinks of Kevin all the time; never
> far from his mind. Kevin was his role model, his support system, and
> that's gone and is not going to be recovered. … He will continue to
> be impacted by the death in the future … but that ten-day period [each
> year when Kevin and Bruce were the same numerical age] is going to
> be a significant marker the rest of his life. Even if he is able to move
> on in general, he is going to have a down time every year where the
> grief is going to be pretty overwhelming for a while.

(Feb. 10, 2004 Tr. at 64-65.)

As Kevin Johnson's brother, Bruce Johnson has brought intentional infliction of emotional distress and wrongful death claims arising from the death of his brother, Kevin Johnson, Sr..  As the evidence shows, Bruce Johnson was not physically present to witness the harm done to his brother.  In light of this fact, and the strict construction Louisiana courts place on the presence requirement in intentional infliction of emotional distress claims, Bruce Johnson may not recover under an intentional infliction of emotional distress claim relating to his brother's death.  Accordingly, to the extent that Bruce Johnson may recover, he must make a valid claim under Louisiana's wrongful death statute.

Bruce Johnson, however, may not maintain a valid wrongful death claim due to the fact that his brother Kevin Johnson, Sr., died with a surviving spouse and surviving children.  Under

Louisiana's wrongful death code, surviving siblings may not recover for wrongful death if there is a surviving spouse or surviving children.  *See* La. Civ. Code Ann. Art. 2315.2(A)(3). Accordingly, Bruce Johnson's wrongful death claim must also be denied.

*vii.      Che Colson*

Che Colson is the step-son of Kevin Johnson, Sr.  Che was born in 1982 and was only 13 years old when Kevin was killed.  (Dec. 4, 2003 A.M. Tr. at 7.)   Che's birth parents are Shyrl Johnson and Greg Colson.  Shyrl and Greg divorced in 1984, when Che was two years old, and Che never had a close relationship with his birth father. Greg developed drug problems and was not around to take care of Che when he was a child, so Shyrl was the only parent in his day- to-day life. *Id.* at 6-7.  Che was three and a half or four years old when Shyrl began dating Kevin. *Id.* at 12.

Kevin treated Che like he was his biological father.  Che and Kevin maintained their close relationship until the day Kevin died. *Id.* at 38, 46.  After Shyrl and Kevin married, Kevin was financially responsible for Che. *Id.* at 46.

The year after Kevin died was very difficult for Che and he "kind of shut down that year, where he wasn't talking to anybody."  Shyrl noticed that Che "wasn't showing any emotion to anybody and I couldn't read him. B ut I do know that his grades suffered.  I think it's because he missed that male role model that he had in Kevin. [Kevin] brought stability [from] the male perspective, I would say, for Che." *Id.* at 38-39.  As Dr. Cable has stated, Che "feels abandoned . . . and is in loss and loneliness. . . .  He will continue in grief for the foreseeable future. . . .  [H]e still has got a number of years ahead of him of trying to come to grips with everything that has happened."  (Feb. 10, 2004 Tr. at 55-56.)

As Kevin Johnson's stepson, Che Colson has brought intentional infliction of emotional distress and wrongful death claims arising from the death of his stepfather, Kevin Johnson.  As the evidence shows, Mr. Colson was not physically present to witness the harm done to his stepfather.  In light of this fact, and the strict construction Louisiana courts place on the presence requirement in intentional infliction of emotional distress claims, Mr. Colson may not recover under an intentional infliction of emotional distress claim relating to his stepfather's death.  Accordingly, to the extent that Mr. Colson may recover, he must make a valid claim under Louisiana's wrongful death statute.

Based on the evidence presented to the Court, however, Mr. Colson is not entitled to recover under an intentional infliction of emotional distress claim due to the fact that, as a non-adopted stepson, Mr. Colson lacks sufficient standing to recover for damages relating to Kevin Johnson's death.  Under Louisiana law, a decedent's child may properly recover for wrongful death.  La. Civ. Code Ann. Art. 2315.2(A)(1).  Nevertheless, Louisiana's code specifically states that a "child" is limited to biological children and children by adoption.  La. Civ. Code Ann. Art. 2315.2(A)(4)(D).  Moreover, this Court is hampered from any flexibility in interpreting this provision due to the fact that "the right of action created by Article 2315 may be extended *only to the statutorily designated beneficiaries enumerated in the article and these classes of beneficiaries must be strictly construed*."  *Craig v. Scandia, Inc.*, 634 So.2d 944, 945 (La. Ct. App. 1994) (emphasis added).  Accordingly, because Mr. Colson does not fall within the statutorily prescribed classes of individuals who may properly recover under a wrongful death action, Mr. Colson's claim must be denied.

D.      *Claims Under New Hampshire Law*

1.    *Causes of Action*

a.    *Wrongful Death*

Under New Hampshire's wrongful death statute, the administrator of the decedent's estate may bring a cause of action when the decedent's death is "caused by the injury complained of in the action."  N.H. Rev. Stat. Ann. § 556:12.  The damages wrongful death plaintiffs may seek include "the mental and physical pain suffered by the decedent in consequence of the injury, the reasonable expenses occasioned to the estate by the injury, the probable duration of life but for the injury, and the capacity to earn money during the deceased party's probable working life." N.H. Rev. Stat. Ann. § 556:12.  Recoverable damages also include damages for loss of life and loss of enjoyment of life.  *See Bennett v. Lembo*, 761 A.2d 494, 498 (N.H. 2000); *Marcotte v. Timberlane/Hampstead Sch. Dist.*, 733 A.2d 394, 405 (N.H. 1999).  Under New Hampshire law, however, the amount of damages recoverable for the benefit of a decedent's sibling is limited to a total of $50,000,[51] unless the sibling shows proof of financial dependency upon the decedent.

b.    *Intentional Infliction of Emotional Distress*

New Hampshire recognizes the tort of intentional infliction of emotional distress, following Section 46 of the Restatement (Second) of Torts.  Under New Hampshire law, the elements of the tort of intentional infliction of emotional distress are: (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that his conduct would cause such distress; (2) the conduct was extreme and outrageous;

---

[51] This figure constitutes a sum of $50,000 *in toto*, as opposed to $50,000 per surviving non-dependent relative.  Such a figure is justified because the New Hampshire legislature "intended wrongful death actions to benefit the estate, rather than the distributees."  *In re Estate of Infant Fontaine*, 519 A.2d 227, 229 (N.H. 1986).

(3) the defendant's conduct caused the plaintiff's emotional distress; and (4) the plaintiff suffered severe emotional distress. *See Orono Karate, Inc. v. Fred Villari Studio of Self Defense, Inc.*, 776 F. Supp. 47, 51 (D.N.H. 1991).

In recognizing the tort of intentional infliction of emotional distress, New Hampshire courts have adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS. *See Orono Karate, Inc.* 776 F. Supp. at 51. Though § 46(2) of the Restatement specifically states that only present third parties may recover for an IIED claim, the Caveat to the section leaves open the possibility of other possible situations where a defendant could be liable for intentional infliction of emotional distress under this section. Moreover, Comment l. to the section specifically expands on the Caveat's language, stating that the Caveat was intended "to leave open the possibility of situations in which presence at the time may not be required." RESTATEMENT (SECOND) OF TORTS § 46, cmt. l.[52]

The Court finds that a terrorist attack is precisely the sort of situation in which presence at the time is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act. This Court and courts of other jurisdictions have found that "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families." *Salazar*, 370 F.Supp.2d at 115 n.12 (citing *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F.Supp.2d 86, 107 (D.D.C. 2003)). In this case, the evidence demonstrates that the defendants' motives in planning the attack on the Khobar Towers, and indeed their motives in carrying out a systematic plan of funding and organizing terrorist attacks,

---

[52] Though the Court is cognizant that both the Caveat and comments to a section of the Restatement are not law by any means, they are instructive in helping to interpret the issue at hand.

-154-

were intended to harm both the victims of the attack, and to instill terror in their loved ones and others in the United States.  Accordingly, in the case of a terrorist attack as this, the Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under New Hampshire law.

Still, it is of paramount concern to this Court that a line be drawn to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress. *See* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l.  The Restatement has noted that recovery for third-party bystanders has typically been granted to members of the victim's "near relatives." *Id.*  State courts have also followed this approach, allowing recovery for the victim's spouse, child, sibling or parents.  *See, e.g.*, *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App. 1991).  The Court finds this approach to be a logical one.  Accordingly, under New Hampshire law, a victim's near relatives, as defined by the state's intestate succession statute, who were not present may nonetheless have standing to seek redress under a claim of intentional infliction of emotional distress.

### 2.   *Plaintiffs*

#### a.   *Estate and Surviving Family Members of Peter Morgera*

##### i.   *Estate of Peter Morgera*

Peter Morgera was killed on June 25, 1996 at the Khobar Towers.  Ex. 9.  He is survived by his two brothers, Michael Morgera and Thomas Morgera.  Michael is three years older than Peter, who was 11 months older than Thomas.  (Dec. 5, 2003 P.M. Tr. at 94-96.)

After high school Peter attended classes at the University of New Hampshire and had a few different jobs before deciding to join the Air Force.  Peter also spent time as a volunteer

firefighter in Stratham, New Hampshire.  After basic training and technical school, Peter was assigned to a duty station in Germany.  *Id.* at 109-111, Ex. 93.

After completing his tour of duty in Germany, Peter was assigned to Eglin AFB in Florida.  Peter and Michael spoke on the telephone several times during this period.  Michael testified that the Air Force changed Peter.  According to his brother, the time Peter spent in the Air Force and the time he spent in Germany had given Peter the confidence to "be much more concerned with the way he lived his life, not for others but for himself."  (Dec. 5, 2003 P.M. Tr. at 111-14.)   Peter volunteered to be temporarily deployed to Saudi Arabia in place of Stan Dworkin, a higher ranking airman who had a wife and children.  *Id.* at 114-115.  Fittingly, Peter's tombstone reads "Family, community, country."  *Id.* at 128.

Peter's estate is represented by his brother, Michael Morgera.  Peter's estate has asserted claims under New Hampshire's wrongful death statute because he was last domiciled in New Hampshire.  As the administrator of Peter's estate, Michael Morgera is the proper plaintiff to bring a wrongful death action under New Hampshire law.  *See* N.H. Rev. Stat. Ann. § 556:12.  In light of the fact that Peter is survived solely by his brothers, Michael and Thomas Morgera, any recovery under this wrongful death action is for Michael and Thomas Moregera.

