# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| *ESTATE OF MICHAEL HEISER, et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 00-cv-2329 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| Defendants. | ) | Consolidated With |
| *ESTATE OF MILLARD D. CAMPBELL, et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 01-cv-2104 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

On the night of June 25, 1996, a tanker truck crept quietly along the streets of Dhahran, coming to rest alongside a fence surrounding the Khobar Towers complex, a residential facility housing United States Air Force personnel stationed in Saudi Arabia.  A few minutes later, the truck exploded in a massive fireball that was, at the time, the largest non-nuclear explosion ever recorded on Earth.  The devastating blast, which was felt up to 20 miles away, sheared the face off Building 131 of the Khobar Towers complex and left a crater more than 85 feet wide and 35 feet deep in its wake.  The bombing killed 19 U.S. military personnel and wounded more than 100.  Subsequent investigations revealed that members of Hezbollah carried out the attack.

A few years after the bombing, plaintiffs—who are former service members injured in the attack, their families, and estates and family members of those killed—brought suit under the "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act ("FSIA" or the "Act"), then codified at 28 U.S.C. § 1605(a)(7). Plaintiffs allege that the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security, and the Iranian Islamic Revolutionary Guard Corps provided material support and assistance to Hezbollah to carry out the heinous attack. Following Iran's failure to appear and plaintiffs' presentation of evidence to substantiate their claims, the Court found that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility and worked with Saudi Hizbollah to execute the plan; and the MOIS participated in the planning and funding of the attack." *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 265 (D.D.C. 2006) ("*Heiser I*").[1] The Court subsequently entered judgment against all defendants for $250 million in compensatory damages. *Id*. at 356. A few years later, Congress passed the National Defense Authorization Act for Fiscal Year 2008 ("NDAA" or the "2008 Amendments"), which replaced § 1605(a)(7) with a new state-sponsored terrorism exception codified at § 1605A, permitted recovery of punitive damages, and added a new provision concerning the enforcement of judgments. Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008). Invoking the NDAA's procedures for retroactive application, in 2009 the Court entered an amended judgment, holding defendants jointly and severally liable for an additional $36 million in compensatory damages and $300 million in punitive damages. *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 31 (D.D.C. 2009).

---

[1] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name." *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 273 n.3 (D.D.C. 2007), *rev'd on other grounds*, 573 F.3d 835 (D.C. Cir. 2009).

Following entry of final judgment, plaintiffs began their journey down the often-frustrating and always-arduous path shared by countless victims of state-sponsored terrorism attempting to enforce FSIA judgments. The matter before the Court today requires exploration of the latest in a series of attempts by Congress to aid these victims. In this instance, plaintiffs—relying on a new provision added to the FSIA as part of the 2008 Amendments—assert that the Telecommunication Infrastructure Company of Iran ("TIC") is an instrumentality of Iran, and ask the Court to direct Sprint Communications Company LP ("Sprint") to turn over funds it owes to TIC. Sprint responds that plaintiff has failed to prove that TIC is an instrumentality as defined by the FSIA, seeks leave to interplead TIC as a defendant, and raises several other legal defenses to attachment of the funds. The Court first reviews the regime of legal and regulatory provisions governing execution of FSIA judgments, and then turns to the parties' dispute.

## II.     BACKGROUND

### A.     Statutory and Regulatory Framework

#### 1.     Iran-Specific Regulations

Relations between the United States and Iran deteriorated following the 1979 revolution in which Iran's monarchy was displaced by an Islamic republic, ruled by the Ayatollahs, that remains in power today. Following the regime change and fueled by the Iran hostage crisis, President Carter—exercising the authority granted to him under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*—blocked the flow of assets between the United States and Iran, and seized Iranian property located within the United States. Executive Order 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979). Over the next two years, Presidents Carter and Reagan issued numerous Executive Orders seizing additional assets, while the Office of Foreign Assets Control ("OFAC")—a component of the Department of the Treasury that administers and

enforces economic and trade sanctions—promulgated regulations concerning transactions between persons in the United States and Iran.  In 1981, the United States and Iran reached an agreement, known as the Algiers Accords, which led to the release of the hostages and the unfreezing of most Iranian assets.  Over the following decades, sanctions regimes instituted by Executive Orders and rules promulgated by OFAC evolved into the complex web of regulations governing Iranian assets in the United States, as well as transactions with Iran.[2]

Today, the basic framework for the treatment of Iranian property and trade with Iran is set forth in two complementary sets of provisions promulgated by OFAC that generally bar all transactions either with Iran or involving Iranian interests and then carve out limited exceptions to that embargo.  The first, known as the Iranian Assets Control Regulations ("IACR") and codified at 31 C.F.R. Part 535, was implemented in 1980 during the Iran Hostage Crisis, 45 Fed. Reg. 24,432 (Apr. 9, 1980), and "broadly prohibits unauthorized transactions involving property in which Iran has any interest," while granting specific licenses for certain transactions.  *Flatow v. Islamic Republic of Iran*, 305 F.3d 1249, 1255 (D.C. Cir. 2002).  The second, known as the Iranian Transactions Regulations ("ITR") and codified at 31 C.F.R. Part 560, "confirms the broad reach of OFAC's Iranian sanctions programs by establishing controls on Iranian trade, investments, and services. . . . As under the IACR, there is a general prohibition under the ITR of unauthorized transactions, coupled with specific licenses permitting certain kinds of transactions."  *Flatow*, 305 F.3d at 1255; *see also Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 68 (E.D.N.Y. 2004) ("The ITR prohibited, *inter alia*, the importation of goods and services from Iran, and the exportation, reexportation, and sale or supply of goods, technology or services to Iran.").

---

[2] The Court here only briefly recounts the relevant background to place the current regulatory framework in proper context.  For an extensive history of regulations and Executive Orders concerning Iran, see Judge Wexler's excellent summary in *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 65–68 (E.D.N.Y. 2004).