Based upon the pleadings and evidence presented to the Court, the estate of Peter Morgera has made out a valid claim for wrongful death under New Hampshire law.  The beneficiaries of his estate are entitled to recover compensatory damages arising from the wrongful death, including "capacity to earn money during the deceased party's probable working life."  *See* N.H. Rev. Stat. Ann. § 556:12(I).  Plaintiffs have presented no evidence of any financial dependency upon the decedent in this case.  Therefore, to the extent that Peter

Morgera's lost wages exceed $50,000, the total amount of recovery for his estate must be reduced to conform to the $50,000 limit imposed by statute under New Hampshire law.

Dr. Herman Miller, an economic consultant testified as an expert that, as a result of Peter's untimely death, he experienced a net economic loss of $1,294,377.00.  In light of the statutory limitation on damages for non-dependent siblings, the Court must therefore award the Estate of Peter Morgera, by Michael Morgera as personal representative, $50,000.00 in economic damages for the benefit of his brothers, Michael and Thomas Morgera, to be distributed in accordance with the method of distribution prescribed under New Hampshire law.  *See* N.H. Rev. Stat. Ann. § 556:14.  As for the intangible pain and suffering damages incurred by Peter's surviving brothers, the Court will address those awards below, in an individualized discussion of the claims of Michael and Thomas Morgera.

<em>ii.</em>    <em>Michael Morgera</em>

Michael William Morgera is a United States citizen and the brother of Peter Morgera and Thomas Morgera.  Michael is three years older than Peter who was 11 months older than Thomas. (Dec. 5, 2003 P.M. Tr. at 94-96.)  Michael was born in Dorchester, Massachusetts on June 4, 1969, and graduated from Exeter Area High School in 1988.  Michael is currently employed as a chef at First Impressions Catering.  Michael was married to his wife, Kristen, on September 15, 1996.  *Id.* at 94-96.

Upon learning of his brother's death, Michael said that he "never felt as much joy as [he] felt pain when [he] lost [his] brother Peter."  (Feb. 10, 2004 Tr. at 173.)   According to Dr. Cable, Michael

is in loss and loneliness. His grief is compounded by the whole

family history of abuse and emotional scars that all three brothers

shared. I think it's hard for him to know what they survived early

in life, only to have his brother taken away this way with

everything else that had happened. … [There's] still a lot of

emotional upheaval in his life. . . .  His grief will continue for a

very long time. … I am not sure he is strong enough yet that he

could handle any other significant loss in his life right now. I think

that would be devastating to him.

*Id.* at 174.

As the brother of Peter Morgera, Michael Morgera has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of his

brother.  Based upon the evidence presented to the Court, the elements of Michael Morgera's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Michael Morgera.  Finally, it is clear that

Michael Morgera has continued to experience emotional distress since that time due to the fact

that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this

Court shall award to Michael Morgera $2.5 million to compensate him for the emotional distress,

pain and suffering that he sustained as a result of his brother's untimely death.

iii.      *Thomas Morgera*

Thomas E. Morgera, a United States citizen, is on active duty in the United States Air

Force.  He is currently assigned to Andrews AFB with the 89th Airway MXG, a special mission

unit.  The unit maintains aircraft that serve as Air Force 2 and transport the Vice President, the

Joint Chiefs of Staff, and Cabinet Members.  Thomas Morgera is a flying crew chief with Air

Force 2.  He has been in the Air Force for 12 years, and has been assigned to bases throughout

the United States and the world.  He has been deployed to South America, Guam, and Puerto

Rico, the Far East, Japan, Thailand, the Philippines and Micronesia as well as England, Europe,

Southwest Asia, Somalia and Kenya. He has been deployed twice to Dhahran AFB in Saudi

Arabia and has lived in the Khobar Towers complex. (Dec. 5, 2003 P.M. Tr. at 40-43.)

Thomas Morgera grew up in a small house located at 35 Lewis Street in Chelsea,

Massachusetts.  As children, Peter and Thomas were inseparable.  Thomas' earliest memory of

Peter was missing him.  He remembers that, when Peter started kindergarten, he would sit in the

window all day long waiting for his brother to come home because before Peter went to

kindergarten, the two boys played together everyday from the time they woke up until they went

to sleep.  *Id.* at 45-47.

Thomas and Peter Morgera lived in a difficult and sometimes violent environment as they

were growing up. Their parents frequently quarreled and there was much screaming and

sometimes physical violence.  Thomas recalled that his mother would consume large amounts of

alcohol and took illegal drugs.  Many times she would not come home at night.  Peter and

Thomas' parents separated in 1972 when Thomas was approximately six years old.  *Id.* at 50-51.

After his parents separated, Thomas, Peter, and Michael stayed with their mother.  At this

point their mother was home even less than previously.  The three boys were left to fend for

themselves, and Michael, who was four years older, spent more and more time away from the

home.  Peter and Thomas often cooked their own meals. On some occasions they would go down the street to their grandmother's house, but their mother warned them not to go their grandmother's house too often for dinner.  As a result, they often went without dinner. *Id.* at 51-53.

When Thomas returned to Japan, he was suffering from depression. He wanted to sleep all the time and became introverted. He cut himself off from all others, including his wife and step-daughter. Further, he was deployed from Japan and away from his family soon after he returned there. His wife had no family or other support in Japan.  As things worsened for Thomas, his wife left and came home to the United States.  Thomas and his wife ultimately separated and divorced.

Thomas' chain of command told him that he could either voluntarily go to psychiatric counseling or they would order him to do so. Thomas met with an Air Force psychiatrist who, after hearing Thomas' story, told Thomas that he had been through more in the last six to eight months than most people go through in their entire lifetime.  Thomas still has bad days and thinks often of Peter.  *Id.* at 89-90.

Thomas has remarried and has a son who he named Peter James Morgera, II.  Thomas gave his son this name because he wants people to ask why his son has this name, so that he has an opportunity to explain who Peter was and what he endured and accomplished in life. *Id.* at 92-93.  According to Dr. Cable, Thomas

> is still in loss and loneliness. He was greatly affected by Peter's death.
>
> He is able to move on to a degree because of his family, his new
>
> family. But I think that description he uses of a roller coaster is very

accurate – that it's still a lot of ups and downs for him. There is not

a sense of real stability. There is still a lot of pain, still a lot of

emotion there.  Again, for him, it's hard to see – it's hard for him to

understand how they could come through so much only to have Peter

die this way. … He will continue with his grief, more in the sense of

waves, because his family will help stabilize his grief to a degree. But

there will still be those events and those activities and time when he

is going to be kind of overcome for a period with ongoing grief.

(Feb. 10, 2004 Tr. at 177.)

As the brother of Peter Morgera, Thomas Morgera has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of his

brother.  Based upon the evidence presented to the Court, the elements of Thomas Morgera's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Thomas Morgera.  Finally, it is clear that

Thomas Morgera has continued to experience emotional distress since that time due to the fact

that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this

Court shall award to Thomas Morgera $2.5 million to compensate him for the emotional distress,

pain and suffering that he sustained as a result of his brother's untimely death.

  E.  *Texas*

    *1.*  *Causes of Action*

### a.      Wrongful Death

Under Texas' wrongful death statute, a wrongful death action may be brought against a person if that person's "wrongful act, neglect, carelessness, unskillfulness, or default" causes an individual's death.  Tex. Civ. Prac. & Rem. Code Ann. § 71.002.  Such an action is brought for the exclusive benefit of the decedent's surviving spouse, children, and parents.  Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a).  Any one of the surviving spouse, children, or parents of the deceased may bring a wrongful death action.  Tex. Civ. Prac. & Rem. Code Ann. § 71.004(b).

A wrongful death plaintiff may seek those damages that are "proportionate to the injury resulting from the death."  Tex. Civ. Prac. & Rem. Code Ann. § 71.010(a).  These damages include pecuniary loss, medical expenses, funeral expenses, loss of companionship and society, and mental anguish.  *See Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1427-29 (5th Cir. 1992).  Any awarded damages are divided among those entitled to recover and who are alive at the time of the award.  Tex. Civ. Prac. & Rem. Code Ann. § 71.010(b).  Though a right of action exists for all persons within the designated class to recover for wrongful death, under the statute only one wrongful death action can exist to recover a single sum that is apportioned among the entire eligible class.  *Texas & P. Ry. Co. v. Wood*, 199 S.W.2d 652, 654 (Tex. 1947).

### b.      Intentional Infliction of Emotional Distress

As a general rule, to state a claim for intentional infliction of emotional distress, the outrageous and extreme conduct must be directed at the plaintiff, although a cause of action may be allowed to an immediate family member who was present at the time.  *See* RESTATEMENT (SECOND) OF TORTS § 46(2).  Some states, however, have done away with the plaintiff presence element altogether.  In Texas, however, the issue of whether a plaintiff must be present in order

-162-

to recover for a claim of intentional infliction of emotional distress has not been specifically addressed by the courts.  In cases such as these, the Court must assess whether such a claim would be valid under the laws of that state.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 2006 WL 2382704, *175-76 (D.D.C. Aug 17, 2006) (Facciola, J.) (interpreting law of Washington State); *Salazar*, 370 F. Supp. 2d at 115 (interpreting Illinois law).

In Texas, the issue of whether a plaintiff must be present in order to recover for a claim of intentional infliction of emotional distress has not been specifically addressed by the courts.  The fact that Texas courts have adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS in recognizing the tort of intentional infliction of emotional distress allows this Court to follow the same reasoning regarding the presence requirement set forth previously in this opinion.[53] Applying this rationale, this Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under Texas law, and that standing to seek such recovery is limited to the victim's near relatives who were not present at the time of the attack.

> 2.    *Plaintiffs*
>
>> a.    *Estate and Surviving Family Members of Millard Campbell*
>>
>>> i.    *Estate of Millard Campbell*

Millard D. Campbell ("Dee") was a Sergeant in the Air Force. (Dec. 6, 2003 A.M. Tr. at 83.)  He was killed at Khobar Towers on June 25, 1996. Ex. 9.   Dee was born in a small town in California on September 20, 1965, where he lived for just a couple of years and then moved with his family to Angleton, Texas.   (Dec. 6, 2003 A.M. Tr. at 89.)  Dee went to the public schools in

---

[53] *See supra* Part VI.D.1.b.

Angleton, graduating from high school in 1984. *Id.* During high school, Dee was a baseball

player, and received a baseball scholarship to play baseball in junior college. *Id.* at 109.