## 2.    Attachment and Execution under the FSIA

"It is a well-established rule of international law that the public property of a foreign sovereign is immune from legal process without the consent of that sovereign." *Loomis v. Rogers*, 254 F.2d 941, 943 (D.C. Cir. 1958); *see also Weinstein v. Islamic Republic of Iran*, 274 F. Supp. 2d 53, 56 (D.D.C. 2003) ("[T]he principles of sovereign immunity 'apply with equal force to attachments and garnishments.'") (quoting *Flatow*, 74 F. Supp. 2d at 21).  To promote this general principle, the FSIA broadly designates all foreign-owned property as immune, and then articulates limited exceptions to that immunity.  *See* 28 U.S.C. § 1609 ("[T]he property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611 of this chapter.").  These exceptions include, *inter alia*, property (1) located in the United States that is (2) used for commercial activity and (3) controlled by a foreign state or its instrumentalities.  *Id.* at § 1610(a)–(b); *see also Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 161 (D.D.C. 2009) ("[The FSIA] provides that the property of a foreign state is *not* immune from attachment or execution if the property at issue is used for a commercial activity by the foreign state") (emphasis in original).  Though providing a workable framework in theory, the past decade of litigation under the Act has proved, for victims of state-sponsored terrorism, to be a journey down a never-ending road littered with barriers and often obstructed entirely.  Two particular roadblocks merit greater discussion.

The first difficulty plaintiffs holding judgments against Iran often faced was the limited number of Iranian assets remaining in the United States.  Attempting to overcome this shortfall, plaintiffs targeted property in which an Iranian entity—often a financial institution owned or controlled by Iran—had an interest.  Though expressly sanctioned by § 1610(b), this strategy was undercut by the Supreme Court's decision in *First Nat'l City Bank v. Banco Para El Comercio*

*Exterior de Cuba*, which involved a U.S. financial institution's attempt to collect money owed to it by the Cuban government through the seizure of funds deposited in the institution by a Cuban bank. 462 U.S. 611, 613 (1983). In its opinion, the Supreme Court observed that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," and determined that Congress "clearly expressed its intention that duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." *Id*. at 626–27. According to the *First Nat'l* Court, this presumption may be overridden *only* where the plaintiff demonstrates that the foreign entity is exclusively controlled by the foreign state or where recognizing the separateness of that entity and the foreign state "would work fraud or injustice." *Id*. at 629–30. The practical effect of this holding was to shield the property of instrumentalities of foreign states from attachment or execution absent evidence of a connection between the instrumentality and the foreign state so strong as to render any distinction irrelevant. And by placing the burden of proof on this issue squarely on plaintiffs, the *First Nat'l* holding became a substantial obstacle to FSIA plaintiffs' attempts to satisfy judgments. *See, e.g.*, *Oster v. Republic of S. Afr.*, 530 F. Supp. 2d 92, 97–100 (D.D.C. 2007); *Bayer & Willis Inc. v. Republic of the Gam.*, 283 F. Supp. 2d 1, 4–5 (D.D.C. 2003).

The second hurdle facing FSIA plaintiffs involved assets that once belonged to Iran or its agencies but had been seized and retained by the United States. As a legal matter, "assets held within United State Treasury accounts that might otherwise be attributed to Iran are the property of the United States and are therefore exempt from attachment or execution by virtue of the federal government's sovereign immunity." *In re Islamic Republic of Terrorism Litig.*, 659 F. Supp. 2d 31, 53 (D.D.C. 2009) (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999)). Victims of state-sponsored terrorism attempting to seize such assets were thus put in the perverse

position of litigating against their own government, *see Weinstein*, 274 F. Supp. 2d at 56 ("[I]f a litigant seeks to attach funds held in the U.S. Treasury, he or she must demonstrate that the United States has waived its sovereign immunity with respect to those funds.") which strongly opposed attempts to attach such assets. As one commentator explains:

> As a matter of foreign policy, the President regards frozen assets as a powerful bargaining chip to induce behavior desirable to the United States; accordingly, allowing private plaintiffs to file civil lawsuits and tap into the frozen assets located in the United States may weaken the executive branch's negotiating position with other countries. For this reason, several U.S. presidents have opposed giving victims access to these funds.

Debra M. Strauss, *Reaching Out to the International Community: Civil Lawsuits as the Common Ground in the Battle against Terrorism*, 19 Duke J. Comp. & Int'l L. 307, 322 (2009). The Executive Branch has consistently succeeded in arguing that the FSIA does not waive the United States' immunity with respect to seized Iranian assets. *See, e.g.*, *Flatow*, 74 F. Supp. 2d 18.

Eventually Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (2002), "to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'" *Weininger v. Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (quoting H.R. Conf. Rep. 107-779, at 27 (2002)). The TRIA declares that

> [n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of the terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).  In other words, the TRIA "subjects the assets of state sponsors of terrorism to attachment and execution in satisfaction of judgments under § 1605(a)(7)," *In re Terrorism Litig.*, 659 F. Supp. 2d at 57, by "authoriz[ing] holders of terrorism-related judgments against Iran . . . to attach Iranian assets that the United States has *blocked*."  *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 129 S. Ct. 1732, 1735 (2009) (quotations omitted; emphasis in original).

The TRIA was designed to remedy many of the problems that previously plagued victims of state-sponsored terrorism; in practice, however, it led to very few successes.  But while the TRIA did abrogate the *First Nat'l* holding with respect to "blocked assets," *Weininger*, 462 F. Supp. 2d at 485–87, that victory proved hollow once victims discovered that, at least with respect to Iran, "very few blocked assets exist."  *In re Terrorism Litig.*, 659 F. Supp. 2d at 58.  And the barren landscape facing these FSIA plaintiffs was only further depleted by the exclusion of diplomatic properties from the TRIA's reach.  *See Bennett*, 604 F. Supp. 2d at 161 ("[The TRIA] expressly excludes 'property subject to Vienna Convention on Diplomatic relations, or that enjoys equivalent privileges and immunities under the law of the United States, being used for exclusively for diplomatic or consular purposes.'") (quoting TRIA § 201(d)(2)(B)(ii)).

Against this desolate backdrop, Congress enacted the NDAA, which added paragraph (g) to the execution section of the FSIA.  This new provision, in its entirety, declares:

> (g) Property in Certain Actions.—
>
> (1) In general.— Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) United states sovereign immunity inapplicable.— Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the [TWEA] or the [IEEPA].