Dee became engaged to his future wife, Marie, in the fall of 1986, and shortly after the

engagement, he enlisted in the Air Force. *Id.* at 90. Dee was supposed to be on a three-year tour

in England, but ultimately he received a humanitarian reassignment back to Texas because his

father had cancer. His father died in April 1989. When Dee returned to Texas, he was stationed

at Bergstrom Air Force Base in Austin, Texas. There, Dee changed his career field, and started

working in flight operations and scheduling. *Id.* at 95.

Marie continued to attend college at Sam Houston State University. She was apart from

him during the week, but they were with each other on weekends. Being away from him so that

she could go to school was not easy because her school was three hours away from his Air Force

Base, but Dee was determined that she get her college degree. *Id.* at 96-97.

After Marie received her college degree, she moved to Austin in order to be with Dee.

She worked at a couple of different jobs, the most permanent of which was a job in a retail

department store. *Id.* at 97. Dee volunteered to go to Iraq as part of Operation Desert Storm in

early 1991. Marie was very worried about this. Dee arrived in the Middle East just a few days

before the war started and came home at the end of March or the beginning of April 1991. *Id.* at

98.

In October 1992, Dee and Marie moved to Eglin Air Force Base in Florida, where again,

he was with a fighter squadron, being the air controller and scheduling arrivals and departures.

*Id.* at 101. Dee was very popular with the other men in the Air Force. He also did his job

very well.  He re-enlisted for another six years because he loved his job so much. Dee planned to

be an air traffic controller in private industry after the conclusion of his tour of duty with the Air

Force.  *Id.* at 102.  Dee returned to Saudi Arabia the second (and last time) in April 1996.

Dee's estate is represented by his wife, Marie Campbell.  Dee's estate has asserted claims

under Texas' wrongful death statute because he was last domiciled in Texas.  As the personal

representative of Dee's estate, Marie Campbell is the proper plaintiff to bring a wrongful death

action under Texas law.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 71.004(b).  Any recovery

under this wrongful death action is for the benefit of his wife, Marie Campbell, and his mother,

Bessie Campbell, to be distributed in a manner consistent with Texas law governing intestate

property distribution.  Tex. Civ. Prac. & Rem. Code Ann. § 71.010(b); *see also Texas & P. Ry.*

*Co. v. Wood*, 199 S.W.2d at 654.

Based upon the pleadings and evidence presented to the Court, the estate of Millard

"Dee" Campbell has made out a valid claim for wrongful death under Texas law, and the

beneficiaries of this estate are entitled to recover the present value of any lost wages and

compensatory damages that would have been recoverable had Dee lived.  Dr. Herman Miller, an

economic consultant testified as an expert that, due to Dee's untimely death, he experienced a net

economic loss of $1,572,314.00. The Court therefore awards the Estate of Millard "Dee"

Campbell, by Marie Campbell as personal representative, $1,572,314.00 in economic damages

for the benefit of Marie Campbell and Bessie Campbell, to be distributed in a manner in

accordance with the method of intestate distribution under Texas law.  A discussion of intangible

economic damages of the wrongful death recovery will be addressed below in an individualized

discussion of the claims of Marie Campbell and Bessie Campbell.

ii.      *Marie Campbell*

Marie was born on June 13, 1966, and was raised in Houston. Her parents are still alive, and her father works for a credit union. *Id.* at 83.  Marie attended public schools as well, graduating from high school in 1984.  After high school, she attended Glen Junior College, in Burham, Texas, where she met Dee. *Id.* When Dee first thought about joining the Air Force, Marie was concerned because her two grandfathers had served in World War II and she only knew of the military in terms of war time. Dee told her not to worry about it. *Id.* at 91.  On the afternoon Dee learned he passed his test to join the Air Force, he proposed marriage to Marie, and she accepted. *Id.* at 92.

Dee joined the Air Force on April 15, 1987. Dee and Marie had been married one month earlier, while she was on spring break from school. At first, Dee and Marie moved into Marie's grandfather's house, where she had been living while at school.  *Id.* at 92-93.  In October 1992, Dee and Marie moved to Eglin Air Force Base in Florida, where again, he was with a fighter squadron, being the air controller and scheduling arrivals and departures. *Id.* at 101.

Dee and Marie never had any children. *Id.* at 113. Dee wanted children but Marie wanted to wait until she was about 32 years old. When Dee died, she had just turned 30.  *Id.* at 113.  For two years Marie tried not to take any medication, but around 1998 she had to start taking medication to help her. She went on Prozac, then went off of it for a while, but has now been taking it for several years continuously.  *Id.* at 145.

Marie continued to teach, but only on a sporadic basis. After missing a number of days, Marie took a leave of absence, and ultimately quit her job altogether.  Finally, Marie moved back

to Dallas, and eventually went back to school to get a master's degree with teaching certification. Id at 147.

In early 1998, Marie started seeing a licensed professional counselor, and still sees a counselor today.  Her feelings fluctuate.  Sometimes she sleeps well, but at other times, she wakes up in the middle of the night and dreams about Dee.  *Id.* at 148.

She is also followed by the fact that she hasn't had any children, that she had wanted to wait until she was 32 to have children, but that now she is 37.   This has also made it difficult to have relationships with another man.  She cannot think about marriage because she wakes up every day and thinks about Dee.  *Id.* at 149.

As Dr. Cable stated, Marie "still needs medication to help her cope with the depression. So it's a very extreme sense of loss and loneliness, a lot of pain. . . .  I see her continuing to grieve in the foreseeable future. . . .  [S]he is probably going to need to continue with medication for quite some time."  (Feb. 10, 2004 Tr. at 36-37.)

Based upon the evidence presented at trial, Marie Campbell has experienced severe mental anguish and suffering as a result of her husband's untimely death.  Therefore, this Court shall award to the estate of Millard "Dee" Campbell, by Marie Campbell as Personal Representative, $8 million for the benefit of his wife Marie Campbell to compensate her for the mental pain and suffering she sustained as a result of her husband's death.

### iii.    *Bessie Campbell*

Bessie Amaryllis Campbell was the mother of Millard D. Campbell ("Dee"). Telephone Deposition Tr., Ex. 181 at 5.  Bessie was born a little town in Texas on January 25, 1928.  Her father was initially a farmer for a period and then became a shipper of jars.  Her mother was a

homemaker.  Mrs. Campbell had two brothers, both of whom served in World War II.  *Id.* at 6.

Bessie graduated from high school but did not go to college. After high school she went to work

in a county clerk's office for three years, and then she met her husband.  He was a truck driver at

that time and became a mechanic. *Id.* at 8-9.  She and her husband had seven children. Dee was

the youngest. *Id.* at 10.

After Dee died, Mrs. Campbell went to the cemetery several times a week for a very long

time and would talk to Dee. Even today, she goes to the cemetery at least once a week.  *Id.* at

36-37.  She thinks of Dee every day. At times she can't believe that he's gone and she thinks that

"he'll probably walk in the door any minute." She dreams about him a lot.  She and her family

even endowed a scholarship fund in Dee's name. She put some of her own money into the fund.

*Id.* at 38.

She often wakes up in the middle of the night thinking about Dee and as a result can't go

back to sleep.  *Id.* at 39.  Bessie finds it very difficult to watch television when she hears about

our soldiers being killed in Iraq because it makes her think about Dee.  *Id.* at 41.  Life has not

been easy for her since her son was killed on June 25, 1996.

According to Dr. Cable, Bessie Campbell

> is still really in loss and loneliness. She still has a hard time admitting
>
> to his death. … Her prognosis is she is one who does cope but it's
>
> very difficult.  I would see her continuing to experience pain, feelings
>
> of emptiness for a considerable period of time in the future.

(Feb. 10, 2004 Tr. at 32-33.)

Based upon the evidence presented at trial, Bessie Campbell has experienced severe mental anguish and suffering as a result of her son's untimely death.  Therefore, this Court shall award to the estate of Millard "Dee" Campbell, by Marie Campbell as Personal Representative, $5 million for the benefit of his mother Bessie Campbell to compensate her for the mental pain and suffering she sustained as a result of her son's death.

> b.    Steve Kitson

Steve Kitson is a brother to decedent Kendall Kitson, Jr. ("Kenny").  As Steve explained in his affidavit to the Court, on June 25, 1996, "the rug was pulled out from under [him.]"  Ex. 293 at  10.  Up until Kenny's death, Steve was doing very well professionally and making a happy life for himself in Dallas, Texas. *Id.* at 9.

After Kenny's death, Steve's father asked him to quit his job and come and live with them in Florida. *Id.* at14.  Steve gave up his job in Dallas to be with his parents and help them through the difficult time. *Id.* at14.  After living with his parents for a year or so in Florida following Kenny's death, Mr. Kitson then asked Steve to move to Oklahoma and assist him with his properties and farms. For several years now, Steve has lived in one of his parent's homes in Oklahoma and helped his father watch over their properties. *Id.* at 16.

The mornings are the hardest time of day for Steve.  The most difficult days for Steve include Kenny's birthday, the anniversary of his death, and holidays. It is difficult for Steve because his friends do not understand what he is going through and so it has created some awkward moments. Steve's therapy is working in the yard and lifting weights. *Id.* at 20-22. Steve has dreamed about Kenny.  *Id.* at24.

According to Dr. Cable, Steve

is in loss and loneliness. He has got his own grief issues, but it's complicated by his parent's bitterness, by his mother's health issues. Kenny was the person who accepted [Steve] for who he was. He doesn't feel any of that now. … He is going to have significant difficulties, because he keeps so much into himself and he doesn't really have an outlet. … So it's not a good prognosis.

(Feb. 10, 2004 Tr. at 149.)

As the brother of Kendall Kitson, Jr., Steve Kitson has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of Steve Kitson's intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Steve Kitson.  Finally, it is clear that Steve Kitson has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court shall award to Steve Kitson $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

    *F.    Ohio*

        *1.    Causes of Action*

            *a.    Wrongful Death*

Under Ohio's wrongful death statute, a civil action may be brought "in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent,  . . . [as well as] the other next of kin of the decedent." Ohio Rev. Code. Ann. § 2125.02(A)(1).[54]  A decedent's next of kin may include the decedent's siblings.  *Karr v. Sixt*, 67 N.E.2d 331, 335 (Ohio 1946).  Available compensatory damages for a wrongful death action include pecuniary damages, loss of support, services, society and prospective inheritance, as well as pain and suffering incurred by the bereaved plaintiff.  The surviving spouse, children and parents of the decedent, if any, are "rebuttably presumed to have suffered damages by reason of the wrongful death."  Ohio Rev. Code. Ann. § 2125.02(A)(1). The decedent's next of kin, however, bear the burden of proving that the alleged damages were suffered.  Ohio Rev. Code. Ann. § 2125.02(A)(1); *Shoemaker v. Crawford*, 603 N.E.2d 1114, 1119-21 (Ohio Ct. App. 1991).