(3) Third-party joint property holders.— Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

28 U.S.C. § 1610(g). Courts have had little opportunity to explore the full implications of § 1610(g), though at least one has observed that the NDAA will have a significant impact on plaintiffs' attempts to enforce FSIA judgments. *See Calderon-Cardona v. Dem. Rep. Congo*, 723 F. Supp. 2d 441, 458 (D.D.C. 2009) ("Section 1083 adds a new subsection, section 1610(g)(1), which significantly eases enforcement of judgments entered under section 1605A.").

### B. Procedural History

Having obtained judgment against defendants and properly served them with copies of that judgment as required under the FSIA, Order, May 10, 2010 [158], plaintiffs issued several

writs to a number of telecommunications companies asking, *inter alia*, whether the particular company does any business with, or is indebted to, defendants or the Telecommunications Company of Iran ("TCI").[3]  Plaintiffs targeted such companies in light of an ITR license authorizing "[a]ll transactions of common carriers incident to the receipt or transmission of telecommunications and mail between the United States and Iran."  31 C.F.R. § 560.508.  In its response, Sprint explained that it does no business with TCI, but stated:

> Consistent with the authority granted by the United States Department of Treasury, Office of Foreign Assets Control, 31 C.F.R. § 560.508, Sprint does exchange telecommunications traffic directly with the Telecommunication Infrastructure Company of Iran, which was not a defendant in the underlying action and was not identified in the plaintiffs' Writ as an 'agency' or 'instrumentality' of one or more of defendants.

> The Sprint/TIC relationship is a bilateral telecommunications carrier relationship that results in a periodic settlement and offset process to determine the net payer and payee.  So far as is known, during 2010, Sprint has been a net payer, which will result in quarterly payments to TIC.  Because telecommunications services are commoditized, the amounts of payments are directly related to the volume of calls Sprint sends to TIC in a given month for termination in Iran.  At present, Sprint owes to TIC the sum of $358,708.76 based on amounts which have been declared by the parties for the months of January, February and March, 2010. Sprint may owe TIC amounts for traffic conducted in April and May, 2010, but those amounts have not yet been determined or invoiced and thus no debt is currently due.

Answer and Defenses of Garnishee Sprint Communications Company LP ¶¶ 4–5, June 21, 2010 [165] ("Answer").  Relying on this response, plaintiffs requested that the Court traverse Sprint's Answer and order the company to turn over the funds that it owed to TIC, asserting that Sprint admitted that it owes money to an instrumentality of Iran and that § 1610(g) permits attachment of these funds.  Motion for Traverse of Answer ¶¶ 7–13, July 1, 2010 [166].  In response, Sprint

---

[3] Because a review of the history of these consolidated actions before the present motions is not necessary for resolution of the matter before the Court, this opinion recounts only the relevant post-judgment history.  For a full recap of the liability proceedings, see *Heiser I*, 466 F. Supp. 2d at 248–51.

pointed to unresolved issues of fact and sought trial on various matters, Request for Trial Setting by Garnishee Sprint Communications Company, LP, Sep. 22, 2010 [168]—a request that the Court denied soon thereafter. Order, Sep. 23, 2010 [169]. In that same Order, the Court also invited the United States to weigh in on whether plaintiffs can garnish payments from a U.S. company to an instrumentality of Iran in satisfaction of a judgment under § 1605A. *Id*.[4] Before any response was submitted by the United States, plaintiffs moved for judgment on the writ and an order directing Sprint to turn over funds owed to TIC. Motion for Judgment against Garnishee Sprint Communications Company LP and for Turnover of Funds, Feb. 8, 2011 [172].

After plaintiffs' motions were fully briefed, the Court previously denied plaintiffs' motion for traverse, finding that nothing in Sprint's Answer could satisfy plaintiffs' burden to demonstrate that the funds owed to TIC are not immune from execution—which requires proof that TIC is in fact an agency or instrumentality of Iran. Order 3–4, Mar. 31, 2011 [180]. And as for plaintiffs' motion for judgment, the Court observed that plaintiffs' submission of evidence on reply denied Sprint "a full and fair opportunity to respond," and thus deferred ruling until Sprint was given an adequate chance to counter. *Id*. at 5–6. The Court then directed Sprint to respond to plaintiffs' evidence or "seek any other relief it deems necessary." *Id*. at 6.

Sprint subsequently sought leave to both amend its Answer and interplead TIC, arguing that TIC is a necessary party to these proceedings. Motion for Leave to Amend Answer, May 2, 2011 [183] ("Leave Mtn."). At the same time, Sprint submitted a proposed complaint against TIC, Counterclaim for Interpleader, May 3, 2011 [184-1], and an amended answer in which it states that it presently owes TIC $613,587.38 and raises a number of defenses previously asserted in its original Answer and opposition to plaintiffs' motion for judgment. Answer & Defenses, June 10, 2011 [187] ("Second Answer"). Plaintiffs opposed Sprint's request for leave

---

[4] To date, the United States has declined to offer any opinion on these proceedings.

to amend and interplead TIC, Opposition to Motion for Leave, May 19, 2011 [185], and

subsequently moved again for judgment on the writ. Second Motion for Judgment of

Condemnation, July 6, 2011 [189]. For the reasons set forth below, the Court grants plaintiffs'

motion for judgment, grants in part and denies in part Sprint's request for leave, and directs

Sprint to turn over to plaintiffs the funds owed to TIC.

## III.    DISCUSSION

### A.    Plaintiffs' Entitlement to Funds Held by Sprint and Owed to TIC

Plaintiffs invoke § 1610(g) of the FSIA in their attempt to garnish funds held by Sprint

and owed to TIC.[5] This provision is designed to "clarify the circumstances under which the

property of a foreign state sponsor of terrorism is subject to attachment and execution." *Bennett*,

604 F. Supp. 2d at 162. Under § 1610(g), the property "of a foreign state" or "of an agency or

instrumentality of a foreign state" is subject to execution, even where that property "is a separate

juridical entity or is an interest held directly or indirectly in a separate juridical entity." 28

U.S.C. § 1610(g)(1).[6] This provision "expand[s] the category of foreign sovereign property that

can be attached; judgment creditors can now reach any U.S. property in which Iran has any

interest . . . whereas before they could only reach property belonging to Iran." *Peterson v.*

---

[5] Though this new provision is codified as part of the general immunity exceptions in the FSIA, the subsection only applies to "property of a foreign state against which a judgment is entered under section 1605A," 28 U.S.C. § 1610(g)(1); thus, the benefits provided accrue only to victims of state-sponsored terrorism who obtained judgments under § 1605A, and not its predecessor, § 1605(a)(7). *In re Terrorism Litig.*, 659 F. Supp. 2d at 115.