> 2.     *Plaintiffs*
>
> > a.     *Estate and Surviving Family Members of Christopher Lester*
> >
> > > i.     *Estate of Christopher Lester*

In June 1996,  Christopher Lester ("Chris") was nineteen years old.  Ex. 14.  Although regularly stationed at Wright Patterson AFB in Ohio, in June 1996, Chris was on assignment in Dhahran, Saudi Arabia where he resided at the Khobar Towers Complex. *Id.*  On June 25, 1996,

---

[54] Under Ohio law, a personal representative from a foreign state is not precluded from bringing an action under Ohio law on behalf of the decedent's estate and its beneficiaries. *See* Ohio Rev. Code Ann. § 2113.75.  Therefore, notwithstanding the fact that Cecil Lester–the personal representative of the estate of Christopher Lester–was domiciled in West Virginia at the time of the attack, he may nonetheless maintain this action on behalf of the estate and its beneficiaries.

Chris was killed at Khobar Towers as a result of the terrorist bombing.  Ex. 9.  As previously noted,[55] Chris was the only decedent of the 17 decedents whose estates are represented in this trial who survived the blast for a discernable amount of time prior to his death.

Plaintiffs Judy Lester, Cecil Lester, Cecil Lester, Jr., and Jessica Lester are Chris' mother, father, brother, and sister respectively (collectively, the "Lester family"). The Lester family testified at the trial of this matter on December 8, 2003.

Before he entered the Air Force, Chris was an outstanding athlete.  He loved football and played on various football teams from the time he was six years old until he graduated from high school.  *Id.* at 6.  Chris was known as being pleasant, honest, sweet, loving, and generous.  *Id.* at 6. Most remarkable about Chris was his ever-present smile.  *Id.* at 5.  Throughout school, Chris was an outstanding student his whole life. He never received a grade below a "B."  *Id.*   He was a member of the Honors Society at Pineville High School, where he graduated in 1995.  Chris always talked about going to college and he joined the Air Force to pay for college. *Id.* at 7-8. Chris planned on taking college courses when he returned from his deployment in Saudi Arabia. *Id.* at 8.

Christopher's estate is represented by his parents, Cecil Lester, Sr., and Judy Lester . Christopher's estate has asserted claims under Ohio's wrongful death statute because he was last domiciled in Ohio.  As a personal representatives of Christopher's estate, Cecil Lester, Sr., and Judy Lester are proper plaintiffs to bring a wrongful death action under Ohio law.  *See* Ohio Rev. Code. Ann. § 2125.02(A)(1).  Under Ohio law, any recovery under this wrongful death action is for the benefit of his parents, Cecil Lester, Sr., and Judy Lester, as well as his siblings, Cecil

---

[55] *See supra* Part V.D.

-172-

Lester, Jr., and Jessica Lester, who have proven that they suffered damages resulting from Christopher's death.[56]

Based upon the pleadings and evidence presented to the Court, the estate of Christopher Lester has made out a valid claim for wrongful death under Ohio law.  The beneficiaries of this estate are entitled to recover the present value of compensatory damages, including lost wages that the decedent might reasonably have been expected to earn but for the wrongful death.  Dr. Herman Miller, an economic consultant testified as an expert that, as a result of Christopher's untimely death, he experienced a net economic loss of $1,960,466.00.

Additionally, Christopher's beneficiaries are entitled to pain and suffering damages suffered by Christopher because he survived in extreme pain for a time following the attack.  In cases where victims survive an attack for a period of time, courts typically award a lump sum award.  *Haim*, 425 F. Supp. 2d at 71-72.  In light of Dr. Parson's testimony that Christopher Lester was alive for 15 minutes after the attack, and was conscious for 10 minutes, this Court finds that the estate of Christopher Lester should be awarded an additional $500,000.

Accordingly, the Court should award the Estate of Christopher Lester, by Cecil Lester, Sr., and Judy Lester as personal representatives, $1,960,466.00 in economic damages, plus $500,000 in personal pain and suffering damages for the benefit of Cecil Lester, Sr., Judy Lester, Cecil Lester, Jr., and Jessica Lester, to be distributed in a manner consistent with the statute governing intestate distribution of property under Ohio law.  A discussion of intangible economic damages of the wrongful death recovery, will be addressed below in an individualized discussion of the claims of Cecil Lester, Sr., Judy Lester, Cecil Lester, Jr., and Jessica Lester.

---

[56] *See infra* Parts VI.F.2.a.iii, iv.

ii.    *Cecil Lester, Sr. & Judy Lester*

Judy and Cecil Lester met when Judy was still in high school. *Id.* at 4.  They were married on February 4, 1972. *Id.*  Judy and Cecil Lester have three children: Cecil Lester, Jr. ("Cecil Jr."), born in 1974; Chris, born in 1977, and Jessica Lester, born in 1987. *Id.* at 3-4.  All three children were born in Beckley, West Virginia. *Id.*  The Lester children, like their parents, are all United States citizens. *Id.* at 55, 71.

Chris' death has dramatically affected Judy and Cecil and their marriage. Judy was so distraught that for several years after Chris' death, she prayed to God to help her get through each day. She could not sleep. *Id.* at 29. Indeed, Cecil testified that Judy still wakes up at night and cries. *Id.* at 25.  Judy feels incomplete since Chris died.  *Id.* at 29.  In order not to think about Chris, both Judy and Cecil intentionally keep themselves busy. Although Judy questioned her faith in God when Chris died, she now believes her faith is allowing her to heal. *Id.* at 51.

Similarly, Cecil is not the same man since Chris' death.  Mr. Lester testified that things he once took a lot of joy in no longer interest him anymore.   Cecil rarely fishes and hunts anymore. He cannot get himself to go motorcycle riding at all. Cecil has lost interest in football.  *Id.* at 28.

Cecil also explained that Judy and he deal with Chris' death differently.  Judy finds it helpful to talk about Chris. *Id.* at 51.  She also has pictures and memorabilia of Chris throughout the house. *Id.* at 32; Ex. 105. Cecil is the opposite.  He becomes upset and emotional when discussing Chris.  *Id.* at 51.  Cecil returned to work six weeks after Chris' funeral. A year later, Cecil's employer asked him to see a counselor because he was not focused at his job.  He saw the counselor several times but did not find counseling helpful because it is too painful to talk about Chris.  *Id.* at 52-53.

Even though they deal with Chris' death differently, both Judy and Cecil think about Chris every day. *Id.* at 32, 54.  For the first five years following Chris' death, Judy visited his grave two or three times a week. Presently, she visits Chris' grave about every other week. *Id.* at 20. Cecil visits Chris' grave three or four times a month. *Id.* at 48. Both Judy and Cecil Lester clean Chris' tombstone when they visit. *Id.*; Ex. 104.

According to Dr. Cable, Judy

> is still in loss and loneliness, but she has made conscious efforts to try to move on. She has got a lot of guilt issues, and the guilt is this not being able to protect her son. . . .  She will continue with her grief. She was a mother for whom the mother role was very important. Her sense of having failed to protect her son is an issue that's not going to resolve itself quickly.

(Feb. 10, 2004 Tr. at 155-56.)

Additionally, Dr. Cable stated that Cecil

> is still in loss and loneliness. He can't seem to let go; holding on to those memories. The dreams are a part of those ongoing memories. He just can't seem to move to the next step along the way. . . .  His grief will continue. I think he is one of these individuals who likely will have a very difficult time ever getting his life really back together again.

(Feb. 10, 2004 Tr. at 158.)

Based upon the evidence presented at trial, both Cecil Lester, Sr., and Judy Lester have experienced severe mental anguish and suffering as a result of their son's untimely death. Therefore, this Court shall award to the estate of Christopher Lester, by Cecil Lester, Sr., and Judy Lester as Personal Representatives, $5 million for the benefit of his mother Judy Lester, and $5 million for the benefit of his father Cecil Lester, Sr., to compensate both for the mental pain and suffering both have sustained as a result of their son's untimely death.

<em>iii.</em>     <em>Cecil Lester, Jr.</em>

Cecil Jr. was utterly crushed by his brother's death.  Chris was Cecil Jr.'s confidant.  Cecil Jr. shut down emotionally after Chris died.  Cecil Jr. believes that the effect that Chris' death had on him directly affected his own marriage.  He wouldn't share his emotions with his wife, and found it difficult to talk with her.  (Dec. 8, 2003 Tr. at 67.)

According to Judy, "Cecil Jr. and Chris [were] like twins . . . there was 2-1/2 years between them, but you would never know that. When they were together, they were like best of friends, playmates and they just loved each other." *Id.* at 30.  Because of their close relationship, Chris' death has left an unspeakable void in Cecil Jr.'s life.  Cecil, Jr. thinks about Chris every day.  Like his father, Cecil Jr. does not enjoy fishing or hunting anymore since Chris' death, and believes that he has become less sociable since Chris died.  *Id.* at 68-69.

Cecil Jr. has dreamed often about Chris.  He visits Chris' grave on the holidays, and drives by Chris' grave two or three times a day on his way to and from work.  *Id.* at 66-67.

As Dr. Cable stated, Cecil

is still in loss and loneliness. He also has some elements of guilt . . .

that [their] last conversation, [their] last time together had an element

-176-

> of an argument to it. … [I]n his own mind, it was not the way to end
>
> his relationship to his brother. … His grief will continue. He will
>
> always have a feeling of needing to be the protector for others. His
>
> brother's [death] will affect his life in may ways throughout his life.

(Feb. 10, 2004 Tr. at 163-64.)

Based upon the evidence presented at trial, Cecil Lester, Jr., experienced severe mental anguish and suffering as a result of his brother's untimely death.  Therefore, this Court shall award to the estate of Christopher Lester, by Cecil Lester, Sr., and Judy Lester as Personal Representatives, $2.5 million for the benefit of his brother Cecil Lester, Jr., to compensate him for the mental pain and suffering he sustained as a result of his brother's untimely death.