[6] The TRIA is inapplicable in this instance, as that statute applies only to "blocked assets," which it defines as "any asset seized or frozen by the United States." TRIA § 201(d)(2)(A). Here, the payments owed from Sprint to TIC are neither seized nor frozen; instead, they are made under a general license permitting payments incident to telecommunications traffic. 31 C.F.R. § 560.508. Money transferred between Sprint and TIC is thus "regulated," which is "[t]he act of controlling by rule or restriction." *Black's Law Dictionary* 1311 (8th ed. 2004). Moreover, the TRIA defines "blocked assets" by reference to OFAC regulations, *Levin v. Bank of N.Y.*, No. 09 Civ. 5900, 2011 U.S. Dist. LEXIS 23779, at *64 (S.D.N.Y. Mar. 4, 2011); *see also Hausler v. JPMorgan Chase Bank, N.A.*, No. 09-cv-10289, 2010 U.S. Dist. LEXIS 96611, at *22 (S.D.N.Y. Sep. 13, 2010) ("TRIA explicitly indicates that 'blocked assets' are to be determined in reference to the [OFAC regulations]."), which provide that a "license authorizing a transaction otherwise prohibited under this part has the effect of removing a prohibition or prohibitions." 31 C.F.R. § 535.502(c). Thus, because transactions between Sprint and TIC are undertaken under an OFAC licensing scheme, they are unblocked and not subject to attachment. *See Bank of N.Y. v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007) (holding "that assets blocked pursuant to Executive Order 12170 . . . and its accompanying regulations, *see* 31 C.F.R. Part 535, that are also subject to license of 31 C.F.R. § 535.579, are not blocked assets under the TRIA").

*Islamic Republic of Iran*, 627 F.3d 1117, 1123 n.2 (9th Cir. 2010). Sprint does not contest that

the funds it owes to TIC are potentially subject to §1610(g), but instead argues that (1) plaintiffs

have not demonstrated that TIC is an agency or instrumentality of Iran as defined by the FSIA,

(2) the amount potentially owed was frozen at the time the writ was issued, and (3) attachment of

the funds would subject Sprint to the risk of double liability in violation of the Act's plain terms.

Opposition to Motion for Judgment 4–7, Mar. 7, 2010 [176] ("Jdgmt. Opp."). The Court

discusses each of these objections in turn.

### 1. TIC is an Agency or Instrumentality of Iran

To attach the funds held by Sprint, plaintiffs need only establish that TIC is an agency or

instrumentality of Iran. 28 U.S.C. § 1610(g). Prior attempts to execute against assets held by

foreign instrumentalities had to be made under § 1610(b), which requires—in addition to proof

of an instrumentality relationship—that "the judgment relates to a claim *for which the agency or

instrumentality is not immune* by virtue" of the FSIA liability exceptions. *Id*. § 1610(b)(2)

(emphasis added). Combined with the presumption of independent status articulated by the

Supreme Court in *First Nat'l*, the practical effect of this provision is to ensure that "an agency or

instrumentality of a foreign state could not automatically be liable for the debts of its associated

foreign state." *Weininger*, 462 F. Supp. 2d at 483; *see also id*. at 482 ("[A]gencies and

instrumentalities also enjoy immunity from suit and execution unless an exception applies.").

Further complicating matters under §1610(b)(2), the Supreme Court—relying on the principle of

U.S. corporate law that "[a]n individual shareholder, by virtue of his ownership of shares, does

not own the corporation's assets and, as a result, does not own subsidiary corporations in which

the corporation holds an interest"—held that mere ownership of a foreign entities' stock does not

render assets held by that entity subject to execution under § 1610(b). *Dole Food Co. v.*

*Patrickson*, 538 U.S. 468, 474–76 (2003).  Section 1610(g) unwinds these limitations, however, by excluding any requirement that the foreign instrumentality be subject to the underlying claim and thus not otherwise immune from liability, *see generally* 28 U.S.C. § 1610(g),[7] and by expressly declaring that property held by an instrumentality is subject to execution "regardless of the level of economic control over the property by the government of the foreign state."  *Id.* § 1610(g)(1)(A).[8]  Thus, the only requirement for attachment or execution of property is evidence that the property in question is held by a foreign entity that is in fact an agency or instrumentality of the foreign state against which the Court has entered judgment.

The FSIA defines "instrumentality" as any entity that (1) is "a separate legal person, corporate or otherwise," (2) is "an organ of a foreign state" or "whose shares or other ownership interest is owned by a foreign state," and that (3) is "neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(b)(1)–(3).  To show that TIC is an instrumentality of Iran, plaintiffs submit an affidavit from Dr. Patrick Clawson,[9] who reviewed several documents concerning TIC's status.  Affidavit of Patrick L. Clawson, Ex. 1 to Reply in Support of Motion for Judgment, Mar. 28, 2011 [178-1] ("Clawson Aff.").  Dr. Clawson reviews TIC's Articles of Association, explaining that its shares are 100% government-owned and that there is "no ambiguity that TIC is under the direct control of the [Iranian] Ministry of Information and Communications Technology."  *Id.* at ¶¶ 12–13.  He also

---

[7] One exception to this expansion of available assets for execution of § 1605A judgments is the ability of FSIA plaintiffs to attach diplomatic properties.  *See Bennett*, 604 F. Supp. 2d at 162 ("[Section] 1610(g) is silent with respect to diplomatic properties; . . . even if the full scope or application of § 1610(g) is not entirely clear, a plain reading of the new enactment in no way provides a sufficient basis for stripping away the immunity long afforded to diplomatic property."); *see also id.* (noting that legislative history "strongly suggests that Congress did not intend for § 1610(g) to allow for attachment or execution of diplomatic properties").

[8] Though not at issue here, it also bears mention that § 1610(g) does not limit attachment to property used in "commercial activity"—unlike the execution provisions found in § 1610(a) & (b)—and thus the Act "removes from the victims the burden of specifying commercial targets . . . to help them receive justice and recover damages."  Strauss, *Reaching Out*, *supra* at 332–33.