### iv.    Jessica Lester

Jessica Lester is the sister of Christopher Lester.  She was nine years old when Chris died. (Dec. 8, 2003 Tr. at 30.)  Jessica remembers Chris "as being so friendly and happy all the time." He was a cheerful person who played and watched movies with her. I d. at 75-76.  He was a great big brother to her.

Since Chris' death, Jessica visits Chris' grave about once or twice a month.  *Id.* at 78. Jessica is saddened by the void Chris' death has caused her and her family.  She laments the fact that she does not have Chris in her life anymore.

As Dr. Cable stated, Jessica

> is in loss and loneliness. Her grief is complicated by the age she was
>
> at the time that this happened. … She not only lost a brother, but she
>
> lost a father figure and she lost a part of her own identity. … She will

> continue in her grief for a long time. I think she will begin to recover,
> but I think that down the road the issue she may face is that when she
> marries, when she has children, the regrets that Chris can't be there
> to be a part of those things. Because of the significant role he played
> in her life, she is going to miss that he can't be a significant role in
> the rest of her family's life at that point.

(Feb. 10, 2004 Tr. at 160-61.)

Based upon the evidence presented at trial, Jessica Lester experienced severe mental anguish and suffering as a result of her brother's untimely death. Therefore, this Court shall award to the estate of Christopher Lester, by Cecil Lester, Sr., and Judy Lester as Personal Representatives, $2.5 million for the benefit of his sister Jessica Lester to compensate her for the mental pain and suffering she sustained as a result of her brother's untimely death.

### G.    Minnesota

#### 1.    Causes of Action

##### a.    Wrongful Death

Under Minnesota's wrongful death statute a court-appointed trustee may bring an action "when death is caused by the wrongful act or omission" of another. Minn. Stat. Ann. § 573.02. The amount of recovery for a wrongful death action is the amount the judge "deems fair and just in reference to the pecuniary loss resulting from the death." Minn. Stat. Ann. §573.02. Pecuniary loss includes loss of income, as well as "loss of advice, comfort, assistance, and protection." *Rath v. Hamilton Standard Div. of United Tech. Corp.*, 292 N.W.2d 282, 284-85 (Minn. 1980) (quoting *Gravley v. Sea Gull Marine, Inc.*, 269 N.W.2d 896, 901 (Minn. 1978).

-178-

Any damages awarded in a wrongful death action are "for the exclusive benefit of the surviving spouse and next of kin, proportionate to the pecuniary loss severally suffered by the death." Minn. Stat. Ann. §573.02.  "Next of kin" are those blood relatives who may properly recover under Minnesota's intestacy statute, and include the decedent's children, parents, and siblings. *Wynkoop v. Carpenter*, 574 N.W.2d 422, 427 (Minn. 1998).

<i>b.       Intentional Infliction of Emotional Distress</i>

Minnesota recognizes the tort of intentional infliction of emotional distress, and has adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS.  *See Dornfeld v. Oberg*, 503 N.W.2d 115, 117 (Minn. 1993).  Accordingly, the elements of the tort of intentional infliction of emotional distress under Minnesota law are: (1) extreme and outrageous conduct; (2) the conduct is intentional or reckless; (3) the conduct causes emotional distress; and (4) the emotional distress is severe.
*Dornfeld*, 503 N.W.2d at 117.  In order for a defendant's conduct to be considered extreme and outrageous, it must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  *Hubbard v. United Press Intl., Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983).

In Minnesota, the issue of whether a plaintiff must be present in order to recover for a claim of intentional infliction of emotional distress has not been specifically addressed by the courts.  The fact that Minnesota courts have adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS in recognizing the tort of intentional infliction of emotional distress allows this Court to follow the same reasoning regarding the presence requirement set forth previously in this

opinion.[57]  Applying this rationale, this Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under Minnesota law, and that standing to seek such recovery is limited to the victim's near relatives who were not present at the time of the attack.

> 2.    *Plaintiffs*
>
> > a.    *Additional Surviving Family Members of Brent Marthaler*
> >
> > > i.    *Matthew Marthaler*

Matthew Lucas Marthaler ("Matt"), a United States citizen, was Brent Marthaler's brother.  Matt was born in St. Paul, Minnesota on February 19, 1975.  (Dec. 3, 2003 Tr. at 110.) Matt is one year younger than his brother Kirk, and one year older than his brother Brent.

Matt testified that Brent's funeral service at the church in Minnesota "was a blur." In the days and weeks following Brent's death, Matt "made sure that [his] Mom and Dad were able to go to work the next day and soldier on." Matt then returned to the base in Meridan, Mississippi and told his Chief, "I'll hold on for as long as you tell me but I don't have much left for the Navy. I just got my heart ripped out."

Matt felt isolated following Brent's death. Matt visited Kirk in Alabama every chance he could even though they were stationed about 200 or 300 miles away from each other. *Id.* at 120-22.  He still thinks of Brent often.  *Id.* at 127.

According to Dr. Cable, Matt

> is in loss and loneliness. He has had a very difficult time coping with
>
> his brother's death. … Following the death and the family

---

[57] *See supra* Part VI.D.1.b.

> estrangement, he was the only member of the family speaking to
> everybody. … He will have continuing grief for a good many years to
> come. He is one again that … is in need of some real grief therapy.
> The fact that this is the first time in all these years he has really talked
> about this would clearly say there is a need to have an opportunity to
> share and to deal with it. He, too, will have grief that re-emerges with
> significant life events in the future.

(Feb. 10, 2004 Tr. at 79-80.)

As the brother of Brent Marthaler, Matthew Marthaler has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of Matthew Marthaler's intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Matthew Marthaler.  Finally, it is clear that Matthew Marthaler has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court shall award to Matthew Marthaler $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

### ii.    *Kirk Marthaler*

Kirk Charles Marthaler, a United States citizen, was  Brent Marthaler's brother. Kirk was born in St. Paul, Minnesota on December 8, 1973.  (Dec. 3, 2003 Tr. at 82.)  Kirk is one year

older than his brother Matt and was two years older than Brent.  As children, the three brothers were very close.

Kirk attended the memorial service at Eglin AFB in Florida with his parents and brother and Katie and Katie's family. Brent's body was returned to Minnesota after the memorial service. Kirk remembers that the funeral home director called the Marthaler home and told Herm and Sharon that he was not sure if they wanted to do an open casket. The funeral home was willing to take the wrapping and gauze off of Brent only if they received strict instructions to do so. The funeral home explained that the injuries to Brent were horrific, and the Air Force had done a very clean job of wrapping him. The funeral home explained that if they had undressed the wrapping, they would not be able to make him viewable. The funeral home director asked if Herman would come in first and view the body. Kirk was sent to do this. Kirk recalled that viewing his brother's body in the casket was the most hollow thing he had ever felt in his life. He then had to call his parents and tell them what he had seen. *Id.* at 102-04.

Kirk blames himself for his brother's death because he was the one who convinced Brent to join the Air Force and become a jet airplane mechanic. *Id.* at 105-08.  He laments the fact that he and Brent "could've been best friends [but] me and my brother spent too much time competing.  We never had an opportunity to become best friends." *Id.* at 108-09.

As Dr. Cable stated, Kirk is

> very much in loss and loneliness, but with guilt added in his case. He
> sees what he will miss the rest of his life in terms of a relationship
> with his brother, how the family had changed, and how the family and
> Kirk will never be the same again. … The grief will continue, and

> that with every major event in life, he will be struck by the fact that
>
> Brent isn't here to be a part of that. So a very strong sense of yearning
>
> . . . . [T]he grief will be re-emerging for many years to come.

(Feb. 10, 2004 Tr. at 77-78.)

As the brother of Brent Marthaler, Kirk Marthaler has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of Kirk Marthaler's intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Kirk Marthaler.  Finally, it is clear that Kirk Marthaler has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court shall award to Kirk Marthaler $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

> H.     Wisconsin

>> 1.     Causes of Action

>>> a.     Wrongful Death

Under Wisconsin's wrongful death statute, a decedent's personal representative may bring an action when the decedent's death is "caused by a wrongful act, neglect or default" of another.  Wis. Stat. Ann. §§ 895.03, 895.04(1).  If the decedent dies without a surviving spouse, any damages inure to the benefit of the decedent's "lineal heirs."  Wis. Stat. Ann. § 895.04(2).

"Lineal heirs" include the decedent's parents.  Wis. Stat. Ann. §§ 852.01(1)(c).  Damages

recoverable in a wrongful death action include pecuniary damages, non-pecuniary damages

limited to $350,000, as well as medical and funeral expenses.  Wis. Stat. Ann. §§ 895.04.

<em>b.</em>        <em>Intentional Infliction of Emotional Distress</em>

Under Wisconsin law, a plaintiff must prove the following elements to establish a

successful claim of intentional infliction of emotional distress: (1) the defendant's conduct was

intended to cause emotional distress; (2) the defendant's conduct was extreme and outrageous;

(3) the defendant's conduct caused plaintiff's emotional distress; and (4) the plaintiff "suffered

an extreme disabling emotional response to the defendant's conduct." *Rabideau v. City of*

*Racine*, 627 N.W.2d 795, 802-03 (Wis. 2001).  In Wisconsin, the issue of whether a plaintiff

must be present in order to recover for a claim of intentional infliction of emotional distress has

not been specifically addressed by the courts.  The fact that Wisconsin courts have adopted

Section 46 of the RESTATEMENT (SECOND) OF TORTS in recognizing the tort of intentional

infliction of emotional distress allows this Court to follow the same reasoning regarding the

presence requirement set forth previously in this opinion.[58]  Applying this rationale, this Court

finds that the presence element does not need to be proven in order to successfully bring a cause

of action for intentional infliction of emotional distress under Wisconsin law, and that standing to

seek such recovery is limited to the victim's near relatives who were not present at the time of

the attack.

<em>2.</em>        <em>Plaintiffs</em>

<em>a.</em>        <em>Paul Fennig</em>

---

[58] *See supra* Part VI.D.1.b.

Mark Fennig and Paul D. Fennig are United States citizens and the brothers of Patrick Fennig ("Pat"). Exs. 281, at 1-3; 282, at 1, 3-4.  In high school, Pat and Paul had common interests and friends, and were close to each other.  Ex. 281, at 7.