[9] This Court has previously observed that Dr. Clawson is "a 'widely-renowned expert on Iranian affairs.'"  *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 68, 78 (D.D.C. 2010) (quoting *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 51 (D.D.C. 2003)).

explains that TIC was created "in accordance with Iran's constitution and with Islamic Law," and that "the decision to create TIC was taken by the government." *Id*. at ¶ 14; *see also id*. at ¶ 15 (quoting Articles of Association explaining that Iranian Cabinet approved creation of TIC). Finally, Dr. Clawson states that "Mohammad Ali Forghani, the Deputy Minister of Information and Communications Technology, was appointed the chairman of the TIC Board of Directors, which under the Articles of Association is responsible for controlling TIC." *Id*. at ¶ 17.[10]

Based on this evidence, the Court has no trouble finding that TIC is an instrumentality of Iran. First, the evidence shows that TIC is distinct from, though wholly owned by, Iran. Second, Dr. Clawson's review of TIC's Articles of Association establishes that it is an "organ" of an Iranian cabinet-level Ministry, and that Iran possesses an "ownership interest" in TIC. Finally, the testimony demonstrates that TIC is established under the laws of Iran, and not those of the United States or a third country. This is sufficient to establish that TIC is an instrumentality of Iran. *See Auster v. Ghana Airways, Ltd.*, 514 F.3d 44, 46 (D.C. Cir. 2008) (finding that Ghana Airways is instrumentality of Ghana based on evidence that it "was incorporated under the laws of Ghana and wholly owned by Ghana"); *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 273 (D.D.C. 2008) (observing "no doubt" that Japan Bank for International Cooperation is instrumentality of Japan because it "was established by Japanese statute," its capital "is wholly owned by the Japanese government" and it "is under the direct control of the Japanese Minister of Finance and the Japanese Minister of Foreign Affairs").

### 2. Total Amount Subject to the Writ

Having found that TIC is an instrumentality of Iran and thus the funds owed to it by Sprint are subject to execution under § 1610(g), the Court now turns to the total amount of money at issue. Under the FSIA, local law on attachment and execution control any dispute.

---

[10] Sprint does not contest the veracity of Dr. Clawson's affidavit. Leave Mtn. at 2.

*Levin v. Bank of N.Y.*, No. 09 Civ. 5900, 2011 U.S. Dist. LEXIS 23779, at *35–*36 (S.D.N.Y. Mar. 4, 2011). DC law specifies that funds held by third parties are subject to attachment and execution only where they are "actually due and ascertainable in amount," *Cummings Gen. Tire Co. v. Volpe Constr. Co.*, 230 A.2d 712, 714 (D.C. 1967), and no amount may be garnished that includes future payments which are contingent upon performance or are otherwise uncertain in amount. *See id*. at 713 ("[M]oney payable upon a contingency or condition is not subject to garnishment until the contingency has happened or the condition has been filled."). Thus, "[i]f the amount of the debt becomes fixed . . . only upon acceptance of performance satisfactory to the obligee, or upon the exercise of judgment, discretion, or opinion, as distinguished from mere calculation or computation, then the amount of the debt is not sufficiently certain to permit garnishment." *Spritz v. Dist. of Columbia*, 393 A.2d 68, 70 (D.C. 1978) (citations omitted).

The funds owed to TIC by Sprint result from "a bilateral telecommunications carrier relationship" that relies on "a periodic settlement and offset process to determine the net payer and payee." Second Answer ¶ 5. This is not a case, therefore, where Sprint "unconditionally owes" TIC a definite sum at the time Sprint answered plaintiffs' interrogatories. *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1356 n.34 (D.C. 1994) (citing *Cummings*, 230 A.2d at 713). Accordingly, Sprint is only required to turn over those amounts that have been officially declared by Sprint and TIC. As a general rule, the amount of money subject to garnishment is set at the time a writ is executed. DC law, however, provides that a party seeking attachment or execution may submit interrogatories to the third party holding the funds in order to ascertain any changes to the amounts owed between the time the writ is served and the time the third party files an answer to the writ. D.C. Code § 16-521(a). At the time Sprint filed its Second Answer to plaintiffs' writ and accompanying interrogatories, Sprint represented that $613,587.38 is the

sum that it owes TIC that the company and TIC have agreed upon, and that other amounts accruing after March 2011 "have not yet been determined." Second Answer ¶ 5. Because the process by which these amounts are calculated is not readily ascertainable, the Court will use this representation in Sprint's Second Answer as the final sum. D.C. Code § 16-521(a).

### 3. Double Liability

Finally, Sprint correctly notes that, as an innocent third party to the underlying action concerning the Khobar Towers bombing, it is afforded certain protections under both the FSIA and DC law. The FSIA contains the following provision: "Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment." 28 U.S.C. § 1610(g)(3). In commenting on this provision, the House Report to the 2008 Amendments explains that "[w]hile [§ 1610(g)] is written to subject any property interest in which the foreign state enjoys a beneficial ownership to attachment and execution, the provision would not supersede the court's authority to appropriately prevent impairment of interests in property held by other persons who are not liable to the claimants in connection with the terrorist act." H.R. Conf. Rep. No. 110-477, at 1001–02 (2007); *see also id.* at 1002 ("The conferees encourage the courts to protect the property interests of such innocent third parties by using their inherent authority, on a case-by-case basis, under the applicable procedures governing execution on judgment."). Thus, § 1610(g)(3) "expressly protects the rights of third parties in actions to levy or execute upon a judgment entered against Iran." *In re Terrorism Litig.*, 659 F. Supp. 2d at 122.

In invoking this provision to defend against garnishment, Sprint points to a particular bedrock principle of the law concerning post-judgment proceedings: "It ought to be and it is the

object of the courts to prevent the payment of any debt twice." *Harris v. Balk*, 198 U.S. 215, 226 (1905). The District of Columbia law on attachment and execution codifies this general principle; specifically, the relevant provision declares:

> A judgment of condemnation against a garnishee, and execution thereon, or payment by the garnishee in obedience to the judgment or an order of the court, is a sufficient defense to any action brought against him by the defendant in the action in which the attachment is issued, for or concerning the property or credits so condemned.