Pat's death affected Paul deeply.  He has dreams of Pat and him spending time together. Paul thinks about Pat every day.  He is sorry that he did not have a chance to say good-bye to Pat. There is a void in Paul's life without Pat.  Paul has trouble understanding why Pat was killed. Ex. 281,  21-22.  Things are particularly difficult for Paul when his friends bring up Pat out of the blue.  Nevertheless, though it hurts him emotionally to think of his dead brother, it means a lot to Paul that his friends remember Pat so fondly.  Ex. 281.

According to Dr. Cable, Paul

> is in loss and loneliness. He was very close to his brother growing up. That closeness is something that he misses desperately. So the loneliness persists. Even though his life is full, there is an element there that's not be replaced that's not been taken care of. . . .  He will continue with this grief in the future. He will move on, but there will always be an element of regret there. There will always be for him something missing, something that's just incomplete in his life.

(Feb. 10, 2004 Tr. at 134-35.)

As the brother of Patrick Fennig, Paul Fennig has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of Paul Fennig's intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Paul Fennig.  Finally, it is clear that Paul Fennig has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court shall award to Paul Fennig $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

>     b.     *Mark Fennig*

Mark Fennig is a brother to Patrick Fennig ("Pat").  Throughout their lives together, Mark and Pat shared many common interests.  As children, both Mark and Pat loved building model airplanes with each other.  (Ex. 282,  9.)  As adults, Pat and Mark developed a common interest in fine cigars.

Mark returned to work about a week after Pat's death hoping that a normal routine would help him deal with everything. Mark was distracted for several months after Pat's death. It was very difficult to concentrate on his work. Mark's Catholic upbringing, faith, and family provided support for him after Pat's death.

Mark has kept a number of Pat's personal belongings. The one that means the most to him is a cigar humidor. It is displayed in Mark's office and holds the cigars that he received from Pat after his death. Ex. 282,  23.

Holidays, anniversaries, and birthdays are difficult for Paul and Mark. Each involves personal reflection by Mark and his family. Thanksgiving and Memorial Day also have much more meaning for Mark now. Mark and his family attend a Memorial Day procession and service

at the cemetery and in their village. Mark's sons are involved in the boy scouts and take part in

the procession which affords Mark the opportunity to share his memories of Pat with his sons.

The Fennig family has a toast on major holidays in memory of Pat. Ex. 281,  23; 282, 24.  Mark

has not been able to shake the feeling of being cheated. Mark has been cheated out of a

relationship with his brother and having an uncle for his sons. Ex. 282,  25.

> According to Dr. Cable, Mark

>> is in loss and loneliness. … He still shows a lot of concern over his
>> mother, worries about how she is doing. Mark, being the oldest, has
>> sort of been the family protector, so he still sees himself as having
>> some responsibility. … His grief will certainly continue. He is
>> fortunate in that he does have a good support system. But because he
>> is so concerned about everybody else, he is not necessarily getting
>> some of his own needs met and getting his own grief resolved. So he
>> will have a road yet ahead of him.

(Feb. 10, 2004 Tr. at 132-33.)

As the brother of Patrick Fennig, Mark Fennig has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of his

brother.  Based upon the evidence presented to the Court, the elements of Mark Fennig's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Mark Fennig.  Finally, it is clear that Mark

Fennig has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner. Therefore, this Court shall award to Mark Fennig $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

    I.     *New York*

        1.    *Causes of Action*

            a.    *Intentional Infliction of Emotional Distress*

New York, adopting the approach taken in Section 46 of the RESTATEMENT (SECOND) OF TORTS, recognizes intentional infliction of emotional distress as a tort. *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). The elements of intentional infliction of emotional distress under New York law are: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Id.*

In New York, the issue of whether a plaintiff must be present in order to recover for a claim of intentional infliction of emotional distress has not been specifically addressed by the courts. Two factors persuade this Court to find that the presence requirement for intentional infliction of emotional distress is unnecessary in this case. First, New York courts have adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS in recognizing the tort of intentional infliction of emotional distress. Second, the Southern District of New York held in *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 829-30 (S.D.N.Y. 2005) that non-present survivors of victims of the September 11, 2001, attacks on the World Trade Center and Pentagon were able to bring a claim of intentional infliction of emotional distress against the

perpetrators of the attacks.[59]  These two reasons allow this Court to follow the same reasoning

regarding the presence requirement set forth previously in this opinion.[60]  Applying this rationale,

this Court finds that the presence element does not need to be proven in order to successfully

bring a cause of action for intentional infliction of emotional distress under New York law, and

that standing to seek such recovery is limited to the victim's near relatives who were not present

at the time of the attack.

2.      *Plaintiffs*

a.      *Mary Young*

Mary Young is the sister of Christopher Adams.  She is the oldest of the Adams' children.

Mary is a police communications operator in Manhattan.  (Dec. 10, 2003 A.M. Tr. at 87.)

On a personal level, Mary has been emotionally effected by Christopher's death.  In

addition, Mary is angry that she had to watch her mother go through the seven years of grief in

dealing with Christopher's death.  *Id.* at 99-100.

Mary thinks about the bombing and about Christopher every day.  Due to the brutality of

the attack that killed Christopher, Mary is much more emotional today than she was in 1996.  *Id.*

at 100.  Ever since Christopher was killed, Mary has had constant trouble sleeping.  Addtionally,

Mary gained about 60 pounds after Christopher died.  She went on medication shortly after he

died.  *Id.* at 102-103.  The medication, the insomnia, and the weight gain are all attributable to

---

[59] Though the precedent set forth by the federal court in the Southern District of New York is not binding on the state courts in New York, in light of the severity of the attacks involved in both cases, the court's opinion carries a great deal of weight in determining whether a presence requirement is necessary in cases involving intentional infliction of emotional distress claims arising out of terrorist attacks.

[60] *See supra* Part VI.D.1.b.

the trauma and sadness that occurred when Christopher was killed. *Id.* at 102-104.

Christopher's death and the manner in which he was killed has been one of the most devastating things that have ever happened to Mary and to her whole family. As she testified, "Death is part of life but not that way, not the way it all went. It's just not normal." *Id.* at 106.

According to Dr. Cable, Mary

> is still in loss and loneliness. She is still very much affected by Chris' death. And her need for ongoing medication, the sleep difficulties, help verify the situation that she is in. … Her grief is going to continue, and she probably will need to continue on medication for quite a period of time. Any future losses are going to complicate all of this for her, and probably provide some setbacks, but I see her grief going on for a number of years.

(Feb. 10, 2004 Tr. at 102.)

As the sister of Christopher Adams, Mary Young has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of her brother. Based upon the evidence presented to the Court, the elements of Mary Young's intentional infliction of emotional distress claim are met. The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous. As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Mary Young. Finally, it is clear that Mary Young has continued to experience emotional distress since that time due to the fact that her brother was taken away from her in such a tragic and horrific manner. Therefore, this Court shall

award to Mary Young $2.5 million to compensate her for the emotional distress, pain and suffering that she sustained as a result of her brother's untimely death.

> b.    *Daniel Adams*

Daniel Adams is the youngest of the Adams children, eight years younger than Christopher.  When Daniel first heard that Christopher had been killed, he didn't believe it. He felt powerless, sad, and angry. Daniel remembered everybody in the family crying for days and days. *Id.* at 43. He went to the service at Patrick AFB and to the other services and did so much crying, he couldn't even see out of his eyes. *Id.* at 44. Whenever he sees the American Flag, he thinks of Christopher. *Id.* at 46.

When Christopher died, Daniel had been working but was unable to return to work because he lost much of his motivation.  He was angry at God, at the terrorists, and at the government. He visits the cemetery at least once a month. *Id.* at 47.

Prior to Christopher's death, Daniel had trouble with drugs, but stopped using them completely during the five year period before Christopher died.  But when Christopher died, Daniel immediately started drinking alcohol. Up to about the middle of 2002, he had been very active in drugs and alcohol constantly for the six-year period after the murder. *Id.* at 47-48. He has obtained counseling from various places. Most of the counseling centers on his reaction to Christopher's dying. *Id.* at 48.

According to Dr. Cable, Daniel "is in loss and loneliness … also some of those earlier stages, the volatile emotions, some of the guilt is very present. He has got a lot of pain, a lot of emotion over Chris. That's not gone away. He is at some great risk. … [H]is prognosis is guarded." (Feb. 10, 2004 Tr. at 115-16.)

As the brother of Christopher Adams, Daniel Adams has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of Daniel Adams' intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Daniel Adams.  Finally, it is clear that Daniel Adams has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court shall award to Daniel Adams $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

c.      *Elizabeth Wolf*

Elizabeth Wolf was Christopher's only younger sister. She is now married with two children, ages 1 and 2.  When Christopher was killed, she felt that she had been abandoned. When she married in 1997, just a year after Christopher's death, it was a time of sadness instead of joy for Elizabeth because Christopher was going to be the one to walk her down the aisle, and he wasn't there. She also felt a sense of guilt because he was not present. *Id.* at 29-30.

Elizabeth continues to feel pain today.  Many things bring back the memory of that terrible day, and family gatherings no longer have the same sense of joy that they had before 1996.  *Id.* at 32.

After Christopher died, Elizabeth would go to the cemetery once a month. Even today, seven years later, she goes once every two months. *Id.*  It hurts Elizabeth that she was never able

to say goodbye to him in person.  She is hurt that the family wasn't there to help him when he

was killed. *Id.* at 34. Other terrorist attacks make her think about Christopher's death all over

again because she thinks it's happening again. She thinks about how other families have to go

through the pain, the grief, and the anguish which the Adams family has experienced. *Id.* at 35.

> According to Dr. Cable, Elizabeth

>> is in loss and loneliness, with some real feelings of missing [her
>>
>> brother, plus] some issues of guilt. . . .  She chose not to view the
>>
>> body, and . . . there is a lot of regret over not having had that last
>>
>> connection. . . .  Her pain is going to continue into the future.  She
>>
>> will put a lot of her effort into ways of helping keep Chris' memory
>>
>> alive. That, to her, will be important, that people don't forget [Chris].
>>
>> That helps her grief as well as helps his memory in her mind.

(Feb. 10, 2004 Tr. at 107-08.)

As the sister of Christopher Adams, Elizabeth Wolf has brought an intentional infliction

of emotional distress claim against the defendants for pain and suffering caused by the death of

her brother.  Based upon the evidence presented to the Court, the elements of Elizabeth Wolf's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Elizabeth Wolf.  Finally, it is clear that

Elizabeth Wolf has continued to experience emotional distress since that time due to the fact that

her brother was taken away from her in such a tragic and horrific manner.  Therefore, this Court

shall award to Elizabeth Wolf $2.5 million to compensate her for the emotional distress, pain and suffering that she sustained as a result of her brother's untimely death.