D.C. Code § 16-528. Under normal circumstances involving parties located in the United States, courts are generally assured that garnishees will be protected by the Full Faith and Credit Clause of the Constitution, which requires other courts to recognize liability and garnishment Orders as full defenses to subsequent litigation. Here, however, Sprint argues that Iranian courts would fail to recognize the legitimacy of plaintiffs' default FSIA judgment, and thus Sprint could be exposed to double-liability in litigation with TIC over the funds. Jdgmt. Opp. at 4–5.

The Court is unaware of any DC caselaw applying § 16-528 to litigation involving Iran or other foreign states. But in *JPMorgan Chase Bank, N.A. v. Motorola, Inc.*, the First Department of the Appellate Division in New York was confronted with a bank's attempt to satisfy a default judgment against Iridium India Telecom Ltd. ("IITL") by attaching funds owed by defendant Motorola, Inc. to IITL as a result of an unrelated lawsuit in India. 47 A.D.3d 293, 294–95 (2007). In response, Motorola argued that the proposed attachment subjected it to double-liability, as "the Indian court is unlikely to deem Motorola's liability to IITL to be reduced by any payment it makes to Chase." *Id*. at 300. The *Motorola* Court agreed, relying on a "policy to protect garnishees from double liability" under both applicable precedent, *id*. at 306 (citing *Harris*, 198 U.S. at 226), and New York law. In closing, the First Department observed that "Chase . . . will realize a 'windfall' if we sustain a garnishment that, given the demonstrated state

18

of Indian law, will force Motorola to bear the cost of Chase's inability to collect its collateral from IITL," and thus held that "[t]he avoidance of this injustice constitutes sufficient reason to exercise our power . . . to deny a garnishment, even assuming that the garnishment would otherwise be proper." *Id*. at 312.

The posture of this case is in stark contrast to that of *Motorola*, in which the third party presented "unrebutted evidence"—including a statement by an Indian law expert—that the courts in India would not recognize the validity of the default judgment, and thus would not offset the third party's liability to IITL as a result of its payment to Chase. 47 A.D.3d at 304–05; *see also id*. at 307 (finding that "the record evidence indicates that the Indian courts will not give the judgment appealed from the effect to which it is entitled under New York law"). Here, Sprint does no more than casually assert that "[i]t does not require elaborate argument or citation to conclude that this defense will be unavailing to Sprint in the event of future litigation between Sprint and TIC in an Iranian court." Jdgmt. Opp. at 4. This unsupported statement fails for several reasons. As an initial matter, unlike *Motorola*—which involved an ongoing suit already proceeding in Indian courts—here Sprint points to no proceeding in which it could be subject to liability to TIC. In a similar vein, Sprint does not explain how it could possibly be subject to the jurisdiction of any Iranian court, nor does it identify any assets that could be in jeopardy were a tribunal located in Iran to rule against it. And to the extent that TIC might pursue an action in a U.S. court against Sprint, DC law expressly protects Sprint from any future judgment. D.C. Code § 16-528 ("A judgment of condemnation against a garnishee . . . is a sufficient defense to any action brought against him . . . for or concerning the property or credits so condemned."). Absent additional evidence of a genuine risk, the Court holds that Sprint is adequately protected from any possibility of exposure to double liability, as required by § 1610(g).

## B.      Sprint's Remaining Objections

In addition to objections based on § 1610(g), Sprint advances several independent legal arguments as to why the Court should not enter judgment on the writ in favor of plaintiffs. The Court dismisses these objections for the reasons that follow.

### 1.      Request for Interpleader

The position most forcefully taken by Sprint is that it should be permitted to interplead TIC into this proceeding. In support of this request, Sprint argues that TIC is a necessary party and that its presence is required to resolve the factual question of whether it is an agency or instrumentality of Iran. Reply in Support of Motion for Leave 1–3, May 26, 2011 [186] ("Leave Reply"). The Court will deny Sprint's motion.

As an initial matter, the Court has determined that TIC is in fact an agency or instrumentality of Iran—a conclusion that Sprint does not contest[11]—and the FSIA does not require any provision of special notice to TIC. Specifically, the FSIA requires *only* that a copy of any default judgment be served on defendants, 28 U.S.C. § 1608(e)—a task which has already been accomplished—and does not demand service of additional post-judgment motions. *Peterson*, 627 F.3d at 1129–30 & n.5.[12] Moreover, even if notice requirements found in the FSIA could be read to require service of post-judgment motions, the provisions concerning notice apply only to attachment and execution under §§ 1610(a) & (b) and say nothing about § 1610(g). *See* 28 U.S.C. § 1610(c) ("No attachment or execution referred to in subsections (a) and (b) of this section . . . ."). The explicit exclusion of attachments and executions under §

---

[11] TIC does object that Dr. Clawson's affidavit is hearsay. Leave Reply at 3 n.1. However, Dr. Clawson's own affidavit verifies the authenticity of the Articles of Association and their consistency with standard legal documents in Iran, and thus this public record may be relied upon. *United States v. Ragano*, 530 F.2d 1191, 1200 (5th Cir. 1975); *see also* Fed. R. Evid. 807.

[12] Sprint attempts to create a conflict on this issue by citing *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737 (7th Cir. 2007). That case, however, involved post-judgment *contempt* motions and expressly relied on local and federal rules mandating service of such motions. *Id*. at 747.

1610(g) from the notice requirement is further evidence that Congress did not intent to require service of garnishment writs on agencies or instrumentalities of foreign states responsible for acts of state-sponsored terrorism under § 1605A—a conclusion in keeping with the underlying justifications for the 2008 Amendments. *See In re Terrorism Litig.*, 659 F. Supp. 2d at 64 (explaining "broad remedial purposes Congress sought to achieve through the enactment of the [NDAA]"). Accordingly, TIC is not a necessary party to this action under applicable law.[13]

Moreover, there is no need for interpleader in this action. "[A] prerequisite for interpleader is that the party requesting interpleader demonstrate that he has been or may be subjected to adverse claims." *Hollister v. Soetoro*, 258 F.R.D. 1, 3 (D.D.C. 2009). As set forth above, Sprint has not sufficiently established *any* risk of being subjected to double liability over the funds it currently holds. *Supra*. "[I]nterpleader requires real claims, or at least the threat of real claims—not theoretical, polemical, speculative, or I'm-afraid-it-might-happen-someday claims." *Id.* This requirement is not satisfied in this instance.