     *J.     North Carolina*

     *1.     Causes of Action*

     *a.     Intentional Infliction of Emotional Distress*

North Carolina recognizes the tort of intentional infliction of emotional distress. *Stanback v. Stanback*, 254 S.E.2d 611 (N.C. 1979). The tort recognized in *Stanback* is in accord with the version found in Section 46 of the RESTATEMENT (SECOND) OF TORTS. *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981). The elements of this tort under North Carolina law are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." *Id.* In North Carolina, the issue of whether a plaintiff must be present in order to recover for a claim of intentional infliction of emotional distress has not been specifically addressed by the courts. The fact that North Carolina courts have found their tort of intentional infliction of emotional distress to be in accord with Section 46 of the RESTATEMENT (SECOND) OF TORTS allows this Court to follow the same reasoning regarding the presence requirement set forth previously in this opinion.[61] Applying this rationale, this Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under North Carolina law, and that standing to seek such recovery is limited to the victim's near relatives who were not present at the time of the attack.

     *2.     Plaintiffs*

---

[61] *See supra* Part VI.D.1.b.

a.      *Patrick Adams*

Patrick Adams is a brother to Christopher Adams.  Patrick thinks about Christopher every day.  *Id.* at 18. He often prays to Christopher for guidance, for support, and for help in making the right decisions about his children. *Id.* at 19.  He always thinks about Christopher when he reads about other terrorist killings.  He thinks about Christopher a lot on April 18, because that was the birthday of both Christopher and Paul Revere, a great patriot.  *Id.* at 21.

According to Dr. Cable, Patrick

> is in loss and loneliness. Grief has altered his world view, in a sense; this attitude of live today, you don't know what's coming. But very much misses his brother and what his brother's role would be in his life now. . . .  Patrick sill has feelings, empty feelings, that overwhelm him at times. . . .   [G]rief [will continue] to be a pretty significant issue for him for a long time.

(Feb. 10, 2004 Tr. at 105-06.)

As the brother of Christopher Adams, Patrick Adams has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based upon the evidence presented to the Court, the elements of Patrick Adams' intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Patrick Adams.  Finally, it is clear that Patrick Adams has continued to experience emotional distress since that time due to the fact that

his brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court

shall award to Patrick Adams $2.5 million to compensate him for the emotional distress, pain and

suffering that he sustained as a result of his brother's untimely death.

b.    <i>John Adams</i>

John Adams is the twin brother of Patrick Adams, and is the younger brother of

Christopher Adams by one year.  Christopher's death has had a terrible impact on John because

Christopher was his power base and gave him strength. *Id.* at 68. John thinks of him a lot,

definitely during the holidays, and whenever he sees the flag, and whenever he hears the National

Anthem. *Id.* at 68-69. When September 11 occurred, he thought about the experiences of other

families. Every year on June 25, John says a prayer and thanks God that there is an angel up in

heaven looking over the family. *Id.* at 69. For John, family occasions are not the same anymore.

The biggest difference is their mother. She is not the same.  *Id.*

As Dr. Cable stated, John is in loss and loneliness:

> Chris was the big brother. He was the one everybody looked up to. .
>
> . . John has an inner strength and a faith that helps him get by.  There
>
> is a wistfulness in his voice for a relationship with his brother that can
>
> never be.  His grief will continue, but he will work on it.  He will
>
> work to move on.

(Feb. 10, 2004 Tr. at 104.)

As the brother of Christopher Adams, John Adams has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of his

brother.  Based upon the evidence presented to the Court, the elements of John Adams'

-196-

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to John Adams.  Finally, it is clear that John

Adams has continued to experience emotional distress since that time due to the fact that his

brother was taken away from him in such a tragic and horrific manner.  Therefore, this Court

shall award to John Adams $2.5 million to compensate him for the emotional distress, pain and

suffering that he sustained as a result of his brother's untimely death.

c.    <em>William Adams</em>

William Adams ("Billy") was a brother of Christopher Adams, who was six years

older.  Billy was the seventh of the eight children in the family and his oldest brother was six

years older than he was.  Ex. 277, 3.  Billy's testimony was admitted by Affidavit.  *Id.*

Christopher's death had a huge impact on Billy.  (Dec. 3, 2003 P.M. Tr. at 66-67.)  About

two months after the Khobar Towers incident, Billy moved away from North Carolina to go back

up to Long Island to be with his mother.  Billy thinks about Christopher every day, especially on

holidays, and on June 25. He keeps pictures of Christopher in his home and has Christopher's Air

Force Academy sword that Caren gave to him, a flag and a bracelet that Christopher bought for

him on one of his previous trips to Saudi Arabia. Ex. 277, 19 and 20.

According to Dr. Cable, Billy

> is in the loss and loneliness stage. He does … have some repressed
>
> emotion. … He will continue in grief for a significant time. There is
>
> a strong identification with his brother, and so the loss of his brother

-197-

will impact him for a long time into the future. There is a need for

some real therapy to help him work through and express some of

those repressed emotions.

(Feb. 10, 2004 Tr. at 112-13.)

As the brother of Christopher Adams, William Adams has brought an intentional

infliction of emotional distress claim against the defendants for pain and suffering caused by the

death of his brother.  Based upon the evidence presented to the Court, the elements of William

Adams' intentional infliction of emotional distress claim are met.  The defendants' conduct in

facilitating, financing, and providing material support to bring about this attack was intentional,

extreme, and outrageous.  As the evidence shows, this horrific act precipitated by the defendants'

planning and assistance brought immediate emotional distress to William Adams.  Finally, it is

clear that William Adams has continued to experience emotional distress since that time due to

the fact that his brother was taken away from him in such a tragic and horrific manner.

Therefore, this Court shall award to William Adams $2.5 million to compensate him for the

emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

> d.    Michael Adams

Michael Adams, brother to Christopher Adams, was born in 1971; he was the sixth of the

eight children.  Christopher was five years older than Michael. Ex. 276, at 3-4.  Michael's

testimony was admitted by way of Affidavit. Ex. 276.

Christopher's death has greatly affected Michael.  Michael has kept all the newspaper

accounts of Christopher's death and funeral and his medals in a box at his home. He also keeps

his green flight suit and keeps a poster of the Khobar Towers after the bombing on the wall

above his desk. *Id.* at 27.

Michael thinks a lot about Christopher during the entire month of June, not just June 25, and many other things remind him of Christopher. *Id.* at 29. He thinks of Christopher every time he turns on the news and hears about military casualties. He thinks about the grief that all the families are going through, not only the families of the dead Iraqi soldiers, but also the families of the people who were killed on September 11. *Id.* at 30. Watching his mother today dealing with Christopher's loss brings as much pain to him as Christopher's own death. *Id.* at 32.

It makes Michael very sad to think that Christopher will not be part of the lives of his children. *Id.* at 34. As Dr. Cable stated, Michael

> is in loss and loneliness. … He has got a lot of pent up emotion there
> that he really hasn't allowed himself to express. … [T]here is some
> volatile emotions that are not quite out in the open. There is still a lot
> of effort to protect his mother. … He has a lot of pain ahead and a lot
> of grief work to do.

(Feb. 10, 2004 Tr. at 110.)

As the brother of Christopher Adams, Michael Adams has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother. Based upon the evidence presented to the Court, the elements of Michael Adams' intentional infliction of emotional distress claim are met. The defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous. As the evidence shows, this horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to Michael Adams. Finally, it is

clear that Michael Adams has continued to experience emotional distress since that time due to the fact that his brother was taken away from him in such a tragic and horrific manner. Therefore, this Court shall award to Michael Adams $2.5 million to compensate him for the emotional distress, pain and suffering that he sustained as a result of his brother's untimely death.

K.     *Indiana*

1.     *Claims Under Indiana Law*

a.     *Wrongful Death*

Under Indiana's wrongful death statute, the decedent's personal representative may bring an action against the person whose wrongful act or omission caused the death of the decedent. Ind. Code Ann. § 34-23-1-1.  A successful wrongful death plaintiff may recover damages that include "reasonable medical, hospital, funeral, and burial expenses," in addition to the decedent's lost earnings.  Ind. Code. Ann. § 34-23-1-1.  Any damages awarded for reasonable medical, hospital, funeral, and burial expenses inure to the benefit of the decedent's estate, while all other damages are awarded to the benefit of "the widow or widower, . . . , and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased."  Ind. Code. Ann. § 34-23-1-1.

"Dependent next of kin" include those individuals who show that: (1) they need support; and (2) the decedent contributed to their support.  *Estate of Sears v. Griffin*, 771 N.E.2d 1136, 1139 (Ind. 2002).  A plaintiff does not have to be wholly dependent on the decedent to be considered a dependent next of kin.  *Id.*  Instead, a court must examine "the assistance that the decedent would have provided through money, services or other material benefits."  *Id.* (quoting *Luider v. Skaggs*, 693 N.E.2d 593, 596-97 (Ind. Ct. App. 1998)).

b.      *Intentional Infliction of Emotional Distress*

Indiana recognizes the tort of intentional infliction of emotional distress, following

Section 46 of the RESTATEMENT (SECOND) OF TORTS.  Under Indiana law, the elements of an

intentional infliction of emotional distress claim are: "(1) 'extreme and outrageous conduct' that

(2) intentionally or recklessly (3) causes (4) severe emotional distress to another."  *Creel v. I.C.E.*

*& Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002).  In Indiana, the issue of whether a

plaintiff must be present in order to recover for a claim of intentional infliction of emotional

distress has not been specifically addressed by the courts.  The fact that Indiana courts have

adopted Section 46 of the RESTATEMENT (SECOND) OF TORTS in recognizing the tort of

intentional infliction of emotional distress allows this Court to follow the same reasoning

regarding the presence requirement set forth previously in this opinion.[62]  Applying this rationale,

this Court finds that the presence element does not need to be proven in order to successfully

bring a cause of action for intentional infliction of emotional distress under Indiana law, and that

standing to seek such recovery is limited to the victim's near relatives who were not present at

the time of the attack.

2.      *Plaintiffs*

a.      *Lewis Cartrette*

Lewis W. Cartrette is a United States citizen, and the brother of Earl "J.R." Cartrette, Jr.