Nor does DC law provide for interpleader in garnishment proceedings—in contrast to other jurisdictions. *See, e.g.* Miss. Code Ann. § 11-35-41 (2011). Instead, DC law permits any person with a claim to property subject to attachment to appear and demand a trial of any issues necessary to determine the appropriate action with respect to the property in question. D.C. Code § 16-554. According to Sprint, amounts due to TIC have been accruing and held by the company since January 2010. Second Answer ¶ 5 n.1. TIC is surely on notice of the hold-up, and if it wishes to challenge the garnishment of funds owed to it by Sprint, DC law provides a clear mechanism for it to register any objection. The Court sees no reason to aid TIC by prolonging this dispute in response to TIC's silence.

---

[13] Sprint's reliance on *Butler v. Polk* to argue that this procedure is a new action requiring service under the FSIA, Leave Reply at 3, is misplaced, as the *Butler* court evaluated whether a *separate* enforcement action is *removable*, 592 F.2d 1293, 1295–96 (5th Cir. 1979), and did not address any of the questions before this Court.

Finally, this action has been proceeding for more than a decade, and yet in all this time Iran has not appeared to account for its role in the horrific bombing of the Khobar Towers residential complex. This choice was made despite both exposure to more than $500 million in damages and evidence that Iran is perfectly capable of appearing when it wishes. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, No. 03 Civ. 9370, 2008 U.S. Dist. LEXIS 4651, at *1–*2 (Jan. 18, 2008). Though Sprint correctly points out that the excessive delay in these proceedings is not the company's fault, it is equally true that the funds to be turned over in this matter are not the company's proceeds. And to the extent interpleader might minimize any risk Sprint may face after the close of these proceedings, that risk came into existence at the precise moment the company decided to engage in commercial transactions with an instrumentality of Iran—OFAC license or not. In this instance, Congress has announced a broad new policy to aid terrorist victims, and has passed a law that permits those victims to seize funds headed for any agency or instrumentality of Iran. The Court will not stand as a roadblock on the path to justice by imposing new requirements or permitting supplementary procedures that Congress itself did not deem necessary. As an action in equity, acceptance of an interpleader action is not mandatory, and may be denied for equitable reasons. *Star Ins. Co. v. Cedar Valley Express, LLC*, 273 F. Supp. 2d 38, 41–42 (D.D.C. 2002). In this instance, given the heinous nature of the attack on Khobar Towers, Iran's deliberate choice not to participate in these proceedings despite repeated notice, s*ee In re Terrorism Litig.*, 659 F. Supp. 2d 31, 85 (observing that "the notion" that Iran might appear "is almost laughable because that nation has never appeared in any of the terrorism actions that have been litigated against it in this Court"), and the extensive delay in justice for victims of state-sponsored terrorism, the Court sees no reason to postpone action. Accordingly, Sprint's request for interpleader will be denied.

## 2. Preemption by OFAC Regulations

The Court now turns to whether the OFAC license that permits Sprint's exchange of telecommunications traffic with TIC preempts enforcement of plaintiffs' judgment. Sprint argues that application of the FSIA and the District of Columbia's enforcement provisions is preempted by the existence of a regulatory regime maintained by OFAC which "implement[s] the foreign policy judgments of the Executive Branch." Jdgmt. Opp. at 3–4. In support of this position, Sprint argues that were the Court to permit execution, "the general license set forth in 31 C.F.R. § 560.508 is rendered a nullity." *Id.* at 3. The Court disagrees.

As an initial matter, the Court rejects any assertion that today's holding could render the general license provided by OFAC a "nullity." The purpose of the general license found in § 560.508 is to permit U.S. companies—such as Sprint—to conduct telecommunications business without being barred by the general prohibitions of the ITR, and nothing in either the OFAC regulations or the letter from OFAC to Sprint, submitted in support of Sprint's opposition, indicates that § 560.508 is designed to have any other effect. Moreover, permitting execution of Sprint's indebtedness to TIC in satisfaction of a valid § 1605A judgment in no way undermines the license, as Sprint remains authorized to exchange telecommunications traffic with TIC or any other Iranian entity under the OFAC regulations.[14]

---

[14] Sprint cites *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272 (S.D. Fla. 2008), but that case is of little help. In *ABC Charters*, the district court was evaluating whether recent amendments to the Florida Sellers of Travel Act were void under the doctrine of conflict preemption. *See generally id.* at 1301–03. In holding that those amendments were preempted, the court observed that federal law "already places restrictions on sellers of travel, including regulations as to who can travel to Cuba, when they can travel, how often they can travel, who can arrange travel to Cuba, and how those transportation arrangements are to be made." *Id.* at 1302–03. The Florida law, the court explained, "seeks to regulate all of these matters," and held that to "place additional restrictions on these sellers of travel, which would regulate the exact same conduct, would create inherent conflicts." *Id.* at 1303. Here, by contrast, *Congress* expressly authorized the use of local procedures for attachment and execution in satisfaction of FSIA judgments—awards entered under a *federal act*—and it did so while well-aware of OFAC's existing licensing scheme. Under these circumstances, the Court does not find that the general provisions of DC law concerning post-judgment procedures present an irreconcilable conflict with federal regulations concerning exchanges of telecommunications traffic with Iranian entities.

Having dismissed Sprint's attempt to construct mountains from molehills, the Court turns to the question of preemption. "[I]n every preemption case, 'the purpose of Congress is the ultimate touchstone.'" *Geier v. Am. Honda Motor Co.*, 166 F.3d 1236, 1237 (D.C. Cir. 1999) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). The matter before the Court, however, is not a typical preemption case. While it is true that DC law provides the process by which plaintiffs may enforce their judgment, the substantive basis for their right to execution is not found in DC law, but in § 1610(g) of the FSIA—a federal statute. Thus, the fundamental question at the heart of Sprint's argument is whether the scope of § 1610(g) is limited by OFAC regulations. The Court rejects this proposition, for three reasons.