Exs. 279,  1-2.  Lewis was born in Sellersberg, Indiana on November 1, 1976.  His parents are

Denise Eichstaedt and the late Earl Frederick Cartrette, Sr.  Ex. 279, at 4.

---

[62] *See supra* Part VI.D.1.b.

Lewis was unable to shake the misery that he felt as a result of J.R.'s death. Lewis shut everyone out and did not want to go on with his life. Lewis was depressed and did not want to function. Lewis testified, "J.R.'s death is the hardest, most painful thing that I have ever had to deal with because just when everything was good, J.R. was killed and there was nothing I could do about it. My brother, my friend was gone." After J.R.'s death, Lewis began using drugs and alcohol, became physically violent, and contemplated suicide on more than one occasion. Lewis had three encounters with the criminal justice system which involved increasingly serious offenses. Lewis lost his job, his wife, his children, his home, and spent one year in jail. Ex. 279, 16-17.

After J.R.'s death, Lewis began seeing a psychiatrist and was prescribed medication. Lewis is no longer seeing the psychiatrist or taking medication. Ex. 279, at 18.  Holidays, anniversaries, and birthdays are still particularly difficult days for Lewis. Lewis is remarried and will soon become a father of twins. Lewis' children will never know their uncle J.R. Lewis always wanted his children to have someone like J.R. in their life.

J.R.'s death is also difficult for Lewis when he is around antique cars which J.R. and Lewis both loved. When Lewis thinks about J.R., the pain and misery today is as strong as it was when Lewis learned of J.R.'s death on June 27, 1996. Ex. 279, at 19-20.

According to Dr. Cable, Lewis

> very clearly is in loss and loneliness. He has had major difficulties
>
> with his brother's death. His brother was really a father figure as well
>
> as a brother to him, very close, and was not there to keep [Lewis]
>
> from kind of sinking in what happened to him. So the death has had

> a major impact on [Lewis], and continues to do so. … His problems,
>
> his grief, is going to continue in the future. He is in need of grief
>
> therapy. He has got a lot of rebuilding of his life to do, and that's
>
> going to take a significant amount of time. It's going to be an ongoing
>
> struggle for him to get back where he can function effectively.

(Feb. 10, 2004 Tr. at 123-24.)

As the brother of Earl Cartrette, Jr., Lewis Cartrette has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of his brother.  Based on the evidence presented to the Court, Lewis Cartrette has satisfied the elements to establish a valid claim for intentional infliction of emotional distress.  First, defendants Iran, MOIS, and the IRGC provided material support to Saudi Hezbollah with the intent that Saudi Hezbollah would carry out attacks that would cause severe emotional distress.  Second, the tragic bombing of the Khobar Towers by means of material support and civil conspiracy is an act that is nothing short of extreme, outrageous, and beyond all bounds of civil decency.  As is the nature of terrorism, terrorists seek to perform acts that are deliberately outrageous and bring about extreme suffering in order to achieve political ends.  Third, the defendants' actions in facilitating and supporting the Khobar Towers bombing proximately caused Lewis emotional distress because the material support and direction given to Saudi Hezbollah ensured the event would occur.  Finally, the evidence shows that Lewis suffered emotional distress, and that his emotional distress was severe.  Accordingly, the Court finds that Lewis Cartrette is entitled to recover from defendants $2.5 million in compensatory damages for the mental anguish and suffering associated with the loss of his brother.

*L.      Oklahoma*

      *1.      Causes of Action*

          *a.      Intentional Infliction of Emotional Distress*

Oklahoma also recognizes the tort of intentional infliction of emotional distress, having adopted Section 46 of the Restatement (Second) of Torts.  *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376-78 (Okla. 1978).  To recover damages for intentional infliction of emotional distress under Oklahoma law, the plaintiff must show: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Publ'n, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).

In Oklahoma, the issue of whether a plaintiff must be present in order to recover for a claim of intentional infliction of emotional distress has not been specifically addressed by the courts.  The fact that Oklahoma courts have found their tort of intentional infliction of emotional distress to be in accord with Section 46 of the Restatement (Second) of Torts allows this Court to follow the same reasoning regarding the presence requirement set forth previously in this opinion.[63]  Applying this rationale, this Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under Oklahoma law, and that standing to seek such recovery is limited to the victim's near relatives who were not present at the time of the attack.

      *2.      Plaintiffs*

          *a.      Nancy A. Kitson*

---

[63] *See supra* Part VI.D.1.b.

-204-

Nancy A. Kitson is the oldest sibling to Kendall Kitson, Jr. ("Kenny").  After Kenny's death, Nancy took at least one month off of work.  She stayed in Florida with her parents.  Nancy was the only one to keep many of Kenny's personal items. Ex. 292,  21.

For the first several years after Kenny's death, Nancy attended the memorial services the military hosted in Washington, D.C. and Quantico, Virginia.  *Id.* at 22.  Nancy does her best to keep going, in spite of her grief.  She breaks down sometimes when people ask her how she is or do not know that Kenny was killed. *Id.* at 23.

The most difficult time of the year for Nancy is around Kenny's birthday in October. For many years, Christmas time was also very difficult for Nancy and she would not celebrate the holiday. *Id.* at 24.  In addition to her own loss of Kenny, Nancy's grief has been compounded by the tension Kenny's loss has created between herself and her parents.  Nancy's parents will not even visit Nancy's daughter.  Nancy is very hurt by her parents' failure to love anyone else since Kenny died. *Id.* at 27.

> As Dr. Cable stated, Nancy A. Kitson
>
> is in loss and loneliness. She misses her brother terribly, and in
> addition has to cope with her parents' bitterness, her mother's illness.
> Fells very alone in the family and very lonely without Kenny. … She,
> too, will continue to experience grief into the future. The feelings of
> loss and loneliness will continue.

(Feb. 10, 2004 Tr. at 151-52.)

As the sister of Kendall Kitson, Jr., Nancy Kitson has brought an intentional infliction of emotional distress claim against the defendants for pain and suffering caused by the death of her

brother.  Based upon the evidence presented to the Court, the elements of Nancy Kitson's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Nancy Kitson.  Finally, it is clear that Nancy

Kitson has continued to experience emotional distress since that time due to the fact that her

brother was taken away from her in such a tragic and horrific manner.  Therefore, this Court shall

award to Nancy Kitson $2.5 million to compensate her for the emotional distress, pain and

suffering that she sustained as a result of her brother's untimely death.

> M.    Kansas
>
>> 1.    Causes of Action
>>
>>> a.    Outrage

In Kansas the tort of intentional infliction of emotional distress is recognized, although it

is called the tort of Outrage.[64]  Naturally, the elements of Outrage are the same as those for

intentional infliction of emotional distress, namely the plaintiff must prove that : "(1) the conduct

of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was

extreme and outrageous; (3) there was a causal connection between the defendant's conduct and

the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe."

*Smith v. Welch*, 967 P.2d 727, 733 (Kan. 1998).

---

[64] Though the Kansas courts have offered a different moniker for these two torts, the tort of Outrage stems from the same root as intentional infliction of emotional distress: Section 46 of the RESTATEMENT (SECOND) OF TORTS.  *See Dotson v. McLaughlin*, 531 P.2d 1, 7-9 (Kan. 1975).

In Kansas, the issue of whether a plaintiff must be present in order to recover for a claim of Outrage has not been specifically addressed by the courts.  The fact that Kansas courts have found their tort of Outrage to be in rooted in Section 46 of the Restatement (Second) of Torts allows this Court to follow the same reasoning regarding the presence requirement set forth previously in this opinion.[65]  Applying this rationale, this Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for Outrage under Kansas law, and that standing to seek such recovery is limited to the victim's near relatives who were not present at the time of the attack.

> 2.    *Plaintiffs*

>> a.    *Starlina Taylor*

Starlina Taylor is the sister to Jeremy Taylor.  Jeremy's death has been particularly difficult for Starlina due to the closeness of her relationship with Jeremy.  When Jeremy died, Starlina lost both a brother and her best friend.  Moreover, Starlina is grieving the loss of the her relationship with her parents due to the fact that her parents–in particular, her father–have become emotionally unavailable as a result of Jeremy's death. Ex. 289,  35.  Further, since Jeremy's death, Starlina has had difficulty maintaining a fulfilling relationship with a man. She has been divorced twice and has trouble letting anyone get close to her. Exs. 289,  35 and 290,  32.

After Jeremy died, Starlina was upset to her stomach all the time and had menopausal symptoms. She also drank excessively from time to time following Jeremy's death.  While she visited a counselor for a short period, she felt like it was a waste of time and only added to her

---

[65] *See supra* Part VI.D.1.b.

father's bills. Ex. 290, 29-30.   Starlina feels as though the grief process is getting worse instead

of better for her.  She is withdrawing into a smaller and smaller group, and there are only a few

people who are her friends. Starlina fantasizes about running away and going somewhere where

no one knows her.  *Id.* at 35.

> According to Dr. Cable, Starlina
>
>> is in loss and loneliness, feeling very much the loss of her brother, her
>>
>> support system. Then complicated because there is a loss of her father
>>
>> as well. He is no longer effective or functioning in that father role,
>>
>> and so that just makes it more intense of loss and loneliness. . . .  She
>>
>> will continue in her grief for a long period of time.

(Feb. 10, 2004 Tr. at 199-200.)

As the sister of Jeremy Taylor, Starlina Taylor has brought an intentional infliction of

emotional distress claim against the defendants for pain and suffering caused by the death of her

brother.  Based upon the evidence presented to the Court, the elements of Starlina Taylor's

intentional infliction of emotional distress claim are met.  The defendants' conduct in facilitating,

financing, and providing material support to bring about this attack was intentional, extreme, and

outrageous.  As the evidence shows, this horrific act precipitated by the defendants' planning and

assistance brought immediate emotional distress to Starlina Taylor.  Finally, it is clear that

Starlina Taylor has continued to experience emotional distress since that time due to the fact that

her brother was taken away from her in such a tragic and horrific manner.  Therefore, this Court

shall award to Starlina Taylor $2.5 million to compensate her for the emotional distress, pain and

suffering that she sustained as a result of her brother's untimely death.

## <u>CONCLUSION</u>

This Court takes note of plaintiffs' courage and steadfastness in pursuing this litigation and their efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  Their efforts are to be commended.


A separate Order and Judgment consistent with these findings shall issue this date.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, December 22, 2006.