First, nothing in the text of the FSIA supports Sprint's position. Congress passed the 2008 Amendments—including § 1610(g)—well-aware of the complex regime of Executive Orders, regulations and statutes which permitted—and, unfortunately, more often prevented— FSIA plaintiffs from enforcing judgments under the Act. *See Ark. Dairy Coop. Ass'n v. Dep't of Agriculture*, 573 F.3d 815, 829 (D.C. Cir. 2009) ("Courts 'generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.'") (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988)). Yet, in crafting the broad remedial language of § 1610(g), Congress made no exceptions to its reach, despite the fact that the plain language of the Act undeniably reaches transactions otherwise authorized by OFAC regulations. This omission is telling, particularly where Congress has demonstrated its ability to exempt particular property from execution by—for example—explicitly exempting diplomatic property from the reach of the TRIA. TRIA § 210(b)(2)(A).

Second, the language of the OFAC regulations does not give any hint of any intended preemptive effect. The specific provision allowing Sprint to exchange telecommunications

traffic with TIC reads, in its entirety: "All transactions of common carriers incident to the receipt or transmission of telecommunications and mail between the United States and Iran are authorized." 31 C.F.R. § 560.508. Nothing in this regulatory provision indicates that it somehow immunizes the activity undertaken under the "general license" from all other statutes—including from execution of legitimate judgments. Indeed, OFAC's letter to Sprint suggests precisely the opposite. In that letter, OFAC explains that payments to TIC are authorized by § 560.508, but then goes on to express the caveat that payments to certain Iranian banks are prohibited by other federal laws, and thus may not be made *regardless* of the general license. Ltr. from OFAC to Sprint, dated Jan. 13, 2009 at 1–2, attached as Ex. 1 to Sprint Opp., Mar. 7, 2011 [176-1]. The fact that certain federal laws can override the legitimacy of payments made in connection with transactions authorized by § 560.508 undermines any notion that this provision has the immunizing quality urged by Sprint.

Finally, mindful of the central role that Congressional intent plays in preemption analysis, the Court cannot ignore that a core purpose of the NDAA is to significantly expand the number of assets available for attachment in satisfaction of terrorism-related judgments under the FSIA. As already set forth above, the language of § 1610(g) is broad and without reservation; indeed, this Court has explored the "broad remedial purposes" of the NDAA, explaining that § 1610(g) "demonstrate[s] that Congress remains focused on eliminating these barriers that have made it nearly impossible for plaintiffs in these actions to enforce civil judgments against Iran or other state-sponsors of terrorism." *In re Terrorism Litig.*, 659 F. Supp. 2d at 62–64. In light of these strong remedial purposes, the Court will not now read a significant exception into § 1610(g) that is not otherwise found in the text and that would severely undercut the unmistakable goals of Congress.

### 3. Necessity of a Regulatory License

Finally, Sprint argues that plaintiffs must obtain a specific license to garnish funds held by the company and owed to TIC. Jdgmt. Opp. at 8. In support of this position, Sprint cites an OFAC regulation declaring that

> [e]xcept as otherwise authorized, specific licenses may be issued on a case-by-case basis to authorize transactions in connection with award, decisions or orders of the Iran-United States Claims Tribunal in The Hague, the International Court of Justice, or other international tribunals (collectively 'tribunals'); agreements settling claims brought before tribunals; and awards, orders, or decisions of an administrative, judicial or arbitral proceeding in the United States or abroad, where the proceeding involves the enforcement of awards, decisions or orders of tribunals, or is contemplated under an international agreement, or involves claims arising before 12:01 a.m. EDT, May 7, 1995, that resolve disputes between the government of Iran and the United States or United States nationals.

31 C.F.R. § 560.510. The plain language of this provision refutes Sprint's position. By its own terms, § 560.510 applies only to transactions concerning (1) awards of international tribunals, (2) settlements of disputes in international tribunals, and (3) awards of U.S. courts in connection with either enforcement of awards of international tribunals or claims arising *before* May 7, 1995. *See generally id*. The underlying action in these proceedings does not involve the ruling of any international tribunal as envisioned in this regulatory provision, and thus § 560.510 is applicable *only* if this action involved claims "arising before 12:01 a.m. EDT, May 7, 1995." *Id*. The Khobar Towers bombing occurred more than a year after this date, *supra*, however, and even if it had not, the "claim" in this proceeding is the right to funds held by Sprint, which arose only two years ago when the Court entered judgment on behalf of plaintiffs. *Ministry of Def. & Support for the Armed Forces v. Cubic Def. Sys.*, 385 F.3d 1206, 1224 (9th Cir. 2004), *rev'd on other grounds*, 546 U.S. 450 (2006). Moreover, as the Eleventh Circuit has explained, the primary purpose of this provision is to regulate any judgment leading to the transfer of funds or

assets from the United States to Iran, *See Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d

355, 362–63 (11th Cir. 1984) (observing that license under §560.510 must be secured where U.S.

citizen seeks to "transfer[] assets out of this country" to Iran)—which is obviously not the case

here. The Court therefore holds that no OFAC license is necessary under relevant regulations.[15]

## IV.  CONCLUSION

The Court would like to conclude by noting that this decision represents renewed hope

for long-suffering victims of state-sponsored terrorism. Would *like to*. But the bleak reality is

that today's decision comes after more than a year of litigation and results in a turnover of funds

amounting to less than one-tenth of one-percent of what plaintiffs are entitled to in these

consolidated cases. And this infinitesimal sum is dwarfed by even greater magnitudes when

compared to the endless agony and suffering befalling these victims. A step in the right

direction, to be sure. But a very small one.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on August 10, 2011.

---

[15] Sprint also points the Court to a statement of interest by the government in a case in which a plaintiff was attempting to garnish payments owned by several private charter companies to instrumentalities of the Cuban government in satisfaction of a FSIA judgment. In that instance, the government took the position that "garnishment is one among many forms of transfer subject to the licensing requirements under the [Cuban Asset Control Regulations]." U.S. Statement of Interest in *Martinez v. ABC Charters, Inc., et al.*, No. 10 Civ. 20611 at 13–14, Ex. 2 to Opp. to Mtn. for Jdgmt., Mar. 7, 2011 [176-2]. In doing so, however, the government relied on two provisions of the relevant regulations: the first bars any transfer of assets between the United States and Cuba without a license, 31 C.F.R. § 515.201, and the second defines transfers to expressly include all garnishments. *Id.* § 515.310. By contrast, the ITR—under which Sprint exchanges telecommunications traffic with TIC—does not include *any* discussion of garnishments.